DISCLOSURE STATEMENT AND SOLICITATION OF ACCEPTANCES OF A
PREPACKAGED CHAPTER 11 PLAN OF REORGANIZATION

## Zais Investment Grade Limited VII

> **THE SOLICITATION OF ACCEPTANCES OF THE ORIGINAL PREPACKAGED PLAN OF REORGANIZATION WILL EXPIRE AT 5:00 p.m. PREVAILING EASTERN TIME, ON APRIL 15, 2011, UNLESS EXTENDED BY THE PLAN PROPONENTS (AS DEFINED HEREIN) (SUCH DATE AND TIME, AS THE SAME MAY BE EXTENDED, THE "VOTING DEADLINE"). HOLDERS OF CLAIMS (AS DEFINED HEREIN) SHOULD REFER TO SECTION II BELOW AND THE BALLOT (AS DEFINED BELOW) FOR INSTRUCTIONS ON HOW TO VOTE ON THE PLAN.**

GRF Master Fund, L.P., Anchorage Illiquid Opportunities Offshore Master, L.P. and Anchorage Capital Master Offshore, Ltd. (collectively, the "Plan Proponents"), hereby propose the Original Prepackaged Chapter 11 Plan of Reorganization (as many be supplemented and amended from time to time, the "Plan") for the outstanding indebtedness of Zais Investment Grade Limited VII ("Zing VII" or as debtor and debtor in possession, the "Debtor") as set forth in this disclosure statement and solicitation of acceptances of the Plan (as it may be supplemented and amended from time to time, collectively the "Disclosure Statement") and the related ballot ("Ballot") for accepting or rejecting the Plan. The indicative terms of the Plan are set forth below in this Disclosure Statement.

Dated:  March 15, 2011

Plan Proponents:

ANCHORAGE CAPITAL
MASTER OFFSHORE, LTD.
By:  Anchorage Capital Group, L.L.C.
     its Investment Manager

By:  _____
Name:     KEVIN ULRICH
Title:     Chief Executive Officer


ANCHORAGE ILLIQUID OPPORTUNITIES
OFFSHORE MASTER, L.P.
By:  Anchorage Capital Group, L.L.C.
    its Investment Manager

By:  _____

Name: ———
Title: _____

KEVIN ULRICH
Chief Executive Officer

GRF MASTER FUND, L.P.
By: Anchorage Capital Group, L.L.C.
    its Investment Manager

By: _____
Name: _____
Title: _____

KEVIN ULRICH
Chief Executive Officer

2

## TABLE OF CONTENTS

**Page**

I.      INTRODUCTION ........................................................................................1

II.     NOTICE TO HOLDERS OF CLAIMS ENTITLED TO VOTE..........................................2

      A.      Voting Procedures and Ballots...........................................4
      B.      Voting Deadline...............................................................5
      C.      Voting Record Date ..........................................................5
      D.      Solicitation Agent and Voting ...........................................5
      E.      Voting Nominee...............................................................6

1.      Pre-Validated Ballot....................................................................6

2.      Master Ballots ............................................................................7

      F.      Miscellaneous .................................................................7

III.    OVERVIEW OF THE PLAN ........................................................................8

IV.     GENERAL INFORMATION ......................................................................11

      A.      Overview of the Debtor ...................................................11
      B.      Assets of the Debtor .......................................................11
      C.      Description of Indebtedness..............................................12
      D.      Description of Old Equity Interests ....................................13
      E.      The Board of Directors ....................................................13
      F.      Legal Proceedings...........................................................13
      G.      Overview of Parties Related to the Debtor's Business and Indebtedness ...........13

1.      The Administrator .....................................................................13

2.      The Collateral Manager ..............................................................13

3.      Hedge and Cashflow Swap Counterparties........................................14

4.      The Trustee ..............................................................................14

      H.      Acceleration of the Notes and the Need for Restructuring ....................14
      I.      Information Regarding the Plan Proponents ........................15

V.      VALUATION AND LIQUIDATION ANALYSIS .....................................................15

VI.     THE CHAPTER 11 PLAN ........................................................................16

      A.      Introduction...................................................................16
      B.      General Description of the Treatment of Claims and Old Equity Interests..........16

1.      Unclassified Claims ...................................................................16

            a.      Administrative Claims ...........................................16
            b.      Tax Claims ........................................................18

2.      Classification and Treatment of Claims and Old Equity Interests...................18

            a.      Class 1 – Senior Indenture Administrative Expense Claims .........18

|  |  | i. | Description | 18 |
|  |  | ii. | Treatment | 19 |
|  |  | iii. | Time for Filing Indenture Administrative Expense Claims | 19 |
|  | b. | Class 2 – Indenture Priority Claims | | 20 |
|  |  | i. | Description | 20 |
|  |  | ii. | Treatment | 20 |
|  |  | iii. | Time for Filing Indenture Priority Claims | 20 |
|  | c. | Class 3 – Senior Note Claims | | 20 |
|  | d. | Class 4 through Class 7 – Junior Note Claims | | 20 |
|  | e. | Class 8 – Subordinated Claims | | 20 |
|  |  | i. | Description | 20 |
|  |  | ii. | Treatment | 21 |
|  | f. | Class 9 – Income Note Claims | | 21 |
|  | g. | Class 10 – General Unsecured Claims | | 21 |
|  | h. | Class 11 – Old Equity Interests | | 21 |
| C. | Means for Implementing the Plan | | | 21 |

1. Basic Structure of the Plan and the Rationale Therefore ............... 21

2. Implementation of the Plan on or Prior to the Effective Date .............. 22

3. Initial Investment Manager and General Partner .............. 22

4. Post-Effective Date Corporate Governance .............. 24

5. Dissolution of the Debtor .............. 24

6. Debtor-in-Possession Financing, If Any .............. 24

7. Exit Facility .............. 25

8. Corporate Action .............. 25

9. Causes of Action .............. 25

10. Investment of Funds Held by the Plan Administrator .............. 26

D. Disbursement Provisions .............. 26

1. Plan Distributions .............. 26

2. Timing of Plan Distributions .............. 26

3. Address for Delivery of Plan Distributions/Unclaimed Plan Distributions .............. 26

4. Time Bar to Cash Payments .............. 27

5. Manner of Payment under the Plan .............. 27

6. Denomination of Foreign Currency .............. 27

7. Fractional Plan Distributions .............. 27

8. Termination of Indenture, Notes, Certificates and Instruments and Continued Transferability of the Senior Notes .............. 28

E. Conditions Precedent to the Effective Date .............. 28

iv

F.      Waiver of Conditions.................................................................................29
G.      Effect of Non-Occurrence of the Effective Date .................................................29
H.      Effect of the Occurrence of the Effective Date...................................................29

1.      Discharge of the Debtor ...........................................................................29

2.      Indemnification Obligation ........................................................................29

3.      Releases by the Debtor.............................................................................30

4.      Exculpation .........................................................................................30

5.      Injunctions..........................................................................................30

I.      Procedures for Resolving and Treating Contested Claims ...................................31

1.      Objection Deadline .................................................................................31

2.      Prosecution of Contested Claims ................................................................32

3.      Claims Settlement ..................................................................................32

4.      Entitlement to Plan Distributions upon Allowance ..........................................32

5.      Estimation of Claims...............................................................................32

J.      The Plan Administrator............................................................................32

1.      Powers and Duties..................................................................................32

2.      Fees and Expenses of the Plan Administrator.................................................33

3.      Exculpation of the Plan Administrator .........................................................33

K.      Treatment of Executory Contracts and Unexpired Leases ...................................33

1.      Assumption and Rejection of Executory Contracts and Unexpired Leases ....................33

2.      Cure.................................................................................................35

3.      Claims Arising from Rejected Contracts .......................................................35

L.      Retention of Jurisdiction.........................................................................35
M.      Other Material Provisions of the Plan..........................................................36

1.      Substantial Consummation .......................................................................36

2.      Payment of Statutory Fees........................................................................36

3.      Notices ..............................................................................................36

4.      Headings ............................................................................................36

5.      Governing Law .....................................................................................36

6.      Expedited Determination ..........................................................................37

7.      Exemption from Transfer Taxes ..................................................................37

8.      Notice of Entry of Confirmation Order and Relevant Dates ...............................37

9.      Modification of the Plan ...........................................................................37

v

10.    Revocation of Plan ................................................................................................37

11.    Setoff Rights ..........................................................................................................37

12.    Compliance with Tax Requirements.......................................................................38

13.    Dissolution of the Creditors' Committee (If Any)..................................................38

14.    Binding Effect ........................................................................................................38

15.    Conflict between Plan, Disclosure Statement and Plan Documents........................38

16.    Severability ............................................................................................................38

17.    No Admissions ........................................................................................................39

VII.    CERTAIN FEDERAL AND STATE SECURITIES LAWS CONSIDERATIONS ........39

VIII.    CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES....................................40

A.    U.S. Federal Income Tax Consequences to the Debtor ...........................................42
B.    U.S. Federal Income Tax Consequences to Class 1 – Senior Indenture
        Administrative Expense Claims and Class 2 – Indenture Priority Claims ............42
C.    U.S. Federal Income Tax Consequences to Class 3 – Senior Note Claims ...........42

1.    Potential Characterizations of the Plan With Respect to Class 3 –Senior Note
        Claims ....................................................................................................................43

a.    No Deemed Exchange on the Effective Date ...............................43
b.    Deemed Exchange on the Effective Date for Equity ....................43
c.    Deemed Exchange on the Effective Date for Debt.......................45

2.    Characterizations – In General..............................................................................46

D.    U.S. Federal Income Tax Consequences to Class 4 Claims through Class 11
        Claims ....................................................................................................................46
E.    U.S. Federal Income Tax Consequences to Certain Non-U.S. Holders ...............47
F.    Information Reporting and Backup Withholding ....................................................47
G.    Importance of Obtaining Professional Tax Assistance ..........................................47

IX.    CERTAIN ERISA AND OTHER CONSIDERATIONS .................................................48

X.    RISK FACTORS ..............................................................................................................50

A.    General Considerations............................................................................................50
B.    Certain Bankruptcy Considerations .......................................................................50
C.    Methods of Solicitation............................................................................................51
D.    Classification and Treatment of Claims and Equity Interests.................................52
E.    Claims Estimations .................................................................................................52
F.    Limited Liquidity ....................................................................................................53
G.    Management of NewCo ...........................................................................................53
H.    Risks Arising from Liquidation Activities...............................................................53
I.    ERISA Considerations.............................................................................................53

XI.    CONFIRMATION AND CONSUMMATION PROCEDURES ......................................54

A.    Overview..................................................................................................................54

NEWYORK 7964400 (2K)

B.      Confirmation of the Plan ........................................................................55

1.      Elements of Section 1129 of the Bankruptcy Code ...........................................55

2.      Acceptance .............................................................................................................56

3.      Best Interests of Creditors Test ...........................................................................57

4.      Feasibility ..............................................................................................................58

C.      Cramdown ....................................................................................................58

1.      No Unfair Discrimination .....................................................................................58

2.      Fair and Equitable Test .........................................................................................58

D.      Effect of Confirmation ...............................................................................59

XII.    CONCLUSION ..............................................................................................60

NEWYORK 7964400 (2K)

EXHIBITS

SAMPLE BALLOT  (DO NOT USE)...........................................................................EXHIBIT A

ORIGINAL PREPACKAGED CHAPTER 11 PLAN .................................................EXHIBIT B

VALUATION ANALYSIS AND LIQUIDATION ANALYSIS................................EXHIBIT C

EXIT FACILITY SUMMARY OF TERMS ...............................................................EXHIBIT D

FORM ADV FOR ANCHORAGE CAPITAL GROUP, L.L.C..................................EXHIBIT E

NEWYORK 7964400 (2K)

# I.

# INTRODUCTION

**All capitalized terms used in this Disclosure Statement and not otherwise defined herein shall have the meanings ascribed thereto in the Plan (see Exhibit A to the Plan entitled "Definitions").**

This Disclosure Statement and the exhibits hereto, the Ballot and the related material are being provided in connection with the Plan Proponents' solicitation to obtain acceptances of the Plan. The Plan Proponents anticipate filing involuntary petitions for the Debtor under Chapter 11 of the Bankruptcy Code. The Plan Proponents are engaged in negotiations with the Debtor seeking, among other things, the Debtor's consent to the termination of the Debtor's exclusive right ("Exclusivity") pursuant to section 1121 of the Bankruptcy Code to file a plan of reorganization during the 120 days after the date the Bankruptcy Court enters an order for relief. In the event the Debtor does not agree to waive Exclusivity, the Plan Proponents anticipate seeking the Bankruptcy Court's approval to terminate Exclusivity. Upon the termination of Exclusivity, the Plan and this Disclosure Statement will be submitted to the Bankruptcy Court for approval.

The Debtor is a collateralized-debt obligation issuer, which has issued certain tranches of notes secured by the Debtor's Assets (the "Notes"). As a result of deteriorating markets (especially in the U.S. residential housing market) and the failure of the assumptions underlying the mathematical model used to structure and rate the Debtor's Notes, such Notes are severely under-collateralized. The Notes are in default and were accelerated pursuant to the Indenture on June 9, 2009. Projections prepared by Houlihan Lokey indicate that only the Senior Notes, subject to a haircut and risk of future non-performance of the Debtor's Assets, will receive distributions from the Debtor's Assets and that all Claims junior to the Senior Notes and all Old Equity Interests will receive no distributions. Notwithstanding the default, the Indenture does not permit for the liquidation of the Debtor's Assets to satisfy the Debtor's obligations, including the Senior Notes, absent consent of the holders of Junior Notes, which consent the Plan Proponents believe is not obtainable under the current circumstances. The Plan Proponents believe that Senior Noteholders will receive a greater (in present value terms) and more certain recovery if the Debtor's Assets can be liquidated opportunistically as compared to what the Senior Noteholders will receive if the Debtor's Assets are held and distributions are made pursuant to the Indenture. In contrast, the Plan Proponents believe that recoveries to Senior Noteholders remain at substantial risk given the potential for future non-performance of the Debtor's Assets. Accordingly, the Plan Proponents seek to confirm the Plan to permit for the opportunistic liquidation of the Debtor's Assets for the benefit of Senior Noteholders.

The Plan is premised upon the formation of a new investment vehicle holding, managing and eventually monetizing substantially all of the Debtor's Assets. The Plan adheres to the contractual payment waterfall and subordination provisions of the Indenture and provides for the payment in full of all Claims senior to the Senior Notes Claims and a pro rata distribution to the Senior Noteholders of the remaining net Cash proceeds from the liquidation of the Designated Assets. All Old Equity Interests and Claims junior to the Senior Note Claims will receive no distribution under the Plan.

**ZING VII HAS NOT FILED FOR RELIEF UNDER CHAPTER 11 OF THE BANKRUPTCY CODE NOR HAVE THE PLAN PROPONENTS YET FILED AN INVOLUNTARY PETITION FOR ZING VII SEEKING SUCH RELIEF. ACCORDINGLY, THIS DISCLOSURE STATEMENT HAS NOT YET BEEN FILED WITH OR APPROVED BY THE BANKRUPTCY COURT, THE SECURITIES AND EXCHANGE COMMISSION (THE "SEC") OR ANY OTHER GOVERNMENTAL OR REGULATORY AGENCY.  THIS DISCLOSURE STATEMENT WILL BE SUBMITTED TO THE BANKRUPTCY COURT FOR APPROVAL <u>ONLY IF</u> THE PLAN PROPONENTS FILE AN INVOLUNTARY PETITION FOR THE DEBTOR AND THE BANKRUPTCY COURT TERMINATES EXCLUSIVITY.  THE PLAN PROPONENTS RESERVE THE RIGHT TO NOT FILE INVOLUNTARY PETITIONS OR TO NOT SEEK CONFIRMATION OF THE PLAN AND RESERVE ALL RIGHTS TO PURSUE ANY AND ALL OTHER RIGHTS AND REMEDIES.  NOTHING CONTAINED HEREIN SHALL BE CONSTRUED AS A COMMITMENT BY THE PLAN PROPONENTS TO TAKE OR REFRAIN FROM TAKING ANY ACTION.**

**THIS DISCLOSURE STATEMENT DESCRIBES THE PLAN.  PURSUANT TO THE PLAN, CLASS 1 – SENIOR INDENTURE ADMINISTRATIVE EXPENSE CLAIMS AND CLASS 2 – INDENTURE PRIORITY CLAIMS ARE UNIMPAIRED AND ARE THEREFORE DEEMED TO HAVE ACCEPTED THE PLAN.  CLASS 4 THROUGH CLASS 11, WHICH INCLUDE ALL JUNIOR NOTE CLAIMS, SUBORDINATED CLAIMS, INCOME NOTE CLAIMS, GENERAL UNSECURED CLAIMS AND OLD EQUITY INTERESTS, ARE NOT ENTITLED TO DISTRIBUTIONS UNDER THE PLAN AND ARE THEREFORE DEEMED TO HAVE REJECTED THE PLAN.  ACCORDINGLY, THE PLAN PROPONENTS ARE ONLY SOLICITING ACCEPTANCES OF THE PLAN FROM THE HOLDERS OF CLASS 3 – SENIOR NOTE CLAIMS.**

**THE PLAN PROPONENTS BELIEVE THAT THE PLAN IS IN THE BEST INTEREST OF AND PROVIDES THE HIGHEST AND MOST EXPEDITIOUS RECOVERIES TO THE HOLDERS OF CLASS 3 – SENIOR NOTE CLAIMS.  ALL HOLDERS OF CLASS 3 – SENIOR NOTE CLAIMS ARE URGED TO VOTE TO ACCEPT THE PLAN.**

**II.**

**NOTICE TO HOLDERS OF CLAIMS ENTITLED TO VOTE**

The purpose of this Disclosure Statement is to enable you, as a creditor whose Claim is impaired under the Plan, to make an informed decision in exercising your right to accept or reject the Plan.

**THIS DISCLOSURE STATEMENT CONTAINS IMPORTANT INFORMATION THAT MAY BEAR UPON YOUR DECISION TO ACCEPT OR REJECT THE PLAN. PLEASE READ THIS DOCUMENT WITH CARE.**

2

**ALL INFORMATION UPON WHICH THE PLAN IS PREMISED AND ALL INFORMATION CONTAINED IN THE DISCLOSURE STATEMENT IS BASED UPON PUBLIC INFORMATION.  THE PLAN PROPONENTS DO NOT WARRANT THE ACCURACY OF ANY SUCH INFORMATION.  PLAN SUMMARIES AND STATEMENTS MADE IN THIS DISCLOSURE STATEMENT ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE PLAN AND THE EXHIBITS ANNEXED TO THE PLAN AND THIS DISCLOSURE STATEMENT.  IN THE EVENT OF ANY CONFLICT BETWEEN THE DESCRIPTIONS SET FORTH IN THIS DISCLOSURE STATEMENT AND THE TERMS OF THE PLAN, THE TERMS OF THE PLAN SHALL GOVERN.**

**THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE ONLY AS OF THE DATE HEREOF, UNLESS OTHERWISE SPECIFIED HEREIN, AND THERE CAN BE NO ASSURANCE THAT THE STATEMENTS CONTAINED HEREIN WILL BE CORRECT AT ANY TIME AFTER THE DATE HEREOF.  DELIVERY OF THIS DISCLOSURE STATEMENT AFTER THE DATE HEREOF DOES NOT IMPLY THAT THERE HAS BEEN NO CHANGE IN INFORMATION SET FORTH HEREIN SINCE THAT DATE.  THE PLAN PROPONENTS HAVE NO DUTY TO, AND EXPRESSLY DISCLAIM ANY OBLIGATION TO, UPDATE OR ALTER ANY FORWARD-LOOKING STATEMENTS WHETHER AS A RESULT OF NEW INFORMATION, FUTURE EVENTS OR OTHERWISE, UNLESS OTHERWISE ORDERED TO DO SO BY THE BANKRUPTCY COURT.**

**THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE, BANKRUPTCY RULE 3016(b) AND APPLICABLE NON-BANKRUPTCY LAW.  THIS DISCLOSURE STATEMENT HAS NEITHER BEEN APPROVED NOR DISAPPROVED BY THE SEC, NOR HAS THE SEC PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED HEREIN.  PERSONS OR ENTITIES TRADING IN OR OTHERWISE PURCHASING, SELLING OR TRANSFERRING CLAIMS OF THE DEBTOR SHOULD EVALUATE THIS DISCLOSURE STATEMENT AND THE PLAN IN LIGHT OF THE PURPOSE FOR WHICH THEY WERE PREPARED.**

**CERTAIN STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT, INCLUDING PROJECTED FINANCIAL INFORMATION, VALUATION, ILLUSTRATIVE CREDITOR RECOVERIES AND OTHER FORWARD-LOOKING STATEMENTS, ARE BASED, AT LEAST IN PART, ON ESTIMATES AND ASSUMPTIONS.  THERE CAN BE NO ASSURANCE THAT SUCH STATEMENTS WILL BE REFLECTIVE OF ACTUAL OUTCOMES.  MOREOVER, THE PLAN PROPONENTS RESERVE ALL OF THEIR RESPECTIVE RIGHTS TO ASSERT THAT THE VALUATION AND ALLOCATION OF VALUE MAY BE DIFFERENT.  FORWARD-LOOKING STATEMENTS ARE PROVIDED IN OR ADOPTED BY THIS DISCLOSURE STATEMENT PURSUANT TO THE SAFE HARBOR PROVIDED UNDER THE PRIVATE SECURITIES LITIGATION REFORM ACT OF 1995 AND SHOULD BE EVALUATED IN THE CONTEXT OF THE ESTIMATES, ASSUMPTIONS, UNCERTAINTIES AND RISKS DESCRIBED HEREIN.**

NEWYORK 7964400 (2K)

FURTHER, READERS ARE CAUTIONED THAT ANY FORWARD-LOOKING STATEMENTS HEREIN ARE BASED ON ASSUMPTIONS THAT ARE BELIEVED TO BE REASONABLE, BUT ARE SUBJECT TO A WIDE RANGE OF RISKS INCLUDING, BUT NOT LIMITED TO, RISKS ASSOCIATED WITH (I) FUTURE FINANCIAL RESULTS AND LIQUIDITY, (II) VARIOUS FACTORS THAT MAY AFFECT THE VALUE OF THE NEW LP INTEREST TO BE ISSUED UNDER THE PLAN, (III) ADDITIONAL FINANCING REQUIREMENTS POST-RESTRUCTURING, (IV) FUTURE DISPOSITIONS, (V) THE PROPOSED RESTRUCTURING AND COSTS ASSOCIATED THEREWITH, (VI) THE ABILITY TO OBTAIN RELIEF FROM THE BANKRUPTCY COURT, (VII) THE CONFIRMATION AND CONSUMMATION OF THE PLAN AND (VIII) EACH OF THE OTHER RISKS IDENTIFIED IN THIS DISCLOSURE STATEMENT.  DUE TO THESE UNCERTAINTIES, READERS CANNOT BE ASSURED THAT ANY FORWARD-LOOKING STATEMENTS WILL PROVE TO BE CORRECT.

AS TO CONTESTED MATTERS, ADVERSARY PROCEEDINGS AND OTHER ACTIONS OR THREATENED ACTIONS, THE DISCLOSURE STATEMENT SHALL NOT CONSTITUTE OR BE CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY, STIPULATION, OR WAIVER, BUT RATHER AS A STATEMENT MADE IN SETTLEMENT NEGOTIATIONS.  THE DISCLOSURE STATEMENT SHALL NOT BE ADMISSIBLE IN ANY NON-BANKRUPTCY PROCEEDING NOR SHALL IT BE CONSTRUED TO BE CONCLUSIVE ADVICE ON THE TAX, SECURITIES OR OTHER LEGAL EFFECTS OF THE PLAN AS TO HOLDERS OF CLAIMS AGAINST OR OLD EQUITY INTERESTS IN THE DEBTOR AND DEBTOR-IN-POSSESSION IN THIS CHAPTER 11 CASE.

ONE OF THE PURPOSES OF THIS SOLICITATION IS TO OBTAIN SUFFICIENT ACCEPTANCES OF THE PLAN PRIOR TO THE BANKRUPTCY COURT'S ENTERING OF AN ORDER FOR RELIEF UNDER CHAPTER 11 OF THE BANKRUPTCY CODE FOR THE DEBTOR.  AT THIS TIME, NO CHAPTER 11 CASE HAS BEEN COMMENCED.  AS SUCH, THE BANKRUPTCY COURT HAS NOT YET APPROVED THIS DISCLOSURE STATEMENT AS CONTAINING ADEQUATE INFORMATION WITHIN THE MEANING OF SECTION 1125(A) OF THE BANKRUPTCY CODE.  UPON THE COMMENCEMENT OF THE DEBTOR'S CHAPTER 11 CASE AND THE TERMINATION OF EXCLUSIVITY, THE PLAN PROPONENTS ANTICIPATE PROMPTLY SEEKING AN ORDER (I) APPROVING (A) THIS DISCLOSURE STATEMENT AS CONTAINING ADEQUATE INFORMATION AND (B) THE SOLICITATION OF VOTES AS HAVING BEEN IN COMPLIANCE WITH SECTION 1126(B) OF THE BANKRUPTCY CODE AND (II) CONFIRMING THE PLAN DESCRIBED HEREIN.

DO NOT RETURN ANY OTHER DOCUMENTS WITH YOUR BALLOT.

A.    Voting Procedures and Ballots

The Plan Proponents have retained Epiq Bankruptcy Solutions, LLC to act as its solicitation, voting and information agent (the "Solicitation Agent") in connection with obtaining

approval and acceptance of the Plan. Additional information may also be obtained by contacting the Investment Manager.

After carefully reviewing this Disclosure Statement, including the attached exhibits, please indicate your acceptance or rejection of the Plan by voting in favor of or against the Plan on the enclosed Ballot and return the same pursuant to the instructions set forth thereon, so that it will be actually received by the Solicitation Agent no later than the Voting Deadline. For the purpose of obtaining sufficient approvals for the Plan, only those parties who actually vote are counted and, therefore, it is important that you submit your Ballot so that it is received by the Voting Deadline. The Plan Proponents reserve the right to extend the Voting Deadline in their sole and absolute discretion, which may be for any or no reason, and to terminate or withdraw the Plan in any respect.

**Holders of Claims that take no action, or fail to take timely action, may nevertheless be bound by the terms of the Plan and have the relevant treatment applied to their Claims if the Plan is consummated.**

ALL VOTES TO ACCEPT OR REJECT THE PLAN MUST BE CAST BY USING THE BALLOT. VOTES WHICH ARE CAST IN ANY OTHER MANNER WILL NOT BE COUNTED.

**THE PLAN PROPONENTS URGE ALL HOLDERS OF IMPAIRED CLAIMS TO ACCEPT THE PLAN. THE DEBTOR HAS NOT EXPRESSED A VIEW ON THE PLAN.**

**B.      Voting Deadline**

**All Ballots must be actually received by the Solicitation Agent no later than April 15, 2011 at 5:00 p.m., Prevailing Eastern Time unless the Voting Deadline is extended by the Plan Proponents. The Plan Proponents may extend the Voting Deadline at their sole discretion without further notice.**

**C.      Voting Record Date**

The "Voting Record Date" for purposes of determining the holders of Claims that are eligible to vote on the Plan is March 9, 2011.

**D.      Solicitation Agent and Voting**

For questions on voting procedures or requests for assistance or additional copies of this Disclosure Statement you may contact the Solicitation Agent at:

Epiq Bankruptcy Solutions, LLC
Zing VII
757 Third Avenue, Third Floor
New York, NY 10017
(646) 282-1800
tabulation@epiqsystems.com

5

The Ballots and all correspondence in connection with the Plan should be sent or delivered to the Solicitation Agent in accordance with the instructions contained in the Ballot.

The Plan Proponents are providing copies of this Disclosure Statement and a Ballot (collectively, a "Solicitation Package"), to the record holders of the Senior Note Claims. Record holders of the Senior Note Claims may include brokerage firms, commercial banks, trust companies, or other such nominees. If such entities do not hold Senior Note Claims for their own account (each of the foregoing, a "Voting Nominee"), they must provide copies of the Solicitation Package to their customers who are beneficial owners of Senior Note Claims as of March 9, 2011. Any beneficial owner of existing Senior Note Claims who has not received a Ballot (a "Beneficial Owner Ballot") should contact his, her or its Voting Nominee or the Solicitation Agent.

Beneficial owners of Senior Note Claims should provide all of the information requested by the Beneficial Owner Ballot and complete and return all Beneficial Owner Ballots received in the enclosed, pre-addressed, postage paid envelope provided with each such Ballot as directed by their Voting Nominee.

If you are both the registered owner and the beneficial owner of any principal amount of Senior Note Claims and you wish to vote such Claims, you may complete, execute and return to the Solicitation Agent either an individual Beneficial Owner Ballot or a Master Ballot.

Special procedures are set forth below for holders of Senior Note Claims who hold their Senior Notes through a bank, broker, or other nominee.

A sample Ballot is attached hereto as Exhibit A, but such sample Ballot may not be used to vote on the Plan.

**E.      Voting Nominee**

A Voting Nominee that, on the Record Date, is the record holder of Senior Note Claims for one or more beneficial owners can obtain the votes of the beneficial owners of such Senior Note Claims, consistent with customary practices for obtaining the votes of securities held in "street name," in one of the following two ways:

1.      *Pre-Validated Ballot*

A Voting Nominee may pre-validate a Beneficial Owner Ballot by (i) completing and executing the Beneficial Owner Ballot (other than Items 2, 3, and 4) and including the beneficial holder's holdings and account number and the Voting Nominee's DTC Participant Number and (ii) delivering to the beneficial owner such "pre-validated" Beneficial Owner Ballot, along with the Solicitation Package and other materials requested to be forwarded and providing a return envelope addressed to the Solicitation Agent. The beneficial owner should complete Items 2, 3 and 4 of its pre-validated Beneficial Owner Ballot and return the completed Beneficial Owner Ballot to the Solicitation Agent so as to be received before the Voting Deadline. A list of the beneficial owners to whom "pre-validated" Beneficial Owner Ballots were delivered should be maintained by Voting Nominees for inspection for at least one year from the Voting Deadline.

2.    *Master Ballots*

If the Voting Nominee elects not to pre-validate Beneficial Owner Ballots, the Voting Nominee may obtain the votes of beneficial owners by forwarding to the beneficial owners the unsigned Beneficial Owner Ballots, together with the Disclosure Statement and a pre-addressed, postage-paid return envelope provided by, and addressed to, the Voting Nominee, and any other materials requested to be forwarded.  Each such beneficial owner must then indicate his, her or its vote on the Beneficial Owner Ballot, complete the information requested on the Ballot, review the certifications contained on the Beneficial Owner Ballot, execute the Beneficial Owner Ballot and return the Beneficial Owner Ballot to the Voting Nominee.  After collecting the Beneficial Owner Ballots, the Voting Nominee should, in turn, complete a Master Ballot compiling the votes and other information from the Beneficial Owner Ballots, execute the Master Ballot and deliver the Master Ballot to the Solicitation Agent so that it is RECEIVED by the Solicitation Agent on or before the Voting Deadline.  All Beneficial Owner Ballots returned by beneficial owners should be (along with the Master Ballot) retained by Voting Nominees for inspection for at least one year from the Voting Deadline.  EACH VOTING NOMINEE SHOULD ADVISE ITS BENEFICIAL OWNERS TO RETURN THEIR BENEFICIAL OWNER BALLOTS TO THE VOTING NOMINEE BY A DATE CALCULATED BY THE VOTING NOMINEE TO ALLOW SUFFICIENT TIME FOR THE VOTING NOMINEE TO PREPARE AND RETURN THE MASTER BALLOT TO THE SOLICITATION AGENT SO THAT IT IS RECEIVED BY THE SOLICITATION AGENT ON OR BEFORE THE VOTING DEADLINE.

**F.    Miscellaneous**

With respect to the tabulation of Ballots for Senior Note Claims, each holder will be deemed to have voted the principal amount of its Senior Note Claims.

Votes cast by beneficial owners through Voting Nominees will be applied to the applicable positions held by such Voting Nominees as of the Voting Record Date, as evidenced by the record and depository listings.  Votes submitted by a Voting Nominee will not be counted in excess of the amount of Claims held by such Voting Nominee as of the Voting Record Date.

If conflicting votes or "over-votes" are submitted by a Voting Nominee, whether pursuant to a Master Ballot or pre-validated Beneficial Owner Ballot, the Plan Proponents will use reasonable efforts to reconcile discrepancies with the Voting Nominees.  If over-votes on a Master Ballot or pre-validated Beneficial Owner Ballot are not reconciled, the Plan Proponents shall apply the votes to accept and to reject the Plan in the same proportion as the votes to accept and to reject the Plan submitted on the Master Ballot or pre-validated Beneficial Ballot that contained the over-vote, but only to the extent of the Voting Nominee's position as of the Voting Record Date.

All Ballots must be signed by the holder of Senior Note Claims of record or any person who has obtained a properly completed Ballot proxy from the record holder of the Senior Note Claims on the Voting Record Date.  For purposes of voting to accept or reject the Plan, the beneficial owners of Senior Note Claims will be deemed to be the holders of the Claims represented by such Senior Notes.  Unless otherwise ordered by the Bankruptcy Court, Ballots that are signed, dated and timely received, but on which a vote to accept or reject the Plan has

7

not been indicated, will not be counted.  Where applicable, the Plan Proponents, in their sole discretion, may request that the Solicitation Agent attempt to contact such voters to cure any such defects in the Ballots.

Under the Bankruptcy Code, for purposes of determining whether the requisite acceptances have been received, only holders of Senior Note Claims who actually vote will be counted.  The failure of a holder to deliver a duly executed Ballot to the Solicitation Agent by the Voting Deadline or to its Voting Nominee with sufficient time for the Voting Nominee to submit the vote before the Voting Deadline, will be deemed to constitute an abstention by such holder with respect to voting on the Plan, and such abstentions will not be counted as votes for or against the Plan.

Unless a Ballot is timely submitted to the Solicitation Agent before the Voting Deadline, together with the information requested in the Ballot and any other documents required by such Ballot, the Plan Proponents may, in their sole discretion, reject such Ballot as invalid and therefore decline to utilize it in connection with seeking confirmation of the Plan.

## III.

## OVERVIEW OF THE PLAN

The Plan is premised upon the formation of a new investment vehicle holding, managing and eventually monetizing substantially all of the Debtor's Assets.  The Plan adheres to the contractual payment waterfall and subordination provisions of the Indenture and provides for the payment in full of all Claims senior to the Senior Notes Claims and a pro rata distribution to the Senior Noteholders of the remaining net Cash proceeds from the liquidation of the Designated Assets.  All Old Equity Interests and Claims junior to the Senior Note Claims will receive no distribution under the Plan.

The following is a summary of the classification and treatment of Claims against, and Old Equity Interests in, the Debtor under the Plan.  It is qualified in its entirety by reference to the full text of the Plan, which is attached to this Disclosure Statement as Exhibit B.

The Claim amounts set forth below reflect what the Plan Proponents believe to be reasonable estimates of the likely resolution of outstanding disputed Claims.  The amounts utilized may differ from the outstanding filed Claims amounts.

The following chart summarizes the distributions to unclassified and classified Claims and Old Equity Interests under the Plan:

[CONTINUED ON NEXT PAGE]

8

**Administrative Claims and Tax Claims**

| Classes of Claims[1] | Treatment of Classes of Claims |
|---|---|
| Administrative Claims<br>Estimated Allowed Claims: TBD[2] | On the Plan Distribution Date, each holder of an Allowed Administrative Claim shall receive (i) the amount of such holder's Allowed Administrative Claim in one Cash payment or (ii) such other treatment as may be agreed upon in writing by the Plan Proponents or Plan Administrator and such holder; provided, that such agreed-upon treatment shall not provide a return to such holder having a present value as of the Effective Date in excess of such holder's Allowed Administrative Claim; provided, further, that an Administrative Claim representing a liability incurred in the ordinary course of business of the Debtor may be paid at the Debtor's election in the ordinary course of business.<br><br>Estimated Recovery: 100% of Allowed Claim |
| Tax Claims<br>Estimated Allowed Claims: TBD[3] | On the Plan Distribution Date, each holder of an Allowed Tax Claim shall receive (i) the amount of such holder's Allowed Tax Claim in one Cash payment or (ii) such other treatment as may be agreed upon in writing by the Plan Proponents or Plan Administrator and such holder; provided, that such agreed-upon treatment shall not provide a return to such holder having a present value as of the Effective Date in excess of such holder's Allowed Tax Claim.<br><br>Estimated Recovery: 100% of Allowed Claim |

---

[1]  Administrative Claims and Tax Claims are treated in accordance with sections 1129(a)(9)(A) and 1129(a)(9)(C) of the Bankruptcy Code, respectively.  Such Claims are not designated as classes of Claims for the purposes of the Plan or for the purposes of sections 1123, 1124, 1125, 1126 or 1129 of the Bankruptcy Code.

[2]  The Plan Proponents anticipate the aggregate amount of Allowed Administrative Claims, Allowed Tax Claims, Allowed Senior Indenture Administrative Expense Claims and Allowed Indenture Priority Claims will not exceed approximately $5.2 million.

[3]  The Plan Proponents anticipate the aggregate amount of Allowed Administrative Claims, Allowed Tax Claims, Allowed Senior Indenture Administrative Expense Claims and Allowed Indenture Priority Claims will not exceed approximately $5.2 million.

9

**Claims and Old Equity Interests**

| Classes of Claims | Treatment of Classes of Claims |
|---|---|
| Class 1 – Senior Indenture Administrative Expense Claims<br>Estimated Allowed Claims: TBD<br><br>Unimpaired[4] | On each Quarterly Plan Distribution Date through the Termination Date, each holder of an Allowed Senior Indenture Administrative Expense Claim shall receive Cash in the amount of such holder's Allowed Senior Indenture Administrative Expense Claim.  For the avoidance of doubt, in no event shall the aggregate amount of Allowed Senior Indenture Administrative Expense Claims exceed the Indenture Administrative Expense Cap on each Quarterly Plan Distribution Date.<br><br>Estimated Recovery: 100% of Allowed Claim |
| Class 2 – Indenture Priority Claims<br>Estimated Allowed Claims: TBD<br><br>Unimpaired[5] | On the Plan Distribution Date, each holder of an Allowed Indenture Priority Claim shall receive the amount of such holder's Allowed Indenture Priority Claim, including any interest to which such holder is legally, contractually or equitably entitled in one Cash payment.<br><br>Estimated Recovery: 100% of Allowed Claim |
| Class 3 – Senior Note Claims<br>Estimated Allowed Claims: $191,086,932<br><br>Impaired | On each Senior Note Plan Distribution Date, each holder of an Allowed Senior Note Claim shall receive its Pro Rata Share of Available Cash.<br><br>Estimated Recovery: 71.84% of Allowed Claim |
| Class 4 – Junior A-2 Note Claims<br>Estimated Allowed Claims: $27,000,000<br><br>Impaired | Each holder of a Junior A-2 Note Claim shall not receive any property under the Plan.<br><br>Estimated Recovery: None |
| Class 5 – Junior A-3 Note Claims<br>Estimated Allowed Claims: $72,000,000<br><br>Impaired | Each holder of a Junior A-3 Note Claim shall not receive any property under the Plan.<br><br>Estimated Recovery: None |
| Class 6 – Junior B-1 Note Claims | Each holder of a Junior B-1 Note Claim shall |

---

[4]  The Plan Proponents anticipate the aggregate amount of Allowed Administrative Claims, Allowed Tax Claims, Allowed Senior Indenture Administrative Expense Claims and Allowed Indenture Priority Claims will not exceed approximately $5.2 million.

[5]  The Plan Proponents anticipate the aggregate amount of Allowed Administrative Claims, Allowed Tax Claims, Allowed Senior Indenture Administrative Expense Claims and Allowed Indenture Priority Claims will not exceed approximately $5.2 million.

NEWYORK 7964400 (2K)

| Classes of Claims | Treatment of Classes of Claims |
|---|---|
| Estimated Allowed Claims: $20,000,000<br><br>Impaired | not receive any property under the Plan.<br><br>Estimated Recovery: None |
| Class 7 – Junior B-2 Note Claims<br>Estimated Allowed Claims: $16,500,000<br><br>Impaired | Each holder of a Junior B-2 Note Claim shall not receive any property under the Plan.<br><br>Estimated Recovery: None |
| Class 8 – Subordinated Claims<br>Estimated Allowed Claims: TBD<br><br>Impaired | Each holder of a Subordinated Claim shall not receive any property under the Plan.<br><br>Estimated Recovery: None |
| Class 9 – Income Note Claims<br>Estimated Allowed Claims: $40,001,000<br><br>Impaired | Each holder of an Income Note Claim shall not receive any property under the Plan.<br><br>Estimated Recovery: None |
| Class 10 – General Unsecured Claims<br>Estimated Allowed Claims: TBD<br><br>Impaired | Each holder of a General Unsecured Claim shall not receive any property under the Plan.<br><br>Estimated Recovery: None |
| Class 11 – Old Equity Interests<br>Estimated Allowed Equity Interests: 250 ordinary voting shares, $1.00 par value per share<br><br>Impaired | Each holder of an Old Equity Interest shall not receive any property under the Plan.<br><br>Estimated Recovery: None |

## IV.

## GENERAL INFORMATION

The discussion below briefly describes the Debtor and its business as they exist as of the date of this Disclosure Statement.

**A.      Overview of the Debtor**

The Debtor is an exempted company incorporated on June 10, 2005 under the laws of the Cayman Islands.  The Debtor is a special purpose vehicle formed for the purpose of acquiring and managing securities described in more detail below (the "Collateral Securities"), issuing Notes backed by the Collateral Securities, listing the Notes on the Irish Stock Exchange and engaging in certain related transactions.

**B.      Assets of the Debtor**

The Debtor's Assets span a broad array of structured products, primarily composed of residential and commercial mortgage-backed securities, asset-backed securities (including

11

consumer loans and non-consumer loans) and tranches of other collateralized debt obligations ("CDO Securities").

A majority of the Debtor's Assets are exposed to mortgage risk. Such assets are comprised mainly of residential mortgage-backed and home-equity loan securities. This portion of the Debtor's portfolio is severely distressed as a majority of such Assets are not performing and more defaults are expected in the future.

The Debtor's remaining Assets are largely exposed to corporate credit risk. The majority of the Debtor's corporate and commercial bank loan portfolio relates to leveraged buyout financings maturing in the next several years. Although most of these assets are still performing, given the impending maturity cliff that will commence in 2012 for leveraged buyout financings, the Debtor's corporate credit portfolio could suffer material future defaults and value decline. Other corporate credit risks include assets backed by high-yield bonds, emerging market bonds, trust preferred securities, sovereign debt and investment grade bonds, which are similarly exposed to global credit market conditions and risk of future defaults.

In general, the Debtor's Assets are subject to liquidity, market value, credit, interest rate, reinvestment and certain other risks and are subject to greater risks than investment-grade corporate obligations. Further, the Debtor's CDO Securities are generally limited recourse obligations of the issuer thereof payable solely from the underlying assets of the issuer or proceeds thereof. Moreover, interest payments owed to the Debtor on such securities (other than the most senior tranche or tranches of a given issue) are generally subject to deferral.

## C.    Description of Indebtedness

On October 19, 2005, the Debtor entered into an Indenture with JPMorgan Chase Bank, National Association, as trustee (together with its permitted successors in the trusts under the Indenture, the "Trustee"). The Bank of New York, National Association ("BONY") is the successor to JPMC as the Trustee under the Indenture. The Indenture provides for, among other things, the authentication and delivery of the Notes, secured by substantially all of the Debtor's Assets, in an aggregate principal amount of $365,500,000. The stated maturity date for the Notes under the Indenture is October 15, 2040.

The Notes are segregated into tranches. As of February 4, 2011, approximately $191,086,932 aggregate principal amount of Senior Notes and $135,500,000 aggregate principal amount of Junior Notes remained outstanding. Additionally, as of February 4, 2011, $40,001,000 aggregate principal amount of unsecured Income Notes (which are treated as equity for U.S. federal income tax purposes) remained outstanding.

The Debtor has also issued certain composite obligations, which consist of various combinations of Junior A-3 Notes, Junior B-1 Notes, Junior B-2 Notes and Income Notes. The Junior Note components of the composite obligations are not separately classified in the Plan because they are subsumed within Class 5 – Junior A-3 Note Claims, Class 6 – Junior B-1 Note Claims or Class 7 – Junior B-2 Note Claims and the Income Note components of the composite obligations are not separately classified in the Plan because they are subsumed within Class 9 – Income Note Claims.

The Debtor has pledged the Collateral Securities and its other material assets to the Trustee as security for its obligations under the Senior Notes and Junior Notes (but not the Income Notes). Pursuant to the Indenture, the Junior Notes and Income Notes are junior in priority and contractually subordinated to the Senior Notes, and cash flow may not be distributed to the Junior Notes or Income Notes until the Senior Notes are paid in full.

**D.     Description of Old Equity Interests**

The Plan Proponents believe that the authorized share capital of the Debtor consists of 250 ordinary voting shares, $1.00 par value per share, all of which have been issued to Maples Finance Limited, a licensed trust company incorporated in the Cayman Islands, under the terms of a declaration of trust in favor of charitable purposes.

**E.     The Board of Directors**

The Plan Proponents believe that the directors of the Debtor are Helen Allen, Carrie Bunton and Guy Major, and that the principal outside function of the directors of the Debtor consists of serving as officers for Maples Finance Limited. The Plan Proponents believe that the Debtor has no employees.

**F.     Legal Proceedings**

Except as otherwise described herein, the Plan Proponents do not believe that the Debtor is involved in any governmental, litigation or arbitration proceedings relating to claims in amounts which may have or have had a material effect on the Debtor, nor, so far as the Plan Proponents are aware, is any such governmental, litigation or arbitration proceedings involving it pending or threatened.

**G.     Overview of Parties Related to the Debtor's Business and Indebtedness**

1.     *The Cayman Administrator*

Maples Finance Limited (the "Cayman Administrator") acts as the administrator of the Debtor. Pursuant to the terms of an agreement between the Cayman Administrator and the Debtor (the "Administration Agreement"), the Cayman Administrator performs various management functions on behalf of the Debtor, including communications with shareholders and the general public, and the provision of certain clerical, administrative and other services in the Cayman Islands. In consideration of the foregoing, the Cayman Administrator receives various fees and other charges payable by the Debtor at rates agreed upon from time to time plus expenses. The Cayman Administrator's principal office is Maples Finance Limited, Queensgate House, South Church Street, P.O. Box 1093 GT, George Town, Grand Cayman, Cayman Islands.

2.     *The Collateral Manager*

The Debtor and Zais Group, LLC (the "Collateral Manager"), whose headquarters is located in Red Bank, New Jersey, are parties to an agreement (the "Collateral Management Agreement") pursuant to which the Collateral Manager performs most material administrative and advisory functions with respect to the Debtor's Assets.

13

Pursuant to the terms of the Collateral Management Agreement, the Collateral Manager monitors the Collateral Securities and provides the Debtor with certain information with respect to the composition and characteristics of the Collateral Securities, any disposition or tender of a Collateral Security and the reinvestment or retention of the proceeds of any such disposition.

The Indenture places significant restrictions on the Collateral Manager's ability to buy and sell Collateral Securities. As a result of the default and acceleration of the Notes (which is described below), the Indenture currently prohibits the Collateral Manager from buying or selling Collateral Securities. Nonetheless, fees payable to the Collateral Manager continue to accrue.

As compensation for the performance of its obligations as Collateral Manager, the Collateral Manager is entitled to receive a base management fee based on the aggregate amount of Collateral Securities outstanding and the amount of outstanding Cash held by the Trustee on the first day of each collection period (the "Base Management Fee"). The Base Management Fee is contractually senior to the payment of any Notes.

The Collateral Manager may also receive a subordinated management fee (the "Subordinated Management Fee") and a participating management fee (the "Participating Management Fee" and, together with the Base Management Fee and the Subordinated Management Fee, the "Management Fee"), however, the Subordinated Management Fee and the Participating Management Fee are contractually subordinated to the payment of all Notes.

3.    *Hedge and Cashflow Swap Counterparties*

The Debtor has entered into two interest rate swap agreements with IXIS Financial Products Inc., a Delaware corporation, and indirect subsidiary of the French bank IXIS Corporate & Investment Bank, S.A. (the "Hedge Counterparty"). The Debtor has also entered into a cashflow swap agreement with Ixis Financial Products, Inc. (the "Cashflow Swap Counterparty"), which provides the Debtor with a source of liquidity for payments to the Senior Notes, Junior A-2 Notes and Junior A-3 Notes.

4.    *The Trustee*

BONY is the Trustee under the Indenture for the Debtor's Notes. The Indenture provides that the Trustee is entitled to payment from the Debtor of certain fees and expenses in exchange for its services.

BONY also acts as collateral administrator and prepares certain reports with respect to the Collateral Securities. The compensation paid to BONY by the Debtor for such services is in addition to the fees paid to the Collateral Manager and to BONY in its capacity as Trustee.

## H.    Acceleration of the Notes and the Need for Restructuring

In 2007, the United States mortgage market began to experience disruptions. Throughout 2007 and 2008, the condition of the mortgage market continued to deteriorate and expanded to the broader United States credit markets. This decline in the United States credit markets has

14

caused the value of mortgage backed securities and other collateralized securities to significantly decrease.

As a result of deteriorating markets (especially in the U.S. residential housing market) and the failure of the assumptions underlying the mathematical model used to structure and rate the Debtor's Notes, such Notes are severely under-collateralized. The Notes are in default and were accelerated and deemed due and payable on June 9, 2009. Of the 120 Assets owned by the Debtor on February 4, 2011, 51 Assets were treated as defaulted securities pursuant to the Indenture, two were deferring interest and more defaults are expected. The Senior Notes, which were originally rated AAA by Moody's are currently rated Ca and all other tranches have been downgraded to a C rating.

As described more fully in Section V herein, Houlihan Lokey's projections indicate that only the Senior Notes, subject to a haircut and risk of future non-performance of the Debtor's Assets, will receive distributions from the Debtor's Assets and that all Claims junior to the Senior Notes and all Old Equity Interests will receive no distributions. Notwithstanding the default, the Indenture does not permit for the liquidation of the Debtor's Assets to satisfy the Debtor's obligations, including the Senior Notes, absent consent of the holders of Junior Notes, which consent the Plan Proponents believe is not obtainable under the current circumstances. The Plan Proponents believe that Senior Noteholders will receive a greater (in present value terms) and more certain recovery if the Debtor's Assets can be liquidated opportunistically as compared to what the Senior Noteholders will receive if the Debtor's Assets are held and distributions are made pursuant to the Indenture. In contrast, the Plan Proponents believe that recoveries to Senior Noteholders remain at substantial risk given the potential for future non-performance of the Debtor's Assets. Accordingly, the Plan Proponents seek to confirm the Plan to permit for the opportunistic liquidation of the Debtor's Assets for the benefit of Senior Noteholders.

## I.    Information Regarding the Plan Proponents

The Plan Proponents are comprised of private investment funds, GRF Master Fund, L.P., Anchorage Illiquid Opportunities Offshore Master, L.P. and Anchorage Capital Master Offshore, Ltd., which combined hold $145,357,000 aggregate original principal amount of Senior Notes and $10,000,000 aggregate original principal amount of Junior Notes and Income Notes as of the date hereof. The Plan Proponents are managed by Anchorage Capital Group, L.L.C. For more information regarding the Plan Proponents and Anchorage Capital Group, L.L.C., see Section VI.C.3 herein.

## V.

## VALUATION AND LIQUIDATION ANALYSIS

The Plan Proponents, through their legal counsel, retained Houlihan Lokey ("Houlihan") to prepare a report (the "Valuation Analysis") analyzing and comparing the economic implications of (i) a managed and opportunistic liquidation of the Debtor's Assets by an experienced investment manager under which the timing of the sale of Assets would be dictated only by the goal of achieving the highest possible price, i.e., the process contemplated by the

15

Plan upon the Debtor emerging from the Chapter 11 Case (the "Chapter 11 Opportunistic Liquidation Scenario") and (ii) allowing the Debtor to remain in existence without active management of the Assets until all of its Assets mature or are otherwise extinguished (the "Status Quo Scenario").  Houlihan concluded that based on a discounted cash flow and market analysis, the value realized on the Senior Notes will be greater in the Chapter 11 Opportunistic Liquidation Scenario than under the Status Quo Scenario.  Moreover, Houlihan concluded that under both the Status Quo Scenario and the Chapter 11 Opportunistic Liquidation Scenario, no tranche of Notes below the Senior Notes will receive any cash flows.

Houlihan also prepared a report (the "Liquidation Analysis") analyzing and comparing the economic implications of (i) the Chapter 11 Opportunistic Liquidation Scenario (under which the liquidation of Assets is expected to occur over approximately two years) and (ii) a fire-sale liquidation under Chapter 7 of the Bankruptcy Code, in which the Debtor's Assets would be sold by a Chapter 7 trustee as quickly as possible (the "Chapter 7 Liquidation Scenario").  Houlihan concluded that holders of Senior Notes will receive more value under the Chapter 11 Opportunistic Liquidation Scenario than under the Chapter 7 Liquidation Scenario.  Houlihan further concluded that under both the Chapter 11 Opportunistic Liquidation Scenario and the Chapter 7 Liquidation Scenario, no class of claim junior to the Senior Notes, including the Junior Note Claims, would receive a distribution.

The Valuation Analysis and Liquidation Analysis are combined into a single report and are attached hereto as Exhibit C.

## VI.

## THE CHAPTER 11 PLAN

### A.      Introduction

The following is a summary of certain terms and provisions of the Plan.  This summary of the Plan is qualified in its entirety by reference to the full text of the Plan.

### B.      General Description of the Treatment of Claims and Old Equity Interests

1.      *Unclassified Claims*

Administrative Claims and Tax Claims are treated in accordance with sections 1129(a)(9)(A) and 1129(a)(9)(C) of the Bankruptcy Code, respectively.  Such Administrative Claims and Tax Claims are not designated as classes of Claims for the purposes of the Plan or for the purposes of sections 1123, 1124, 1125, 1126 or 1129 of the Bankruptcy Code.

a.      Administrative Claims

All Administrative Claims shall be treated as follows:

Each holder of an Administrative Claim, other than (i) a Fee Claim, (ii) a liability incurred and payable in the ordinary course of business by the Debtor (and not past due) or (iii) an Administrative Claim that has been Allowed on or before the Effective Date, must file

NEWYORK 7964400 (2K)

with the Bankruptcy Court and serve on the Debtor, the Plan Proponents, the Creditors' Committee (if any) and the Office of the United States Trustee, an Administrative Claim request pursuant to Local Rule 3003-2(b) within forty-five (45) days after service or publication of the Notice of Confirmation or such other date established by the Bankruptcy Court in the Confirmation Order.  Such Administrative Claim request must include at a minimum (i) the name of the holder of the Administrative Claim, (ii) the amount of the Administrative Claim and (iii) the basis of the Administrative Claim.  **Failure to file and serve such request timely and properly shall result in the Administrative Claim being forever barred from assertion against the Debtor and its Estate.**

Except as otherwise provided in the Plan, each Professional Person who holds or asserts a Fee Claim shall be required to file with the Bankruptcy Court, and serve on all parties required to receive notice, a Fee Application within forty-five (45) days after service or publication of the Notice of Confirmation or such other date established by the Bankruptcy Court in the Confirmation Order.  **The failure to timely file and serve such Fee Application shall result in the Fee Claim being forever barred from assertion against the Debtor and its Estate.**

An Administrative Claim with respect to which a request has been properly filed and served pursuant to Section 4.2(a) of the Plan shall become an Allowed Administrative Claim if no objection is filed within sixty (60) days after the later of (i) the Effective Date, (ii) the date of service of the applicable Administrative Claim request or (iii) such later date as may be (A) agreed to by the holder of such Administrative Claim or (B) approved by the Bankruptcy Court on motion of a party in interest, without notice or a hearing.  If an objection is filed within such 60-day period (or any extension thereof), the Administrative Claim shall become an Allowed Administrative Claim only to the extent allowed by a Final Order.  A Fee Claim in respect of which a Fee Application has been properly filed and served pursuant to Section 4.2(b) of the Plan shall become an Allowed Administrative Claim only to the extent allowed by order of the Bankruptcy Court.

On the Plan Distribution Date, each holder of an Allowed Administrative Claim shall receive (i) the amount of such holder's Allowed Administrative Claim in one Cash payment or (ii) such other treatment as may be agreed upon in writing by the Plan Proponents or Plan Administrator and such holder; provided, that such agreed-upon treatment shall not provide a return to such holder having a present value as of the Effective Date in excess of such holder's Allowed Administrative Claim; provided, further, that an Administrative Claim representing a liability incurred in the ordinary course of business of the Debtor may be paid at the Debtor's election in the ordinary course of business.

Notwithstanding anything contained herein to the contrary, on the Effective Date, the Plan Administrator shall reimburse the Plan Proponents for all reasonable fees and out-of-pocket expenses incurred by the Plan Proponents through the Effective Date, including, without limitation, fees and expenses of attorneys (including White & Case LLP and Fox Rothschild LLP), financial advisors (including Houlihan Lokey) and other professionals and agents (including Epiq Bankruptcy Solutions, LLC), in each case to the extent not reimbursed on or prior to the Effective Date, without the necessity of filing a fee application or any other application of any kind or nature with the Bankruptcy Court.

b.      Tax Claims

All Tax Claims shall be treated as follows:

Each holder of a Tax Claim shall file with the Bankruptcy Court and serve on the Debtor, the Plan Proponents, the Creditors' Committee (if any) and the Office of the United States Trustee, a proof of Claim evidencing such Tax Claim within forty-five (45) days after service or publication of the Notice of Confirmation or such other date established by the Bankruptcy Court in the Confirmation Order.  **Failure to file and serve such request timely and properly shall result in the Tax Claim being forever barred from assertion against the Debtor and its Estate.**

On the Plan Distribution Date, each holder of an Allowed Tax Claim shall receive (i) the amount of such holder's Allowed Tax Claim in one Cash payment, or (ii) such other treatment as may be agreed upon in writing by the Plan Proponents or Plan Administrator and such holder; provided, that such agreed-upon treatment shall not provide a return to such holder having a present value as of the Effective Date in excess of such holder's Allowed Tax Claim.

The Confirmation Order shall enjoin any holder of an Allowed Tax Claim from commencing or continuing any action or proceeding against any responsible person, officer or director of the Debtor that otherwise would be liable to such holder for payment of a Tax Claim so long as the Debtor is in compliance with this Section.  So long as the holder of an Allowed Tax Claim is enjoined from commencing or continuing any action or proceeding against any responsible person, officer or director under this Section or pursuant to the Confirmation Order, the statute of limitations for commencing or continuing any such action or proceeding shall be tolled.

2.      *Classification and Treatment of Claims and Old Equity Interests*

The classes of Claims against the Debtor and Old Equity Interests in the Debtor shall be treated under the Plan as follows:

a.      Class 1 – Senior Indenture Administrative Expense Claims.

i.      Description

Class 1 shall consist of all Senior Indenture Administrative Expense Claims.  To the extent that the aggregate amount of unpaid Indenture Administrative Expense Claims does not exceed the Indenture Administrative Expense Cap on each Quarterly Plan Distribution Date, all Indenture Administrative Expense Claims shall be deemed Senior Indenture Administrative Expense Claims.  To the extent that the aggregate amount of unpaid Indenture Administrative Expense Claims exceeds the Indenture Administrative Expense Cap on each Quarterly Plan Distribution Date, in accordance with the priority of payments set forth in the definition of "Administrative Expenses" in the Indenture and as described below, (i) the Indenture Administrative Expense Claim of the Trustee shall be deemed a Senior Indenture Administrative Expense Claim in an amount up to, but not exceeding, the Indenture Administrative Expense Cap and (ii) other Indenture Administrative Expense Claims shall be deemed Senior Indenture Administrative Expense Claims in the amount of each holder's Pro Rata Share of the Indenture

18

Administrative Expense Cap that remains after the payment of the Trustee's Senior Indenture Administrative Expense Claim, if any.

Indenture Administrative Expense Claims are all Claims for administrative expenses under the Indenture, including, but not limited to, fees, expenses and other amounts due and accrued on the Petition Date payable (a) first to the Trustee and (b) then, on a pari passu basis to (i) the independent accountants, agents (other than the Collateral Manager) and counsel of Zing VII, (ii) the rating agencies in connection with rating the Senior Notes and Collateral Securities, (iii) the Collateral Manager (but excluding the Management Fee), (iv) the Cayman Administrator for certain services provided to Zing VII under the Administration Agreement and (v) any other person in respect of any other fees or expenses permitted under the Indenture and the documents delivered pursuant to or in connection with the Indenture and the Senior Notes.

ii.    <u>Treatment</u>

On each Quarterly Plan Distribution Date through the Termination Date, each holder of an Allowed Senior Indenture Administrative Expense Claim shall receive Cash in the amount of such holder's Allowed Senior Indenture Administrative Expense Claim. For the avoidance of doubt, in no event shall the aggregate amount of Allowed Senior Indenture Administrative Expense Claims exceed the Indenture Administrative Expense Cap on each Quarterly Plan Distribution Date. To avoid the costs and delay of litigation, the Plan Proponents have treated the Senior Indenture Administrative Expense Claims as unimpaired and have provided such holders with the same economic recoveries they would have received if the Debtor's Assets were liquidated under the Indenture. Accordingly, Class 1 – Senior Indenture Administrative Expense Claims are unimpaired under the Plan, and holders of such Senior Indenture Administrative Expense Claims are therefore deemed to accept the Plan and are not entitled to vote to accept or reject the Plan. To the extent holders of Senior Indenture Administrative Expense Claims object to such treatment, the Plan Proponents reserve the right to modify the treatment of Class 1 – Senior Indenture Administrative Expense Claims, including without limitation seeking a determination from the Bankruptcy Court that such Claims are not entitled to distributions under a liquidation of the Debtor's Assets pursuant to the Chapter 11 Case.

iii.    <u>Time for Filing Indenture Administrative Expense Claims</u>

Each holder of an Indenture Administrative Expense Claim must file with the Bankruptcy Court and serve on the Debtor, the Plan Proponents, the Creditors' Committee (if any) and the Office of the United States Trustee, a proof of Claim evidencing its Indenture Administrative Expense Claim within forty-five (45) days after service or publication of the Notice of Confirmation or such other date established by the Bankruptcy Court in the Confirmation Order. **Failure to file and serve such proof of Claim timely and properly shall result in the Indenture Administrative Expense Claim being forever barred from assertion against the Debtor and its Estate.**

19

b.      Class 2 – Indenture Priority Claims.

i.      Description

Class 2 shall consist of all Indenture Priority Claims, which are all Claims to which the Senior Notes are subordinated under Section 11.1 of the Indenture, other than Senior Indenture Administrative Expense Claims, including (i) any Claim for the Base Management Fee held by the Collateral Manager, (ii) any Claim by the Cashflow Swap Counterparty except termination payment claims, if any, that arose from a default by the Cashflow Swap Counterparty and (iii) any claim by the Hedge Counterparty except termination payment claims, if any, that arose from a default by the Hedge Counterparty.

ii.      Treatment

On the Plan Distribution Date, each holder of an Allowed Indenture Priority Claim shall receive the amount of such holder's Allowed Indenture Priority Claim, including any interest to which such holder is legally, contractually or equitably entitled in one Cash payment. Class 2 – Indenture Priority Claims are unimpaired under the Plan, and holders of such Claims are therefore deemed to accept the Plan and are not entitled to vote to accept or reject the Plan.

iii.      Time for Filing Indenture Priority Claims

Each holder of an Indenture Priority Claim must file with the Bankruptcy Court and serve on the Debtor, the Plan Proponents, the Creditors' Committee (if any) and the Office of the United States Trustee, a proof of Claim evidencing its Indenture Priority Claim within forty-five (45) days after service or publication of the Notice of Confirmation or such other date established by the Bankruptcy Court in the Confirmation Order. **Failure to file and serve such proof of Claim timely and properly shall result in the Indenture Priority Claim being forever barred from assertion against the Debtor and its Estate.**

c.      Class 3 – Senior Note Claims.  Class 3 shall consist of all Senior Note Claims.  On each Senior Note Plan Distribution Date, each holder of an Allowed Senior Note Claim shall receive its Pro Rata Share of Available Cash.  Class 3 – Senior Note Claims are impaired under the Plan, and holders of such Claims are therefore entitled to vote to accept or reject the Plan.

d.      Class 4 through Class 7 – Junior Note Claims.  Class 4 through Class 7 shall consist of all Junior Note Claims.  Each holder of such a Junior Note Claim shall not receive any property under the Plan.  Class 4 through Class 7 – Junior Note Claims are impaired, but, because they are not entitled to any distribution under the Plan, holders of such Claims are therefore deemed to reject the Plan and are not entitled to vote to accept or reject the Plan.

e.      Class 8 – Subordinated Claims.

i.      Description

Class 8 shall consist of all Subordinated Claims, which are all Claims that are subordinated to the Senior Notes under the Indenture other than Junior Note Claims and Income

20

Note Claims, including, but not limited to, (i) any Indenture Administrative Expense Claim which does not qualify as a Senior Indenture Administrative Expense Claim, (ii) any Claim for the Subordinated Management Fee or the Participating Management Fee, (iii) any Claim for termination payments that arose from a default by the Cashflow Swap Counterparty and (iv) any Claim for termination payments that arose from a default by the Hedge Counterparty.

ii.    <u>Treatment</u>

Each holder of a Subordinated Claim shall not receive any property under the Plan.  Class 8 – Subordinated Claims are impaired, but, because they are not entitled to any distribution under the Plan, holders of such Claims are therefore deemed to reject the Plan and are not entitled to vote to accept or reject the Plan.

f.    <u>Class 9 – Income Note Claims</u>.  Class 9 shall consist of all Income Note Claims.  Each holder of an Income Note Claim shall not receive any property under the Plan.  Class 9 – Income Note Claims are impaired, but, because they are not entitled to any distribution under the Plan, holders of such Claims are therefore deemed to reject the Plan and are not entitled to vote to accept or reject the Plan.

g.    <u>Class 10 – General Unsecured Claims</u>.  Class 10 shall consist of all General Unsecured Claims.  Each holder of a General Unsecured Claim shall not receive any property under the Plan.  Class 10 – General Unsecured Claims are impaired, but, because they are not entitled to any distribution under the Plan, holders of such Claims are therefore deemed to reject the Plan and are not entitled to vote to accept or reject the Plan.

h.    <u>Class 11 – Old Equity Interests</u>.  Class 11 shall consist of all Old Equity Interests.  Each holder of an Old Equity Interest shall not receive any property under the Plan.  Class 11 – Old Equity Interests are impaired, but, because they are not entitled to any distribution under the Plan, holders of such Old Equity Interests are therefore deemed to reject the Plan and are not entitled to vote to accept or reject the Plan.

**C.    Means for Implementing the Plan**

1.    *Basic Structure of the Plan and the Rationale Therefore*

As described in more detail below, upon the Effective Date, the Debtor will transfer the Designated Assets (which will consist of, among other things, all of the Debtor's Collateral Securities) to a new entity, NewCo, in exchange for the New LP Interest in NewCo and, if necessary, certain Cash to fund the Debtor's obligations that are senior to the Senior Notes.  NewCo will hold and opportunistically liquidate the Designated Assets and, after deducting NewCo's expenses and liabilities, will distribute the proceeds from the sale of the Designated Assets to the Debtor (on account of the New LP Interest) for payment of Plan Distributions.  This structure is being utilized, among other reasons, to allow the continued transferability of the Senior Notes (in accordance with the transferability restrictions described in Section VII herein) without requiring the Debtor or Plan Administrator to duplicate the anti-money laundering and securities law compliance originally performed by or on behalf of the Debtor.

21

2.     *Implementation of the Plan on or Prior to the Effective Date*

During the period from the Confirmation Date through and until the Effective Date, the Debtor shall continue to operate its business as Debtor in Possession, subject to the oversight of the Bankruptcy Court as provided in the Bankruptcy Code, the Bankruptcy Rules and all orders of the Bankruptcy Court that are then in full force and effect.

On or prior to the Effective Date, the Plan Proponents shall form NewCo as an exempted limited partnership organized under the laws of the Cayman Islands.  The Limited Partnership Agreement, substantially in the form of Exhibit D to the Plan, sets forth the powers, rights and preferences, as well as certain limitations, qualifications and restrictions associated with, the New LP Interest.  The New LP Interest will have voting rights consistent with standard voting equity interests for limited partnership investment vehicles.  The Limited Partnership Agreement contains customary provisions restricting the sale, transfer, assignment, conversion or other disposal of such New LP Interest.  Z-CDO Liquidation Fund GP, LLC, an affiliate of the investment manager of the Plan Proponents, shall be the General Partner of NewCo.

On the Effective Date, the Debtor shall transfer title to the Designated Assets to NewCo free and clear of all liens, Claims, Causes of Action, interests, security interests and other encumbrances and without further order of the Bankruptcy Court.  In exchange for the transfer of the Designated Assets, NewCo shall transfer to the Debtor (i) on the Effective Date, the New LP Interest and (ii) on or after the Effective Date, Cash sufficient to fund the Debtor's senior obligations under the Plan, but solely to the extent that the Debtor's Cash on the Effective Date and projected Cash distributions from the New LP Interest are not sufficient to fund such obligations when due.

All Cash necessary for the Plan Administrator to make payments and Plan Distributions shall be obtained from the Debtor's Cash balances on the Effective Date, Cash received on account of the New LP Interest and, if necessary, Cash received under the Exit Facility.

3.     *Initial Investment Manager and General Partner*

From and after the Effective Date, (i) NewCo's operation shall be managed by the General Partner and (ii) Anchorage Capital Group, L.L.C. (the "Investment Manager") shall be the Investment Manager of NewCo with the responsibility for liquidating the Designated Assets. Neither the General Partner nor the Investment Manager will receive monetary compensation for such services, but each will receive certain benefits and contractual rights in its role.  The General Partner shall be responsible for the management of NewCo.  The General Partner will, pursuant to an investment management agreement between NewCo and the Investment Manager (as amended, restated or supplemented from time to time, the "Investment Management Agreement"), delegate to the Investment Manager the authority to liquidate the Designated Assets and to distribute the proceeds of such liquidation to the Debtor on account of the New LP Interest after deducting NewCo's expenses and liabilities.  A copy of the Investment Management Agreement is attached to the Plan as Exhibit E.  A copy of the Form ADV for Anchorage Capital Group, L.L.C. is attached hereto as Exhibit E.

Anchorage Capital Group, L.L.C., a Delaware limited liability company, was founded in 2003 by Kevin Ulrich and Anthony Davis (the "Principals"). Biographical information of the Principals is set forth under "*Anchorage Management Team*" below. Kevin Ulrich, Anthony Davis, Daniel Allen and Yale Baron will serve as the portfolio management team for NewCo. The Investment Manager has approximately $9.6 billion in assets under management as of January 31, 2011. The Investment Manager is registered as an investment adviser with the SEC.

In addition, as of February 28, 2011, the Investment Manager maintains a staff of approximately 43 full-time research and risk professionals, with offices in New York City and London. For additional information about the Investment Manager or to discuss any aspect of the Plan, please contact:

Yale Baron
Anchorage Capital Group, L.L.C.
610 Broadway, 6th Floor
New York NY 10012
E-mail: ybaron@anchoragecap.com
Phone: 212.358.4243

*Anchorage Management Team*

**Kevin Ulrich** is the Chief Executive Officer of the Investment Manager and serves as a portfolio manager for the Anchorage Capital Partners Funds ("ACP"), the Anchorage Illiquid Opportunities Funds ("AIO" and "AIO II"), the Anchorage Short Credit Funds ("ASC"), the Anchorage Crossover Credit Funds ("ACC") and a number of customized investment funds managed by the Investment Manager and its affiliates. Prior to co-founding the Investment Manager, Mr. Ulrich was Managing Director, Head of Distressed Bank Loans and Global Head of Bank Loan Trading at Goldman, Sachs & Co. ("Goldman Sachs"). In this capacity, Mr. Ulrich was directly responsible for the trading operation and proprietary investment portfolio of the Goldman Sachs Bank Loan business. Prior to joining Goldman Sachs, Mr. Ulrich was an Associate in the Investment Banking Division of Lehman Brothers Inc. Mr. Ulrich's professional education was at Harvard Law School, where he received a J.D. and graduated with honors.

**Anthony Davis** is the President of the Investment Manager and serves as a portfolio manager for ACP, AIO, AIO II, ASC, ACC and a number of customized investment funds managed by the Investment Manager and its affiliates. On June 1, 2010, Mr. Davis was named President and Member of Anchorage Capital Europe, LLP, a London-based investment manager registered with the Financial Services Authority ("FSA") which was established by the Investment Manager on February 17, 2009 to focus on European investment capabilities. As of the date of this Disclosure Statement, Mr. Davis works full time from London, England to focus exclusively on European investment opportunities. Prior to co-founding the Investment Manager, Mr. Davis was Head of Research and Portfolio Manager for the Goldman Sachs Bank Loan business. Previously, he was Co-head of the Goldman Sachs High Yield Distressed Bond

23

business.  In these capacities, Mr. Davis identified, evaluated and executed proprietary investments and was responsible for portfolio construction and risk management.  Prior to joining the Fixed Income division of Goldman Sachs, Mr. Davis was an Associate in the Investment Banking Division's Financial Institutions Group.  Mr. Davis' professional education was at The Wharton School and the Lauder Institute of the University of Pennsylvania, where he received an M.B.A. and an M.A., respectively.

**Daniel Allen** is a Partner and Senior Portfolio Manager of the Investment Manager and serves as a portfolio manager for ACP, AIO, AIO II, ASC, ACC and a number of customized investment funds managed by the Investment Manager and its affiliates.  Prior to joining the Investment Manager, Mr. Allen spent six years with Morgan Stanley, where in his most recent role he was Co-head of North American Credit Trading with a primary focus on bank debt, high yield bonds and distressed securities.  Earlier in his career at Morgan Stanley, he oversaw the par loan and distressed loan trading desks and later managed the leveraged credit trading and high-yield operations.  Prior to joining Morgan Stanley in 2002, Mr. Allen was a Loan Trader at Goldman Sachs and a Corporate Bond Trader at Fidelity Investments.  Mr. Allen's professional education was at Duke University's Fuqua School of Business where he received an M.B.A.

**Yale Baron** is a Structured Credit Analyst at the Investment Manager.  Prior to joining the Investment Manager, Mr. Baron worked at JPMorgan from 2004 to 2008, and in his most recent role was responsible for the global CLO business.  Prior to joining JPMorgan, Mr. Baron was a banker in Deutsche Bank's CDO business.  Mr. Baron started his career at Goldman Sachs where he held various positions in investment banking, including in the CDO business.  Mr. Baron received his B.S. in Economics from The Wharton School at the University of Pennsylvania and holds the Chartered Financial Analyst designation.

4. *Post-Effective Date Corporate Governance*

On the Effective Date, the authority of the Debtor's directors, officers and administrator shall be terminated to the extent permitted by applicable law.  The Plan Administrator shall succeed to such powers as would have been applicable to the Debtor's officers, directors and shareholders; provided that the Plan Administrator may continue to consult with any of the directors to the extent required to comply with applicable law or other contractual provisions of the Debtor's or NewCo's documents.

5. *Dissolution of the Debtor*

On the Termination Date, the Debtor shall be deemed dissolved for all purposes to the fullest extent permitted under applicable Cayman law, and, to the extent necessary, the Plan Administrator may take any actions required under applicable law to accomplish the dissolution of the Debtor.  The Plan Proponents anticipate that the Debtor will generate sufficient Cash to fund its Administrative Expenses during the pendency of the Chapter 11 Case.

6. *Debtor-in-Possession Financing, If Any*

The Plan Proponents anticipate that the Debtor will generate sufficient Cash to fund its Administrative Expenses during the pendency of the Chapter 11 Case.  If not, however, it may be necessary for the Debtor to obtain debtor-in-possession financing to address its short-term

24

liquidity needs.  Such debtor-in-possession financing would be paid back prior to making Plan Distributions to Senior Noteholders.  The Plan Proponents reserve their right to provide such debtor-in-possession financing.

7.    *Exit Facility*

To the extent necessary to provide Cash to consummate the Plan, the Exit Facility will be entered into between NewCo and the Exit Facility Lender on or after the Effective Date.  The Exit Facility will allow NewCo to borrow up to $5 million.  If the Debtor does not have sufficient Cash to make Plan Distributions to holders of Claims senior to the Senior Notes, NewCo will transfer the proceeds from the Exit Facility to the Debtor to allow the Debtor to make Cash Plan Distributions, and NewCo will pay the Exit Facility Lender any amounts due under the Exit Facility prior to making distributions on account of the New LP Interest that will be used to pay holders of Senior Notes.  While the Plan Proponents do not anticipate that NewCo will need to borrow funds under the Exit Facility, the Plan contemplates that the Exit Facility could be available to bridge liquidity shortfalls caused by either (i) unexpected Allowed Administrative Expenses, Allowed Tax Claims, Allowed Senior Administrative Expense Claims and Allowed Indenture Priority Claims or (ii) the Debtor receiving less than anticipated Cash proceeds over the course of the Chapter 11 Case.  The Exit Facility Lender may be an Affiliate of the investment manager of the Plan Proponents or a fund managed by the Investment Manager, and the Exit Facility shall be on terms substantially similar to those contained in the term sheet attached hereto as Exhibit D; however, in the event that an Affiliate of the investment manager of the Plan Proponents is unable to provide the Exit Facility due to restrictions under ERISA (as defined below) or other reasons, the Plan Proponents shall approach a third party to provide the Exit Facility on market terms available at the time the Exit Facility is entered into.

8.    *Corporate Action*

The entry of the Confirmation Order shall constitute authorization for NewCo and authorization and direction for the Debtor and their respective directors, officers, partners, stockholders and agents to take or cause to be taken all corporate actions necessary or appropriate to implement all provisions of, and to consummate, the Plan prior to, on and after the Effective Date and all such actions taken or caused to be taken shall be deemed to have been authorized and approved by the Bankruptcy Court without further approval, act or action under any applicable law, order, rule or regulation, including any action required to implement (a) the issuance of the New LP Interest, (b) the adoption of the NewCo Constituent Documents, (c) the incurrence of all obligations contemplated by the Plan and the making of Plan Distributions, (d) the implementation of all settlements and compromises as set forth in or contemplated by the Plan and (e) the execution and deliverance of all agreements, documents, instruments, notices and certificates as are contemplated by the Plan.

9.    *Causes of Action*

Except as otherwise provided in the Plan, (a) all Causes of Action of the Debtor and its Estate shall, upon the occurrence of the Effective Date, be transferred to, and be vested in, NewCo and (b) the rights of NewCo to commence, prosecute or settle such Causes of Action, in its sole discretion, shall be preserved notwithstanding the occurrence of the Effective Date.

NEWYORK 7964400 (2K)

**No Person may rely on the absence of a specific reference in the Plan or the Disclosure Statement to any Cause of Action against them as any indication that NewCo will not pursue any and all available Causes of Action against them. NewCo expressly reserves all rights to prosecute any and all Causes of Action against any Person, <u>except</u> as otherwise provided in the Plan.** Unless any Causes of Action against a Person are expressly waived, relinquished, exculpated, released, compromised or settled in the Plan or a Final Order, NewCo expressly reserves all Causes of Action for later adjudication and, therefore, no preclusion doctrine, <u>including</u> without limitation, the doctrines of res judicata, issue preclusion, claim preclusion, estoppel (collateral, judicial, equitable or otherwise) or laches, shall apply to such Causes of Action upon or after the confirmation or consummation of the Plan.

10.     *Investment of Funds Held by the Plan Administrator*

The Plan Administrator may, but shall not be required to, invest any funds held by the Debtor or the Plan Administrator on behalf of the Debtor pending the distribution of such funds pursuant to the Plan in investments that are exempt from federal, state and local taxes. Further, the Plan Administrator may, but shall not be required to, invest any funds held by the Debtor or the Plan Administrator on behalf of the Debtor in interest-bearing accounts or certificates.

**D.     Disbursement Provisions**

1.     *Plan Distributions*

<u>Except</u> as otherwise set forth in the Plan, all Plan Distributions shall be made on the Plan Distribution Date, each Quarterly Plan Distribution Date or each Senior Note Plan Distribution Date, as applicable, free and clear of all liens, Claims, Causes of Action, interests, security interests and other encumbrances. In the event a Plan Distribution shall be payable on a day other than a Business Day, such Plan Distribution shall instead be paid on the immediately succeeding Business Day, but shall be deemed to have been made on the date otherwise due. For federal income tax purposes, a Plan Distribution will be allocated first to the principal amount of a Claim and then, to the extent the Plan Distribution exceeds the principal amount of the Claim, to the portion of the Claim representing accrued but unpaid interest (if any). Except as otherwise provided in the Plan, Plan Distributions shall be made to the holders of Allowed Claims as reflected in the registry of claims as of the Effective Date. The Plan Administrator and its agents shall have no obligation to recognize any transfer of a Claim after the Effective Date and shall be permitted to treat DTC, which is the sole registered holder of the Senior Notes as the sole "holder" of a Senior Note Claim on and after the Effective Date. If necessary or convenient, the Plan Administrator may enter into, on behalf of the Debtor, a paying agency agreement to facilitate payments through DTC.

2.     *Timing of Plan Distributions*

Each Plan Distribution shall be made on a Plan Distribution Date, a Quarterly Plan Distribution Date or a Senior Note Plan Distribution Date, as applicable, and shall be deemed to have been timely made if made on such date or within ten (10) days thereafter.

3.     *Address for Delivery of Plan Distributions/Unclaimed Plan Distributions*

26

Subject to Bankruptcy Rule 9010, any Plan Distribution or delivery to a holder of an Allowed Claim other than an Allowed Senior Note Claim (distributions to which shall be made in accordance with Section 6.6 of the Plan) shall be made at the address of such holder as set forth (a) in the Schedules, if any, or the Debtor's records, (b) on the proof of Claim filed by such holder, (c) in any notice of assignment filed with the Bankruptcy Court with respect to such Claim pursuant to Bankruptcy Rule 3001(e) or (d) in any notice served by such holder giving details of a change of address. If any Plan Distribution is returned to the Plan Administrator as undeliverable, no Plan Distributions shall be made to such holder unless the Plan Administrator is notified of such holder's then current address within ninety (90) days after such Plan Distribution was returned. After such date, if such notice was not provided, a holder shall have forfeited its right to such Plan Distribution, and the undeliverable Plan Distribution shall be treated as Available Cash and distributed in accordance with Section 3.1 of the Plan.

4.      *Time Bar to Cash Payments*

Checks issued in respect of Allowed Claims shall be null and void if not negotiated within one hundred and eighty (180) days after the date of issuance thereof. Requests for reissuance of any voided check shall be made directly to the Plan Administrator by the holder of the Allowed Claim to whom such check was originally issued. Any claim in respect of such a voided check shall be made within one hundred and eighty (180) days after the date of issuance of such check. If no request is made as provided in the preceding sentence, any claims in respect of such voided check shall be discharged and forever barred and such unclaimed Plan Distribution shall be treated as Available Cash and distributed in accordance with Section 3.1 of the Plan.

5.      *Manner of Payment under the Plan*

Unless the Person receiving a Plan Distribution agrees otherwise, any Plan Distribution to be made in Cash under the Plan shall be made at the option of the Plan Administrator by check drawn on a domestic bank or by wire transfer from a domestic bank. Cash payments to foreign creditors may be, in addition to the foregoing, made at the option of the Plan Administrator in such funds and by such means as are necessary or customary in a particular foreign jurisdiction. The Plan Administrator shall cause all Plan Distributions in respect of the Senior Note Claims to be paid to DTC for payment to the Senior Noteholders similar to the manner in which the Debtor previously made payments on the Senior Notes.

6.      *Denomination of Foreign Currency*

Where a Claim has been denominated in foreign currency on a proof of Claim, the Allowed amount of such Claim shall be calculated in legal tender of the United States based upon the conversion rate in place as of the Petition Date and in accordance with section 502(b) of the Bankruptcy Code.

7.      *Fractional Plan Distributions*

Notwithstanding anything to the contrary contained herein, no Plan Distributions of fractions of dollars will be made. Fractions of dollars shall be rounded to the nearest whole dollar (with any amount equal to or less than one-half dollar to be rounded down).

8.      *Termination of Indenture, Notes, Certificates and Instruments and Continued Transferability of the Senior Notes*

On the Effective Date, the Indenture and all certificates, instruments and notes governed by the Indenture shall be automatically terminated, and instead holders of such certificates, instruments and notes shall be limited solely to the rights granted under the Plan; provided, however that notwithstanding entry of the Confirmation Order or the occurrence of the Effective Date, (i) any certificates, instruments or notes governed by the Indenture shall continue to represent the right, if any, to participate in Plan Distributions and (ii) the Senior Notes shall continue in effect solely for purposes of allowing holders of Senior Note Claims to receive Plan Distributions as though the Senior Notes remained outstanding, subject to the terms of (a) section 2.12 of the Indenture which restricts ownership and transferability and specifies the enforcement rights of the Debtor as described in the paragraph below and (b) section 2.2 of the Indenture which designates DTC as the registered holder of the Senior Notes held in global form to receive payment on behalf of the Senior Noteholders, both of which are incorporated by reference into the Plan.  On the final Senior Note Plan Distribution Date, the registered holder of the Senior Notes shall surrender the Senior Notes in exchange for the final Plan Distributions made on account of the Senior Notes.

Section 2.12 of the Indenture contains restrictions on the transferability of the Senior Notes, which will remain in effect after the Effective Date of the Plan, including, but not limited to, restrictions that **holders must be either (1) both (x) a "qualified institutional buyer" under the United States Securities Act of 1933, as amended (the "Securities Act") that, in either case, is not a broker-dealer which owns and invests on a discretionary basis less than $25 million in securities of issuers that are not affiliated persons of the dealer and is not a plan referred to in paragraph (a)(1)(i)(D) or (a)(1)(i)(E) of Rule 144A under the Securities Act or a trust fund referred to in paragraph (a)(1)(i)(F) of Rule 144A Securities Act that holds the assets of such a plan, if investment decisions with respect to the plan are made by beneficiaries of the plan and (y) a "qualified purchaser" ( a "Qualified Purchaser") under the United States Investment Company Act of 1940, as amended (the "Investment Company Act") or (2) not a "U.S. person" (a "Non-US Person") as defined in Regulation S under the Securities Act and is acquiring the Senior Notes in reliance on the exemption from registration provided by Regulation S under the Securities Act.**  The structure of the Plan permits transfer of the Senior Notes subject to such restrictions.

E.      **Conditions Precedent to the Effective Date**

The following are conditions precedent to the occurrence of the Effective Date:

(i)      the Confirmation Order shall have been entered by the Bankruptcy Court, be in full force and effect and not be subject to any stay or injunction;

(ii)      all necessary consents, authorizations and approvals shall have been given for the transfers of property and the payments provided for or contemplated by the Plan;

(iii)      the Confirmation Order, the Plan, the Plan Documents and all other definitive documentation shall be in form and substance satisfactory to the Plan Proponents;

28

(iv)    all actions, documents and agreements necessary to implement the Plan and the transactions contemplated by the Plan shall have been effected or executed; and

(v)    the New LP Interest to be issued under the Plan shall have been duly authorized and, upon issuance, shall be validly issued and outstanding.

## F.    Waiver of Conditions

The Plan Proponents may waive any one or more of the conditions set forth in Section 8.1 of the Plan (other than Section 8.1(a) of the Plan) without notice or order of the Bankruptcy Court and without notice to other parties in interest.

## G.    Effect of Non-Occurrence of the Effective Date

If the Effective Date shall not occur, the Plan shall be null and void and nothing contained in the Plan shall: (a) constitute a waiver or release of any Claims against or Old Equity Interests in the Debtor; (b) prejudice in any manner the rights of the Debtor or the Plan Proponents; or (c) constitute an admission, acknowledgement, offer or undertaking by the Debtor or the Plan Proponents.

## H.    Effect of the Occurrence of the Effective Date

### 1.    *Discharge of the Debtor*

Except as expressly provided in the Plan, upon the Termination Date, (a) each holder (as well as any trustees and agents on behalf of each holder) of a Claim against or Old Equity Interest in a Debtor shall be deemed to have forever waived, released and discharged the Debtor, to the fullest extent permitted by section 1141 of the Bankruptcy Code, of and from any and all Claims, Old Equity Interests, rights and liabilities that arose prior to the Effective Date and (b) all such holders shall be forever precluded and enjoined, pursuant to section 524 of the Bankruptcy Code, from prosecuting or asserting any discharged Claim against or terminated Old Equity Interest in the Debtor.

### 2.    *Indemnification Obligations*

Any obligations of the Debtor to indemnify and hold harmless its current and former directors or any other parties, whether arising under the Debtor's constituent documents, contract, law or equity, shall be rejected upon the Effective Date with the same effect as though such obligations constituted executory contracts that are rejected under section 365 of the Bankruptcy Code.  On the Effective Date, the Debtor shall indemnify all of the Debtor's directors and officers who acted in such capacity on the Petition Date and continuously through the Effective Date for any liability arising from an act, omission, transaction, event or other occurrence taking place on or prior to the Effective Date in connection with (a) the filing of the involuntary Chapter 11 petition, (b) the preparation and prosecution of the Chapter 11 Case, (c) the preparation, negotiation, filing and pursuit of approval of this Disclosure Statement, (d) the preparation, negotiation, solicitation, filing and pursuit of the confirmation of the Plan, (e) the consummation of the Plan or (f) the implementation or administration of the Plan or the property to be distributed under the Plan to the fullest extent permitted by law except for (i) any

29

willful misconduct or gross negligence as determined by a Final Order and (ii) any costs or liabilities incurred in opposing any action described in subsections (a) – (f) above; provided, however, that indemnification for actual out of pocket expenses incurred prior to the Petition Date shall be limited to $250,000 in the aggregate.  The Debtor or NewCo may also purchase and implement a director and officer insurance policy for the Debtor's directors who acted in such capacity on the Petition Date continuously through the Effective Date.

   3.       *Releases by the Debtor*

   **As of the Effective Date, for good and valuable consideration, the Debtor in its individual capacity and as Debtor in Possession will be deemed to release and forever waive and discharge all Causes of Action that are based in whole or part on any act, omission, transaction, event or other occurrence taking place on or prior to the Effective Date in any way relating to the Debtor, NewCo, the Chapter 11 Case, the Plan or this Disclosure Statement, and that could have been asserted by or on behalf of the Debtor or its Estate against (a) the Debtor's officers, directors, administrator, agents and representatives who were acting in their capacity as such on both the Petition Date and the Effective Date, in their respective capacities as such, (b) the Trustee and its agents, attorneys and advisors, in their respective capacities as such, (c) the Plan Proponent Parties and their present and former officers, directors and employees, in their respective capacities as such and (d) each of the foregoing's respective successors and assigns and each of their respective agents, attorneys, advisors, accountants, investment bankers, bankruptcy and restructuring advisors and financial advisors, in their respective capacities as such; except, that nothing in this Section shall be construed to release any party or entity from (i) willful misconduct or gross negligence as determined by a Final Order or (ii) any objections by the Debtor or the Plan Administrator to Claims filed by such party or entity against the Debtor or its Estate.**

   4.       *Exculpation*

   None of the Exculpated Parties shall have or incur any liability to any Person for any act or omission in connection with, or arising out of, (a) the filing of the involuntary Chapter 11 petition, (b) the preparation and prosecution of the Chapter 11 Case, (c) the preparation, negotiation, filing and pursuit of approval of this Disclosure Statement, (d) the preparation, negotiation, solicitation, filing and pursuit of the confirmation of the Plan, (e) the consummation of the Plan or (f) the implementation or administration of the Plan or the property to be distributed under the Plan, except solely for any act or omission arising out of such Exculpated Party's willful misconduct or gross negligence as finally determined by the Bankruptcy Court, and, in all respects each Exculpated Party shall be entitled to rely upon the advice of counsel and all information provided by other Exculpated Parties herein without any duty to investigate the veracity or accuracy of such information with respect to their duties and responsibilities under the Plan.

   5.       *Injunctions*

   The Confirmation Order will contain an injunction permanently enjoining the commencement or prosecution of certain actions, which injunction shall provide, inter alia:

(a)  On the Effective Date and <u>except</u> as otherwise provided in the Plan or the Confirmation Order, all Persons who have been, are, or may be holders of Claims against or Old Equity Interests in the Debtor shall be permanently enjoined from taking any of the following actions against or affecting (i) the Debtor, (ii) the Estate, (iii) NewCo, (iv) the Trustee, (v) the Plan Proponent Parties, (vi) the Plan Administrator, (vii) any of the aforementioned parties' current or former officers, directors, administrators, employees, members, managers, professionals, affiliates, advisors, partners and agents and (viii) the successors and assigns of the parties listed in (i) – (vii), or their respective assets and property, with respect to such Claims or Old Equity Interests (other than actions brought to enforce any rights or obligations under the Plan):

  (i)  commencing, conducting or continuing in any manner, directly or indirectly, any suit, action or other proceeding of any kind (including, without limitation, all suits, actions and proceedings that are pending as of the Effective Date, which must be withdrawn or dismissed with prejudice);

  (ii)  enforcing, levying, attaching, collecting or otherwise recovering by any manner or means, whether directly or indirectly, any judgment, award, decree or order;

  (iii)  creating, perfecting or otherwise enforcing in any manner, directly or indirectly, any encumbrance; and

  (iv)  asserting any setoff, right of subrogation or recoupment of any kind; provided, that any defenses, offsets or counterclaims which the Debtor, NewCo or the Plan Administrator may have or assert in respect of the above referenced Claims are fully preserved in accordance with Section 5.6 of the Plan; and

(b)  All Persons are permanently enjoined from commencing or continuing in any manner any Cause of Action, whether directly, derivatively, on account of or respecting any Cause of Action which has been released pursuant to the Plan, including pursuant to Sections 3.1, 4.2, 4.3, 10.3, 12.3, 12.4, 12.5 and 12.6 of the Plan;

(c)  All holders of a Claim against or an Old Equity Interest in the Debtor, or representative thereof, are permanently enjoined from pursuing any Cause of Action against any holder of a Claim for receiving or retaining Plan Distributions as provided for by the Plan; and

(d)  Notwithstanding anything to the contrary contained in the foregoing, nothing in Section 12.7 of the Plan shall preclude or impair any holder of an Allowed Claim or Allowed Old Equity Interest from bringing an action in the Bankruptcy Court against the Debtor or Plan Administrator to compel the making of Plan Distributions contemplated by the Plan on account of such Claim or Old Equity Interest.

## I.  Procedures for Resolving and Treating Contested Claims

  1.  *Objection Deadline*

Except as otherwise provided in the Plan, as soon as practicable, but in no event later than one hundred and twenty (120) days after the Confirmation Date (subject to being extended by the

order of the Bankruptcy Court upon motion of the Plan Administrator without notice or a hearing), objections to Claims shall be filed with the Bankruptcy Court and served upon the holders of each of the Claims to which objections are made.

    2.    *Prosecution of Contested Claims*

The Plan Administrator may object to the allowance of Claims with the Bankruptcy Court with respect to which liability is disputed in whole or in part.  All objections that are filed and prosecuted as provided herein shall be litigated to Final Order or compromised and settled in accordance with Section 7.3 of the Plan.

    3.    *Claims Settlement*

Notwithstanding any requirements that may be imposed pursuant to Bankruptcy Rule 9019, from and after the Effective Date, the Plan Administrator shall have authority to settle or compromise all Claims and Causes of Action against the Debtor without further review or approval of the Bankruptcy Court.

    4.    *Entitlement to Plan Distributions upon Allowance*

Notwithstanding any other provision of the Plan, no Plan Distribution shall be made with respect to any Claim to the extent it is a Contested Claim, unless and until such Contested Claim becomes an Allowed Claim, subject to the setoff rights provided in Section 12.16 of the Plan. When a Claim that is not an Allowed Claim as of the Effective Date becomes an Allowed Claim (regardless of when), the holder of such Allowed Claim shall thereupon become entitled to receive Plan Distributions in respect of such Allowed Claim in the same manner as though such Claim had been an Allowed Claim on the Effective Date.

    5.    *Estimation of Claims*

The Plan Proponents or the Plan Administrator may, at any time, request that the Bankruptcy Court estimate any Contested Claim pursuant to section 502(c) of the Bankruptcy Code regardless of whether an objection has been filed with respect to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court will retain jurisdiction to estimate any Claim at any time during litigation concerning any objection to any Claim, including during the pendency of any appeal relating to any such objection.  In the event that the Bankruptcy Court estimates any Contested Claim, that estimated amount will constitute the Allowed amount of such Claim for all purposes under the Plan.  All of the objection, estimation, settlement and resolution procedures set forth in the Plan are cumulative and not necessarily exclusive of one another.  Claims may be estimated and subsequently compromised, settled, withdrawn or resolved by any mechanism approved by the Bankruptcy Court.

## J.    The Plan Administrator

    1.    *Identity; Powers and Duties*

The initial Plan Administrator will be NewCo or an agent selected by it.  The Plan Proponents anticipate that NewCo will appoint the Investment Manager to act as the Plan Administrator.

Pursuant to the terms and provisions of the Plan, the Plan Administrator shall be empowered to (a) take all steps and execute all instruments and documents necessary to make Plan Distributions to holders of Allowed Claims; (b) comply with the Plan and the obligations thereunder; (c) employ, retain or replace professionals to represent it with respect to its responsibilities; (d) object to Claims as specified in Article VII of the Plan, and prosecute such objections; (e) compromise and settle any issue or dispute regarding the amount, validity, priority, treatment or Allowance of any Claim as provided in Article VII of the Plan; (f) make any required periodic reports; and (g) exercise such other powers as may be vested in the Plan Administrator pursuant to the Plan, the Plan Documents or an order of the Bankruptcy Court.

2.    *Fees and Expenses of the Plan Administrator*

Notwithstanding anything contained herein to the contrary, the amount of any reasonable fees and expenses incurred (or to be incurred) by the Plan Administrator (including, but not limited to, taxes) shall be paid when due prior to any Plan Distributions in respect of Senior Indenture Administrative Expense Claims, Indenture Priority Claims or Senior Note Claims. Professional fees and expenses incurred by the Plan Administrator from and after the Effective Date in connection with the effectuation of the Plan shall be paid in the ordinary course of business.  Any dispute regarding compensation shall be resolved by agreement of the parties, or if the parties are unable to agree, as determined by the Bankruptcy Court.

3.    *Exculpation of the Plan Administrator*

Except as otherwise provided in this Section, the Plan Administrator, together with its officers, directors, employees, members, managers, professionals, affiliates, partners, agents and representatives, are exculpated pursuant to the Plan by all Persons, holders of Claims and Old Equity Interests and all other parties in interest, from any and all Causes of Action arising out of the exercise of the powers and duties conferred upon the Plan Administrator by the Plan, any Final Order of the Bankruptcy Court entered pursuant to or in furtherance of the Plan or applicable law, except solely for actions or omissions arising out of the Plan Administrator's willful misconduct or gross negligence.  Nothing contained in this Section shall preclude or impair any holder of an Allowed Claim from bringing an action in the Bankruptcy Court against the Debtor or the Plan Administrator to compel the making of Plan Distributions contemplated by the Plan on account of such Claim.

## K.    Treatment of Executory Contracts and Unexpired Leases

1.    *Assumption and Rejection of Executory Contracts and Unexpired Leases*

All executory contracts and unexpired leases of the Debtor shall be rejected pursuant to the provisions of section 365 of the Bankruptcy Code effective as of and subject to the occurrence of the Effective Date, unless another date is specified in the Plan except:  (i) the Designated Assets to the extent such Designated Assets are executory; (ii) contracts and leases listed on a "Schedule of Assumed Executory Contracts and Unexpired Leases" to be filed by the

33

Plan Proponents with the Bankruptcy Court fifteen (15) Business Days prior to commencement of the Confirmation Hearing as Exhibit B of the Plan; (iii) any executory contract or unexpired lease that is the subject of a dispute over the amount or manner of cure pursuant to the next section hereof and for which the Debtor or Plan Administrator make a motion to reject such contract or lease based upon the existence of such dispute filed at any time; and (iv) any agreement, obligation, security interest, transaction or similar undertaking that the Plan Proponents believe is not executory or a lease that is later determined by the Bankruptcy Court to be an executory contract or unexpired lease that is subject to assumption or rejection under section 365 of the Bankruptcy Code.  Any order entered post-confirmation by the Bankruptcy Court, after notice and a hearing, authorizing the rejection of an executory contract or unexpired lease shall cause such rejection to be a prepetition breach under sections 365(g) and 502(g) of the Bankruptcy Code, as if such relief was granted and such order was entered preconfirmation.  The Plan Proponents reserve the right to amend the "Schedule of Assumed Executory Contracts and Unexpired Leases" prior to the entry of the Confirmation Order.  Each executory contract and unexpired lease to be assumed by the Debtor shall include modifications, amendments, supplements, restatements or other similar agreements made directly or indirectly by any agreement, instrument or other document that affects such executory contract or unexpired lease, without regard to whether such agreement, instrument or other document is listed on the "Schedule of Assumed Executory Contracts and Unexpired Leases."

The inclusion of a contract, lease or other agreement in Section 10.1(a) of the Plan or on the "Schedule of Assumed Executory Contracts and Unexpired Leases" shall not constitute an admission by the Plan Proponents as to the characterization of whether any such included contract, lease or other agreement is, or is not, an executory contract or unexpired lease or whether any claimants under any such contract, lease or other agreement are time-barred from asserting Claims against the Debtor.  The Plan Proponents reserve all rights with respect to the characterization of any such agreements.

The Plan shall constitute a motion to reject the Debtor's executory contracts and unexpired leases in accordance with Section 10.1 of the Plan, and the Debtor shall have no liability thereunder except as is specifically provided in the Plan.  Entry of the Confirmation Order by the Clerk of the Bankruptcy Court shall constitute approval of such rejections pursuant to section 365(a) of the Bankruptcy Code, subject to the occurrence of the Effective Date, and a finding by the Bankruptcy Court that each such rejected agreement, executory contract or unexpired lease is burdensome and that the rejection thereof is in the best interests of the Debtor and its Estate.

The Plan shall constitute a motion to assume and assign to NewCo, such executory contracts and unexpired leases as set forth in the "Schedule of Assumed Executory Contracts and Unexpired Leases."  Entry of the Confirmation Order by the Clerk of the Bankruptcy Court shall constitute approval of such assumption and assignment pursuant to sections 365(a), (b) and (f) of the Bankruptcy Code, and a finding by the Bankruptcy Court that the requirements of section 365(f) of the Bankruptcy Code have been satisfied.  Any non-Debtor counterparty to an agreement listed on the "Schedule of Assumed Executory Contracts and Unexpired Leases" or any other contract or unexpired lease otherwise designated as being assumed or assumed and assigned in Section 10.1(a) of the Plan who disputes the assignment of an executory contract or unexpired lease must file with the Bankruptcy Court, and serve upon the Plan Proponents, a

34

written objection to the assumption and assignment, which objection shall set forth the basis for the dispute by no later than five (5) Business Days prior to the commencement of the Confirmation Hearing.  The failure to timely object shall be deemed a waiver of any and all objections to the assumption and assignment of executory contracts and leases as set forth in the "Schedule of Assumed Executory Contracts and Unexpired Leases" or as otherwise designated as being assumed or assumed and assigned in Section 10.1(a) of the Plan.

      2.    *Cure*

At the election of the Plan Proponents, any monetary defaults under each executory contract and unexpired lease to be assumed under the Plan shall be satisfied pursuant to section 365(b)(1) of the Bankruptcy Code: (a) by payment of the default amount in Cash on the Effective Date or as soon thereafter as practicable; or (b) on such other terms as agreed upon in writing by the Plan Proponents or the Plan Administrator and the counter-party to such executory contract or unexpired lease.  In the event of a dispute regarding: (i) the amount of any cure payments; (ii) the ability to provide adequate assurance of future performance under the contract or lease to be assumed or assumed and assigned; or (iii) any other matter pertaining to assumption or assumption and assignment, the cure payments required by section 365(b)(1) of the Bankruptcy Code shall be made following the entry of a Final Order resolving the dispute and approving assumption or assignment, as applicable.  The "Schedule of Assumed Executory Contracts and Unexpired Leases" shall set forth the Debtor's cure obligations for each agreement for which cure obligations must be satisfied as a condition to the assumption and assignment of such agreement.  Any non-Debtor counterparty to an agreement listed on the "Schedule of Assumed Executory Contracts and Unexpired Leases" who disputes the scheduled cure obligation (or objects to the omission of a scheduled cure obligation) must file with the Bankruptcy Court, and serve upon the Plan Proponents, a written objection to the cure obligation, which objection shall set forth the basis for the dispute, the alleged correct cure obligation and any other objection related to the assumption or assumption and assignment of the relevant agreement by no later than five (5) Business Days prior to the commencement of the Confirmation Hearing.  If a non-Debtor counterparty fails to file and serve an objection which complies with the foregoing, the cure obligation set forth on the "Schedule of Assumed Executory Contracts and Unexpired Leases" shall be binding on the non-Debtor counterparty, and the non-Debtor counterparty shall be deemed to have waived any and all objections to the assumption or assumption and assignment of the relevant agreement as proposed by the Plan Proponents.

      3.    *Claims Arising from Rejected Contracts*

Rejection Damage Claims must be filed with the Bankruptcy Court and served on the Debtor, the Plan Proponents, the Creditors' Committee (if any) and the Office of the United States Trustee within forty-five (45) days after service or publication of the Notice of Confirmation or such other date established by the Bankruptcy Court in the Confirmation Order. **Failure to properly file any such Rejection Damage Claim pursuant to Section 10.3 of the Plan shall result in the Rejection Damage Claim being forever barred and discharged.**

## L.    Retention of Jurisdiction

On and after the Effective Date, pursuant to sections 105(a) and 1142 of the Bankruptcy

Code, the Bankruptcy Court shall retain jurisdiction over all matters arising in, arising under and related to the Chapter 11 Case to the fullest extent permitted by law.

**M.    Other Material Provisions of the Plan**

1.    *Substantial Consummation*

On the Effective Date, the Plan shall be deemed to be substantially consummated under sections 1101 and 1127(b) of the Bankruptcy Code.

2.    *Payment of Statutory Fees*

All fees payable pursuant to section 1930 of title 28 of the United States Code, as determined by the Bankruptcy Court at the Confirmation Hearing, shall be paid by the Debtor on or before the Effective Date.

3.    *Notices*

Any notices, requests and demands to or upon the Plan Proponents, in order to be effective, shall be in writing (including, without express or implied limitation, by facsimile transmission) and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when actually delivered or, in the case of notice by facsimile transmission, when received and telephonically confirmed, addressed as follows:

> Anchorage Capital Group, L.L.C.
> 610 Broadway, 6th Floor
> New York, New York 10012
> Attention:  Yale Baron
> With copy to: Anne-Marie Kim, Esq.
>
> and
>
> White & Case LLP
> Attention:  Zing VII Restructuring
> 1155 Avenue of the Americas
> New York, New York  10036

4.    *Headings*

The headings used in the Plan and this Disclosure Statement are inserted for convenience only, and neither constitutes a portion of the Plan nor in any manner affects the construction of the provisions of the Plan.

5.    *Governing Law*

Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and the Bankruptcy Rules), the laws of the State of New York, without giving effect to the conflicts of laws principles thereof, shall govern the construction of the Plan and any agreements,

documents and instruments executed in connection with the Plan, <u>except</u> as otherwise expressly provided in such instruments, agreements or documents.

6.      *Expedited Determination*

The Plan Administrator is hereby authorized to file a request for expedited determination under section 505(b) of the Bankruptcy Code for all tax returns filed with respect to the Debtor.

7.      *Exemption from Transfer Taxes*

Pursuant to section 1146 of the Bankruptcy Code, the issuance, transfer or exchange of notes or equity securities under the Plan, the creation of any mortgage, deed of trust, lien, pledge or other security interest, the making or assignment of any lease or sublease, or the making or delivery of any deed or other instrument of transfer under, in furtherance of, or in connection with the Plan, shall not be subject to any stamp, real estate transfer, mortgage recording or other similar tax.

8.      *Notice of Entry of Confirmation Order and Relevant Dates*

Promptly upon entry of the Confirmation Order, the Plan Proponents shall publish as directed by the Bankruptcy Court and serve on all known parties in interest and holders of Claims and Old Equity Interests, the Notice of Confirmation and notice of all relevant deadlines and dates under the Plan, including, but not limited to, the respective deadlines for filing Administrative Claims requests, Rejection Damages Claims or proofs of Claim evidencing Indenture Administrative Expense Claims and Indenture Priority Claims.

9.      *Modification of the Plan*

The Plan Proponents may modify the Plan in accordance with section 1127 of the Bankruptcy Code.  Additionally, prior to the Effective Date, the Plan Proponents may make appropriate technical adjustments and modifications to the Plan without further order or approval of the Bankruptcy Court, provided that such technical adjustments and modifications do not adversely affect in a material way the treatment of holders of Claims or Old Equity Interests.

10.     *Revocation of Plan*

The Plan Proponents reserve the right to revoke and withdraw the Plan and/or to adjourn the Confirmation Hearing prior to the occurrence of the Effective Date.

11.     *Setoff Rights*

In the event that the Debtor has a Claim of any nature whatsoever against the holder of a Claim against the Debtor, then the Debtor may, but is not required to, setoff against the Claim (and any payments or other Plan Distributions to be made in respect of such Claim hereunder) the Debtor's Claim against such holder, subject to the provisions of sections 553, 556 and 560 of the Bankruptcy Code.  Neither the failure to setoff nor the allowance of any Claim under the Plan shall constitute a waiver or release of any Claims that the Debtor may have against the holder of any Claim.

NEWYORK 7964400 (2K)

12.   *Compliance with Tax Requirements*

In connection with the Plan, the Debtor and the Plan Administrator, as applicable, shall comply with all withholding and reporting requirements imposed by federal, state, local and foreign taxing authorities, and all Plan Distributions hereunder shall be subject to such withholding and reporting requirements.  Notwithstanding the above, each holder of an Allowed Claim that is to receive a Plan Distribution shall have the sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed by any government unit, <u>including</u> income, withholding and other tax obligations, on account of such Plan Distribution.  The Plan Administrator has the right, but not the obligation, to not make a Plan Distribution until such holder has made arrangements satisfactory to the Plan Administrator for payment of any such tax obligations.

13.   *Dissolution of the Creditors' Committee (If Any)*

Upon the Effective Date, the Creditors' Committee (if any) shall dissolve automatically, whereupon its members, professionals and agents shall be released from any further duties and responsibilities in the Chapter 11 Case and under the Bankruptcy Code, except with respect to (a) applications for Fee Claims or reimbursement of expenses incurred as a member of the Creditors' Committee and (b) any motions or other actions seeking enforcement or implementation of the provisions of the Plan or the Confirmation Order or pending appeals of orders entered in the Chapter 11 Cases.

14.   *Binding Effect*

The Plan shall be binding upon NewCo, the Debtor, the holders of all Claims and Old Equity Interests, parties in interest, Persons and their respective successors and assigns.  The rights, benefits and obligations of any Person named or referred to in the Plan shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, successor or assign of such Person.

15.   *Conflict between Plan, Disclosure Statement and Plan Documents*

Except as provided below, in the event of any conflict between the terms and provisions in the Plan and the terms and provisions in this Disclosure Statement, the terms and provisions of the Plan shall control and govern.

In the event of any conflict between the terms and provisions in the Plan and the terms and provisions in the Plan Documents, the terms and provisions of the Plan Documents shall control and govern.

16.   *Severability*

**IN THE EVENT THE BANKRUPTCY COURT DETERMINES THAT ANY PROVISION OF THE PLAN IS UNENFORCEABLE EITHER ON ITS FACE OR AS APPLIED TO ANY CLAIM OR OLD EQUITY INTEREST OR TRANSACTION, THE PLAN PROPONENTS MAY MODIFY THE PLAN IN ACCORDANCE WITH AND SUBJECT TO SECTION 12.14 OF THE PLAN SO THAT SUCH PROVISION SHALL**

NEWYORK 7964400 (2K)

**NOT BE APPLICABLE TO THE HOLDER OF ANY SUCH CLAIM OR OLD EQUITY INTEREST OR TRANSACTION. SUCH A DETERMINATION OF UNENFORCEABILITY SHALL NOT (A) LIMIT OR AFFECT THE ENFORCEABILITY AND OPERATIVE EFFECT OF ANY OTHER PROVISION OF THE PLAN OR (B) REQUIRE THE RESOLICITATION OF ANY ACCEPTANCE OR REJECTION OF THE PLAN.**

17.    *No Admissions*

None of the filing of the Plan or the taking by the Debtor or the Plan Proponents of any action with respect to the Plan or any statement or provision contained herein shall be or be deemed to be an admission by any such party against interest, or be or be deemed to be a waiver of any rights, claims or remedies that such parties may have, and all such rights and remedies are and shall be specifically reserved. In the event the Plan is not confirmed and the Confirmation Order is not entered, the Plan, this Disclosure Statement and the Plan Documents, and any statement contained herein or therein, may not be used by any Person, party or entity against the Debtor or any of the Plan Proponents.

**AS TO CONTESTED MATTERS, ADVERSARY PROCEEDINGS AND OTHER CAUSES OF ACTION OR THREATENED CAUSES OF ACTION, THIS PLAN SHALL NOT CONSTITUTE OR BE CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY, STIPULATION OR WAIVER, BUT RATHER AS A STATEMENT MADE IN SETTLEMENT NEGOTIATIONS. THIS PLAN SHALL NOT BE ADMISSIBLE IN ANY NON-BANKRUPTCY PROCEEDING NOR SHALL IT BE CONSTRUED TO BE CONCLUSIVE ADVICE ON THE TAX, SECURITIES AND OTHER LEGAL EFFECTS OF THE PLAN AS TO HOLDERS OF CLAIMS AGAINST, AND OLD EQUITY INTERESTS IN, THE DEBTOR.**

**VII.**

**CERTAIN FEDERAL AND STATE SECURITIES LAWS CONSIDERATIONS**

While the Plan provides for the Senior Notes to continue in effect solely for the purposes of allowing the holders of Senior Note Claims to receive Plan Distributions, the characterization of the Senior Note Claims under U.S. and state securities laws is unclear. If the consummation of the Plan results in the exchange of Senior Notes for a new securities, the Debtor and NewCo will rely on section 1145 of the Bankruptcy Code to exempt the issuance of such securities from the registration requirements of the Securities Act and of any state or local securities or "blue sky" laws. Section 1145 of the Bankruptcy Code exempts from registration the offer or sale of securities of a debtor or a successor to such debtor under a Chapter 11 plan if such securities are offered or sold in exchange for a claim against, or interest in, or a claim for an administrative expense in a case concerning, such debtor under such plan. The Plan Proponents believe any offer and sale of a new security under the Plan satisfies the requirements of section 1145 and is therefore exempt from the registration requirements of the Securities Act and state or local securities laws.

NEW YORK 7964400 (2K)

The Debtor will not be registered as an investment company under the Investment Company Act in reliance upon the exemption provided by Section 3(c)(7) thereof.  To rely on Section 3(c)(7), the Debtor must have a "reasonable belief" that the holders of its securities are, at the time of purchase, either Qualified Purchasers or, in the case of a non-US issuer such as the Debtor, a Non-US Person.  The Debtor will rely upon the restrictions and deemed representations set forth herein and in the Indenture to establish such a reasonable belief that each person is either a Qualified Purchaser or a non-US person.

The Indenture contains restrictions on the transferability of the Senior Notes, including, but not limited to, restrictions that **holders must be either (1) both (x) a "qualified institutional buyer" under the Securities Act that, in either case, is not a broker-dealer which owns and invests on a discretionary basis less than $25 million in securities of issuers that are not affiliated persons of the dealer and is not a plan referred to in paragraph (a)(1)(i)(D) or (a)(1)(i)(E) of Rule 144A under the Securities Act or a trust fund referred to in paragraph (a)(1)(i)(F) of Rule 144A Securities Act that holds the assets of such a plan, if investment decisions with respect to the plan are made by beneficiaries of the plan and (y) a Qualified Purchaser under the Investment Company Act or (2) a Non-US Person as defined in Regulation S under the Securities Act, and is acquiring the Senior Notes in reliance on the exemption from registration provided by Regulation S under the Securities Act.**  The structure of the Plan permits transfer of the Senior Notes subject to such restrictions.  Failure to comply with these restrictions will cause such transfers to be null and void.

## VIII.

## CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES

The following discussion is a summary of certain U.S. federal income tax consequences expected to result from the implementation of the Plan.  This discussion is based on the Internal Revenue Code of 1986, as amended (the "Internal Revenue Code"), U.S. Treasury Regulations ("Treasury Regulations"), as well as judicial and administrative interpretations, in each case, available and in effect on the date of this Disclosure Statement (collectively, the "Tax Law").  All of the foregoing are subject to change, which change could apply retroactively and could affect the tax consequences described below.  There can be no assurance that the Internal Revenue Service ("IRS") will not take a contrary view with respect to one or more of the issues discussed below and no ruling from the IRS has been or will be sought with respect to any issues which may arise under the Plan.

Due to a lack of definitive judicial or administrative authority or interpretation, the complexity of the Internal Revenue Code and Treasury Regulations with respect to the implementation of the Plan, the possibility of changes in the law, the differences in the nature of various Claims and the potential for disputes as to legal and factual matters, the tax consequences discussed below are subject to substantial uncertainties.

For purposes of this summary, a "U.S. Holder" is a holder of a Claim or Old Equity Interest that is, for U.S. federal income tax purposes: (a) a citizen or resident of the United States; (b) a corporation created or organized in or under the laws of the United States or any state thereof (including the District of Columbia); (c) an estate the income of which is subject to

U.S. federal income taxation regardless of its source; or (d) a trust if such trust validly elects to be treated as a U.S. person for U.S. federal income tax purposes, or if (I) a court within the United States is able to exercise primary supervision over its administration and (II) one or more United States persons have the authority to control all of the substantial decisions of such trust.

The following summary is for general information only and discusses certain U.S. federal income tax consequences of the Plan to the Debtor, certain holders of Claims and holders of Old Equity Interests.  This summary does not purport to address all of the U.S. federal income tax consequences that may be applicable to any particular holder, nor does this discussion address any estate and gift tax issues.  Except as otherwise noted, the following discussion does not address state, local or foreign tax considerations that may be applicable to the Debtor and holders.  This summary does not address tax considerations applicable to holders that may be subject to special tax rules, such as financial institutions, insurance companies, real estate investment trusts, regulated investment companies, grantor trusts, dealers or traders in securities or currencies, tax-exempt entities, persons that hold an equity interest or a security in the Debtor as a position in a "straddle" or as part of a "hedging," "conversion" or "integrated" transaction for U.S. federal income tax purposes, persons that have a "functional currency" other than the U.S. dollar, and persons who acquired an equity interest or other security in the Debtor in connection with the performance of services.

If a partnership (or any other entity treated as a partnership for U.S. federal income tax purposes) holds Claims or Old Equity Interests, the tax treatment of a partner in such partnership generally will depend on the status of the partner and the activities of the partnership.  Any such partner should consult its tax advisor as to its tax consequences.

EACH HOLDER OF A CLAIM AGAINST OR OLD EQUITY INTEREST IN THE DEBTOR IS URGED TO CONSULT ITS OWN TAX ADVISOR WITH RESPECT TO THE U.S. FEDERAL, STATE, LOCAL AND FOREIGN TAX CONSEQUENCES OF THE CONFIRMATION AND CONSUMMATION OF THE PLAN.  THE TAX LAWS APPLICABLE TO CORPORATIONS IN BANKRUPTCY ARE EXTREMELY COMPLEX, AND THE FOLLOWING SUMMARY IS NOT EXHAUSTIVE.

### U.S. INTERNAL REVENUE SERVICE CIRCULAR 230 DISCLOSURE

PURSUANT TO U.S. INTERNAL REVENUE SERVICE CIRCULAR 230, WE HEREBY INFORM YOU THAT THE DESCRIPTION SET FORTH HEREIN WITH RESPECT TO U.S. FEDERAL TAX ISSUES WAS NOT INTENDED OR WRITTEN TO BE USED, AND SUCH DESCRIPTION CANNOT BE USED, BY ANY TAXPAYER FOR THE PURPOSE OF AVOIDING ANY PENALTIES THAT MAY BE IMPOSED ON THE TAXPAYER UNDER THE INTERNAL REVENUE CODE.  THIS DESCRIPTION IS LIMITED TO THE U.S. FEDERAL TAX ISSUES DESCRIBED HEREIN.  IT IS POSSIBLE THAT ADDITIONAL ISSUES MAY EXIST THAT COULD AFFECT THE U.S. FEDERAL TAX TREATMENT OF THE MATTER THAT IS THE SUBJECT OF THE DESCRIPTION NOTED HEREIN, AND THIS DESCRIPTION DOES NOT CONSIDER OR PROVIDE ANY CONCLUSIONS WITH RESPECT TO ANY SUCH ADDITIONAL ISSUES.  TAXPAYERS SHOULD SEEK ADVICE BASED ON THE TAXPAYER'S PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.

**A.    U.S. Federal Income Tax Consequences to the Debtor**

The Plan Proponents do not expect the Debtor to incur any material United States federal income tax as a result of implementation of the Plan.

**B.    U.S. Federal Income Tax Consequences to Class 1 – Senior Indenture Administrative Expense Claims and Class 2 – Indenture Priority Claims**

Pursuant to the Plan, holders of Class 1 – Senior Indenture Administrative Expense Claims and Class 2 – Indenture Priority Claims will receive solely Cash in full satisfaction of their Allowed Claims.  A holder who receives Cash in exchange for its Allowed Claim pursuant to the Plan generally will recognize income, gain or loss for U.S. federal income tax purposes in an amount equal to the difference between (i) the amount of Cash received in exchange for its Allowed Claim and (ii) the holder's adjusted tax basis in its Allowed Claim.  The character of such income, gain or loss as capital gain or loss or as ordinary income or loss will be determined by a number of factors, including the tax status of the holder, the nature of the Allowed Claim in such holder's hands, whether the Allowed Claim constitutes a capital asset under the Tax Law in the hands of the holder, whether the Allowed Claim was purchased at a discount, and whether and to what extent the holder has previously claimed a bad debt deduction with respect to its Allowed Claim.  To the extent that any amount received by a holder of an Allowed Claim is attributable to accrued interest, such amount should be taxable to the holder as interest income.  Conversely, a holder of an Allowed Claim may be able to recognize a deductible loss (or, possibly, a write-off against a reserve for worthless debts) to the extent that any accrued interest on the Allowed Claims previously was included in the holder's gross income but was not paid in full by the Debtor.  Such loss may be ordinary, but the tax law is unclear on this point.

**C.    U.S. Federal Income Tax Consequences to Class 3 – Senior Note Claims**

The United States federal income tax treatment of Class 3 – Senior Note Claims under the Plan is not clear.  The following are the possible alternative U.S. federal income tax

NEWYORK 7964400 (2K)

characterizations of the Plan to holders of Class 3 Claims.  Each holder should seek its own
guidance as to the most likely characterization for its particular circumstances.

1.    *Potential Characterizations of the Plan With Respect to Class 3 –Senior Note
Claims*

a.    No Deemed Exchange on the Effective Date

The first possible characterization of the Plan is that the Plan is simply a mechanism by
which the holders of Class 3 – Senior Note Claims assert their rights to effect a liquidation of the
Debtor and be paid pursuant to the terms of the Senior Notes.  Pursuant to this characterization of
the Plan, the termination of the Indenture (except as described in section VI.D.8 herein) and the
rights of other holders of Claims and Old Equity Interests in the Debtor pursuant to the Plan all
would be part of the Bankruptcy liquidation process and would not alter the characterization of
the Senior Notes or the amounts recovered on the Senior Notes.  Upon the Effective Date, there
would not be a "significant modification" of the Senior Notes under the Treasury Regulations or
otherwise for U.S. federal income tax purposes and, as a result, U.S. Holders of Class 3 – Senior
Note Claims would not realize a gain or loss because there would be no deemed exchange of
their Senior Notes for newly issued debt or equity of the Debtor for U.S. federal income tax
purposes.  Holders of Class 3 – Senior Note Claims would be treated as if they retained and
received Plan Distributions with respect to the Senior Notes.

After the Effective Date, any Plan Distributions or other property distributed to U.S.
Holders of a Class 3 – Senior Note Claims generally would be allocated first to the principal
amount of the Senior Notes and, thereafter, to the extent the aggregate Plan Distributions and the
fair market value of other property distributed exceed such amount, to any portion of such Claim
representing accrued but unpaid interest.  There is no assurance, however, that such allocation
will be respected by the IRS for U.S. federal income tax purposes.  To the extent that any amount
received by a U.S. Holder of a Class 3 – Senior Note Claim is received in satisfaction of accrued
interest during its holding period, such amount would be taxable to the U.S. Holder as interest
income (if not previously included in the U.S. Holder's gross income).  Conversely, a U.S.
Holder generally would recognize a deductible loss to the extent any accrued interest claimed
was previously included in its gross income and was not paid in full.

A U.S. Holder of a Class 3 – Senior Note Claim generally would be required to recognize
gain for U.S. federal income tax purposes to the extent the aggregate amount realized from Plan
Distributions and distributions of other property in respect of its Claim (not including any
amount attributable to accrued but unpaid interest) exceeds its adjusted tax basis in its Claim
(other than any portion of the Claim attributable to such accrued interest).  If all Plan
Distributions and distributions of other property have ceased being distributed as a result of the
Plan's termination, then, to the extent a U.S. Holder's adjusted tax basis in its Class 3 – Senior
Note Claim exceeds the aggregate amount of all Plan Distributions and distributions of other
property in respect of such holder's Class 3 – Senior Note Claim, such U.S. Holder would
recognize a loss.

b.    Deemed Exchange on the Effective Date for Equity

43

Pursuant to the Treasury Regulations, if the terms of a debt instrument undergo a "significant modification" a holder of the debt instrument generally is deemed to exchange the debt instrument for a modified debt instrument of or an equity interest in the debtor, even when there is no actual exchange of the debt instrument for another interest in the debtor. Such new interest in the debtor can be treated as either debt of or equity in the debtor depending on a number of factors. Recently promulgated Treasury Regulations make it clear that in making a determination of whether such new instrument in the debtor should be treated as debt or equity, the financial deterioration of the debtor is not to be used as a factor. On the Effective Date, the Indenture and Senior Notes will be terminated (except as described in section VI.8.D of the Disclosure Statement) and all debt instruments junior to the Senior Notes and the Old Equity Interests will be cancelled and holders thereof will not have any rights to receive distributions from the Debtor. Accordingly, it might be determined that on the Effective Date, for U.S. federal income tax purposes, the terms of the Senior Notes will have been "significantly modified" and, therefore, holders should be treated as having exchanged their Senior Notes for a new instrument of the Debtor.

If it is determined that upon the Effective Date the holders of the Senior Notes will be deemed to have exchanged their Senior Notes for another instrument of the Debtor (due to a "significant modification"), it is likely that such instrument received in the exchange would be treated as equity in the Debtor. As a result of the cancellation of all the Old Equity Interests and all Claims junior to the Class 3 – Senior Note Claims, the holders of Class 3 – Senior Note Claims would have the right to receive all distributions from the Debtor after the Class 1 – Senior Indenture Administrative Expense Claims and Class 2 – Indenture Priority Claims have been paid and the new interest in the Debtor held by these holders will have no maturity date nor any other financial terms or covenants other than the right to receive distributions pursuant to the Plan. If the new interest in the Debtor is treated as equity for U.S. federal income tax purposes, this deemed exchange of the Senior Notes for the new equity interest generally should be treated as a tax-free "recapitalization" for U.S. federal income tax purposes. As a tax-free "recapitalization," a U.S. Holder of a Senior Note generally would have a tax basis in its equity received equal to such U.S. Holder's adjusted tax basis in the Senior Notes deemed exchanged for such equity interest. A U.S. Holder's holding period in the equity received in the deemed exchange would include the holding period in its surrendered Senior Note.

Based on certain estimates of its gross income and gross assets and the nature of its business, the Debtor should be classified as a "passive foreign investment company" ("PFIC"), for United States federal income tax purposes, for the taxable year ending December 31, 2011. A foreign corporation generally will be a PFIC if, for a taxable year, either (a) 75% or more of its gross income for such taxable year is passive income , or (b) 50% or more of the average percentage, generally determined by fair market value, of its assets either produce passive income or are held for the production of passive income. "Passive income" includes, for example, dividends, interest, certain rents and royalties, certain gains from the sale of stock and securities and certain gains from commodities transactions. Certain look-through rules apply for purposes of the income and asset tests described above. If a foreign corporation owns, directly or indirectly, 25% or more of the total value of the outstanding value of another foreign corporation, it will be treated as if it (a) held a proportionate share of the other corporation's assets and (b) directly received a proportionate share of the other corporation's income. As a PFIC, U.S. Holders generally would be subject to imputed interest charges and other

44

disadvantageous tax treatment with respect to any gain from the sale or exchange of, and certain distributions (and possibly Plan Distributions) with respect to, equity in the Debtor, including the denial of the taxation of certain dividends at the lower rates applicable to long-term capital gains. A U.S. Holder electing to treat the Debtor as a "qualified electing fund" or making a "mark-to-market" election will be taxed differently. U.S. Holders of Class 3 – Senior Note Claims should consult their own tax advisors with respect to ownership and disposition of equity in the Debtor in the event that for U.S. federal income tax purposes, holders of Senior Notes are treated as exchanging their Senior Notes for equity in the Debtor pursuant to the Plan.

c.    <u>Deemed Exchange on the Effective Date for Debt</u>

If it is determined that upon the Effective Date of the Plan the holders of the Senior Notes would be deemed to have exchanged their Senior Notes for another instrument of the Debtor (due to a "significant modification" of the Senior Notes), it is also possible that such instrument would be treated as debt of the Debtor instead of equity in the Debtor for U.S. federal income tax purposes. If the instrument received is treated as debt that is a "security" for U.S. federal income tax purposes, the deemed exchange of the Senior Notes for the new debt instrument generally would not be a taxable exchange for U.S. federal income tax purposes. If the instrument received is treated as debt that is not a "security," the deemed exchange generally would be a taxable exchange for U.S. federal income tax purposes. The term "security" is not defined in the Internal Revenue Code or in the Treasury Regulations and has not been clearly defined by judicial decisions. The determination of whether a particular debt instrument constitutes a "security" depends on an overall evaluation of the nature of the debt. One of the most significant factors considered in determining whether a particular debt instrument is a security is its original term. In general, debt obligations issued with a weighted average maturity at issuance of five years or less (e.g., trade debt and revolving credit obligations) do not constitute securities, whereas debt obligations with a weighted average maturity at issuance of ten years or more constitute securities. In the case of a newly issued debt instrument in the deemed exchange, such instrument would not have any term, although it is expected that the liquidation of the Debtor will be completed within a few years and the new debt instrument would be extinguished at that time. It is unlikely that such newly issued debt instrument would constitute a security for U.S. federal income tax purposes but this conclusion is uncertain. If the newly issued debt instrument did not constitute a security, the deemed exchange of the Class 3 – Senior Note Claims for the newly issued debt would be a taxable exchange. In such a taxable exchange, a U.S. Holder of a Class 3 – Senior Note Claim generally would recognize gain or loss equal to the difference between the fair market value of the newly issued instrument and its adjusted tax basis in the Class 3 – Senior Note Claim. A U.S. Holder would take a new tax basis equal to the fair market value of the newly issued instrument and would begin a new holding period.

If the newly issued instrument did constitute a security, the exchange generally would qualify as a tax-free "recapitalization." As a tax-free "recapitalization" a U.S. Holder of a Senior Note generally should have a tax basis in the debt deemed to be issued equal to such U.S. Holder's adjusted tax basis in the Senior Notes deemed exchanged for such new debt. A U.S. Holder's holding period in the new debt received in the deemed exchange would include the holding period in its surrendered Senior Note.

45

After the Effective Date, any Plan Distributions or other property distributed to holders of Class 3 – Senior Note Claims generally would be allocated first to the principal amount of such new debt instrument and, thereafter, to the extent the aggregate Plan Distributions and the fair market value of other property distributed exceed such amount, to any portion of such Claim representing accrued but unpaid interest.  There is no assurance, however, that such allocation would be respected by the IRS for U.S. federal income tax purposes.  To the extent that any amount received by a U.S. Holder of a Class 3 – Senior Note Claim is received in satisfaction of accrued interest during its holding period, such amount generally would be taxable to the U.S. Holder as interest income (if not previously included in the U.S. Holder's gross income).  Conversely, a U.S. Holder generally would recognize a deductible loss to the extent any accrued interest claimed was previously included in its gross income and was not paid in full.

2.    *Characterizations – In General*

Whether the Plan is characterized for U.S. federal income tax purposes pursuant to alternatives (a), (b) or (c) above, to the extent that a holder is required to recognize gain or loss, the character of such gain or loss as long-term or short-term capital gain or loss or as ordinary income will be determined by a number of factors.  In general, any gain should constitute capital gain that qualifies as long-term capital gain if, as of the date of the Plan Distribution, the Senior Note (or interest in the Debtor deemed exchanged for the Senior Note) constitutes a capital asset and such U.S. Holder held its Senior Note (or interest in the Debtor deemed exchanged for the Senior Note) for more than one year.  In contrast, if the Senior Note (or interest in the Debtor deemed exchanged for the Senior Note) does not constitute a capital asset or it is held by a U.S. Holder that (i) purchased such Senior Note from a prior holder at more than a de minimis market discount and who has not elected to amortize market discount into income on a current basis or (ii) previously claimed a bad debt deduction with respect to the Senior Note, all or a portion of such gain generally could be characterized as ordinary income.  Under current U.S. federal income tax law, the maximum regular individual United States federal income tax rate on capital gains generally is 15% for capital assets held for more than one year and sold prior to January 1, 2013 (and 20% for gains recognized thereafter).  Capital gains on the sale of capital assets held for one year or less are subject to United States federal income tax at ordinary income rates.  A U.S. Holder's ability to utilize capital losses may be limited.

**D.    U.S. Federal Income Tax Consequences to Class 4 Claims through Class 11 Claims**

Pursuant to the Plan, holders of all Class 4 through Class 11 Claims, which include all Junior Note Claims, Subordinated Claims, Income Note Claims, General Unsecured Claims and Old Equity Interests will receive nothing in exchange for their respective Claims.  As a result, upon the Effective Date of the Plan, each U.S. Holder of a Class 4, 5, 6, 7, 8, 9, 10 or 11 Claim generally will recognize a loss equal to the U.S. Holder's adjusted tax basis in such Claim extinguished under the Plan, except to the extent that such U.S. Holder previously claimed a loss with respect to such Claim under its regular method of tax accounting.  U.S. Holders of any Class 4 through Class 11 Claims are urged to consult with their own tax advisors, though, regarding their own specific situation and tax consequences.  Generally, such loss, if any, would be a capital loss (which capital loss would be long-term capital loss to the extent that the U.S. Holder has held the debt instrument or equity interest underlying its Claim for more than one year) if the Claim is a capital asset in the U.S. Holder's hands.

46

E.      **U.S. Federal Income Tax Consequences to Certain Non-U.S. Holders**

For purposes of the following discussion, a Non-U.S. Holder is a holder that is not a U.S. Holder.  A Non-U.S. Holder generally will not be subject to U.S. federal income tax or withholding tax on any gain recognized on the satisfaction of an Allowed Claim unless: (1) such gain is effectively connected with a United States trade or business, as defined in the Internal Revenue Code; or (2) a Non-U.S. Holder is an individual who was present in the United States for 183 days or more in the taxable year of the satisfaction of such Allowed Claim and certain other conditions are met.

Non-U.S. Holders are urged to consult their own tax advisors, though, with respect to the U.S., federal, state, local and foreign tax consequences of the Plan.

F.      **Information Reporting and Backup Withholding**

All distributions to U.S. Holders of Claims under the Plan are subject to any applicable withholding (including employment tax withholding). Under U.S. federal income tax law, interest, dividends and other reportable payments may, under certain circumstances, be subject to "backup withholding" at the then applicable rate (currently 28%). Backup withholding generally applies if the U.S. Holder (a) fails to furnish its social security number or other taxpayer identification number ("TIN"), (b) furnishes an incorrect TIN, (c) fails to properly report interest or dividends or (d) under certain circumstances, fails to provide a certified statement, signed under penalty of perjury, that the TIN provided is its correct number and that it is a United States person that is not subject to backup withholding. Backup withholding is not an additional tax but merely an advance payment, which may be refunded to the extent it results in an overpayment of tax and the appropriate information is supplied to the IRS. Certain persons are exempt from backup withholding.  Certain Non-U.S. Holders also could be subject to backup withholding or and/or information reporting unless such Non-U.S. Holders certify their non-U.S. status.

In addition, from an information reporting perspective, Treasury Regulations generally require disclosure by a taxpayer on its U.S. federal income tax return of certain types of transactions in which the taxpayer participated, including, among other types of transactions, the following: (1) certain transactions that result in the taxpayer claiming a loss in excess of specified thresholds and (2) certain transactions in which the taxpayer's book-tax differences exceed a specified threshold in any tax year. U.S. Holders are urged to consult their tax advisors regarding these regulations and whether the transactions contemplated by the Plan would be subject to these regulations and require disclosure on the U.S. Holders' tax returns.

Certain U.S. Holders of stock in a foreign corporation may be required to file an information return on Form 5471 with respect to their ownership of such stock. U.S. Holders should consult their own tax advisors with respect to the potential application of this requirement to them.

G.      **Importance of Obtaining Professional Tax Assistance**

THE FOREGOING DISCUSSION IS INTENDED ONLY AS A SUMMARY OF CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING WITH A TAX PROFESSIONAL.  THE

47

ABOVE DISCUSSION IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT TAX ADVICE.  THE TAX CONSEQUENCES ARE IN MANY CASES UNCERTAIN AND MAY VARY DEPENDING ON A CLAIM HOLDER'S PARTICULAR CIRCUMSTANCES. ACCORDINGLY, HOLDERS OF CLAIMS AND INTERESTS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS ABOUT THE U.S. FEDERAL, STATE AND LOCAL AND APPLICABLE NON-U.S. INCOME AND OTHER TAX CONSEQUENCES OF THE PLAN.

## IX.

## CERTAIN ERISA AND OTHER CONSIDERATIONS

The U.S. Employee Retirement Income Security Act of 1974, as amended ("ERISA"), imposes certain restrictions on employee benefit plans and on certain other benefit plans and arrangements, including individual retirement accounts as well as bank collective investment funds and insurance company separate accounts and general accounts in which such plans or arrangements are invested, that are subject to ERISA or Section 4975 of the Internal Revenue Code (collectively, "Benefit Plans") and on persons who are fiduciaries with respect to Benefit Plans.  ERISA and Section 4975 of the Internal Revenue Code prohibit a broad range of transactions involving the assets of a Benefit Plan and certain persons (referred to as "parties in interest" under ERISA or "disqualified persons" under the Internal Revenue Code) having certain relationships to Benefit Plans, unless a statutory or administrative exemption is applicable to the transaction.

Under ERISA and U.S. Department of Labor regulations, if a Benefit Plan invests in an equity interest of an entity, such as the Debtor, that is neither a publicly offered security registered under the U.S. securities laws nor a security issued by an investment company registered under the Investment Company Act of 1940, the Benefit Plan's assets are deemed to include both the equity interest and an undivided interest in each of the underlying assets of the entity, unless (a) the entity is an operating company or (b) immediately after the most recent acquisition of any equity interest in the entity, less than 25 percent of the total value of each class of equity interest in the entity, disregarding equity interests held by persons with discretionary authority or control over the assets of the entity or who provide investment advice for a fee with respect to such assets, and their respective affiliates, is held by "Benefit Plan Investors" (the "25% Test"). The term "Benefit Plan Investor" means (1) any "employee benefit plan" (as defined in section 3(3) of ERISA), subject to the fiduciary responsibility provisions of Title I of ERISA, (2) any "plan" to which Section 4975 of the Internal Revenue Code applies and (3) any entity whose underlying assets include plan assets by reason of a Benefit Plan's investment in that entity, but only to the extent of the percentage of the equity interests in that entity that are held by Benefit Plan Investors.

Upon consummation of the Plan, the Senior Notes may constitute equity interests in the Debtor for these purposes.  Neither the Debtor nor NewCo will be registered under the Investment Company Act of 1940.  Furthermore, for these purposes, it is not anticipated that the Senior Notes will constitute publicly offered securities, and neither the Debtor nor NewCo will qualify as an operating company.  Investment in and transfer of the Senior Notes has not been and will not be restricted or monitored with respect to satisfaction of the 25% Test.  Accordingly, there can be no assurance that 25% or more of the Senior Notes will not be held by Benefit Plan

Investors for purposes of the 25% Test.  If the Debtor does not satisfy the 25% Test, an undivided portion of the Debtor's assets may be deemed to be assets of each Benefit Plan that invests in the Senior Notes.  In such case, among other things:  (1) certain transactions or investments that the Debtor or NewCo might enter into, or may have entered into, in the ordinary course of its business might constitute direct or indirect prohibited transactions under ERISA and/or Section 4975 of the Internal Revenue Code, or breach contracts to which the Debtor or NewCo is a party, and might have to be rescinded; (2) although not contemplated in this Disclosure Statement, certain fees paid to the Investment Manager might be considered to be a non-exempt prohibited transaction under Section 406 of ERISA and/or Section 4975 of the Internal Revenue Code; (3) the Investment Manager and other persons providing services with respect to the Debtor's assets may be considered fiduciaries or other parties in interest or disqualified persons with respect to an investing Benefit Plan; and (4) it is not clear whether the limitations of Section 403(a) of ERISA on the delegation of investment management responsibilities by fiduciaries of ERISA-covered Benefit Plans or whether the rules of Section 404(b) of ERISA and the regulations thereunder regarding maintenance of the indicia of ownership of the assets of ERISA-covered Benefit Plans outside the jurisdiction of the U.S. district courts would be satisfied.

In the event that the Investment Manager obtains knowledge that the Debtor's assets are deemed to be assets of Benefit Plans that invest in the Senior Notes, the Investment Manager intends to use reasonable efforts to operate NewCo in compliance with the applicable requirements of ERISA and Section 4975 of the Internal Revenue Code.

In connection with solicitation of votes on the Plan, the Plan Proponents will request for each holder of a Senior Note to indicate if it is a Benefit Plan Investor.  If it can be determined that 25% or more of the Senior Notes will not be held by Benefit Plan Investors for purposes of the 25% Test, the Investment Manager will have greater flexibility in opportunistically liquidating NewCo's assets.

**The discussion of ERISA and Section 4975 of the Internal Revenue Code contained in this Disclosure Statement should not be construed as legal advice and is, of necessity, general, and does not purport to be complete.  Moreover, the provisions of ERISA and Section 4975 of the Internal Revenue Code are subject to extensive and continuing administrative and judicial interpretation and review.  Therefore, the matters discussed above may be affected by future regulations, rulings and court decisions, some of which may have retroactive application and effect.**

**Any Benefit Plan, and any fiduciary thereof, that holds the Senior Notes or any interest therein should consult with its legal advisors regarding the applicability of the fiduciary responsibility and prohibited transaction provisions of ERISA and Section 4975 of the Internal Revenue Code to its investment in the Notes.**

# X.

# RISK FACTORS

THE IMPLEMENTATION OF THE PLAN IS SUBJECT TO A NUMBER OF MATERIAL RISKS, INCLUDING THOSE ENUMERATED BELOW.

The holder of a Claim against the Debtor entitled to vote on the Plan should read and carefully consider the following factors, as well as the other information set forth in this Disclosure Statement (and the documents delivered together herewith and/or incorporated by reference herein or in the Plan), before deciding whether to vote to accept or reject the Plan.

THESE SPECIFIC RISK FACTORS SHOULD NOT, HOWEVER, BE REGARDED AS CONSTITUTING THE ONLY RISKS INVOLVED IN CONNECTION WITH THE PLAN AND ITS IMPLEMENTATION.

## A.    General Considerations

The formulation of a reorganization plan is a principal purpose of a Chapter 11 Case. The Plan sets forth the means for satisfying the Claims against, and Old Equity Interests in, the Debtor.  Reorganization of the Debtor's businesses and operations under the proposed Plan also avoids the potentially adverse impact of a protracted and costly reorganization.

## B.    Certain Bankruptcy Considerations

Risk Involuntary Relief Is Denied.  The Plan Proponents anticipate filing involuntary petitions for the Debtor under Chapter 11 of the Bankruptcy Code.  While the Plan Proponents believe that relief under Chapter 11 of the Bankruptcy Code is appropriate, there can be no assurance as to whether the Bankruptcy Court will enter an order for relief under Chapter 11 of the Bankruptcy Code or whether the Bankruptcy Court will not abstain from hearing the Chapter 11 Case.

Risk Exclusivity Is Not Terminated.  The Plan Proponents are engaged in negotiations with the Debtor seeking, among other things, the Debtor's consent to the termination of Exclusivity to file a plan of reorganization during the 120 days after the date the Bankruptcy Court enters an order for relief pursuant to section 1121 of the Bankruptcy Code.  There can be no assurance that the Debtor will agree to terminate Exclusivity.  In the event the Debtor does not agree to waive Exclusivity, the Plan Proponents anticipate seeking the Bankruptcy Court's approval to terminate Exclusivity; however, there is a risk that the Bankruptcy Court may refuse to terminate Exclusivity.  If termination of Exclusivity is not obtained, it will be necessary for the Plan Proponents to abstain from filing the Plan and the Disclosure Statement with the Bankruptcy Court for 120 days or such other time as enumerated in section 1121 of the Bankruptcy Code.  If this delay in the filing of the Plan were to occur, there is a substantial risk that holders of Claims would receive less than they would receive under the Plan.

Risk Debtor-in-Possession Financing Becomes Necessary.  The Plan Proponents anticipate that the Debtor will generate sufficient Cash to fund its Administrative Expenses during the pendency of the Chapter 11 Case.  If not, however, it may be necessary for the Debtor

to obtain debtor-in-possession financing to address its short-term liquidity needs.  Such debtor-in-possession financing, including the Exit Facility, would be paid back prior to making Plan Distributions to Senior Noteholders.  There can be no assurances that debtor-in-possession financing would not materially and adversely affect Senior Noteholders' recoveries under the Plan.

Risk Plan and Disclosure Statement Are Not Accepted or Approved.  The Plan requires the approvals of a requisite number of Senior Noteholders as described in the section hereof entitled "Confirmation and Consummation Procedures – Overview" and the approval of the Bankruptcy Court.  The Bankruptcy Court must also approve this Disclosure Statement pursuant to section 1125 of the Bankruptcy Code.  Consequently, there can be no assurance that such acceptance and approval will be obtained and therefore, that the Plan will be confirmable.

Risk of Non-Occurrence of Confirmation and the Effective Date. Although the Plan Proponents believe that the Effective Date will occur reasonably soon after the Confirmation Date, there can be no assurance as to the timing or as to whether the Effective Date will occur.  If the Plan is not confirmed and consummated, there can be no assurance that any alternative plan of reorganization would be on terms as favorable to the holders of impaired Claims as the terms of the Plan.  In addition, if a protracted reorganization were to occur, there is a substantial risk that holders of Claims would receive less than they would receive under the Plan.  See Exhibit C hereto for a liquidation analysis of the Debtor.

## C.    Methods of Solicitation

Section 1126(b) of the Bankruptcy Code provides that the holder of a claim against, or interest in, a debtor who accepts or rejects a plan of reorganization before the commencement of a chapter 11 case is deemed to have accepted or rejected such plan under the Bankruptcy Code so long as the solicitation of such acceptance was made in accordance with applicable non-bankruptcy law governing the adequacy of disclosure in connection with such solicitations, or, if such laws do not exist, such acceptance was solicited after disclosure of "adequate information," as defined in section 1125 of the Bankruptcy Code.  In addition, Bankruptcy Rule 3018(b) states that a holder of a claim or interest who has accepted or rejected a plan before the commencement of the case under the Bankruptcy Code will not be deemed to have accepted or rejected the plan if the court finds, after notice and a hearing, that the plan was not transmitted in accordance with reasonable solicitation procedures.

The Plan Proponents believe that the use of the Disclosure Statement and Ballots for the purpose of soliciting acceptances of the Plan is in compliance with the Bankruptcy Code.  Moreover, the Plan Proponents believe that its solicitation of votes to accept or reject the Plan from Holders of Claims in Class 3 – Senior Note Claims is proper under applicable non-bankruptcy law, rules and regulations, and contains adequate information as defined by section 1125(a) of the Bankruptcy Code.  The Plan Proponents also believe that it is not required to solicit any other class under the Bankruptcy Code or applicable non-bankruptcy law, rules or regulations.  While the Plan Proponents believe its solicitation of the Plan meets the requirements of section 1126(b) of the Bankruptcy Code and Bankruptcy Rule 3018(b), there can be no assurance that the Bankruptcy Court will agree.  If the Bankruptcy Court determines that the solicitation does not comply with the requirements of section 1126(b) of the Bankruptcy

NEWYORK 7964400 (2K)

Code, the Plan Proponents may seek to resolicit acceptances, and, in such event, confirmation of the Plan could be delayed and possibly jeopardized.

**D.    Classification and Treatment of Claims and Equity Interests**

Section 1122 of the Bankruptcy Code requires that the Plan classify claims against, and interests in, the Debtor. The Bankruptcy Code also provides that the Plan may place a Claim or interest in a particular class only if such Claim or interest is substantially similar to the other Claims or interests of such Class. The Plan Proponents believe that all Claims and Equity Interests have been appropriately classified in the Plan.

To the extent that the Bankruptcy Court finds that a different classification is required for the Plan to be confirmed, the Plan Proponents presently anticipate that they would seek (i) to modify the Plan to provide for whatever classification might be required for confirmation and (ii) to use the acceptances received from any creditor pursuant to this solicitation for the purpose of obtaining the approval of the class or classes of which such creditor ultimately is deemed to be a member. Any such reclassification of creditors, could adversely affect the class in which such creditor was initially a member, or any other class under the Plan, by changing the composition of such Class and the vote required for approval of the Plan. There can be no assurance that the Bankruptcy Court, after finding that a classification was inappropriate and requiring a reclassification, would approve the Plan based upon such reclassification. Except to the extent that modification of classification in the Plan requires resolicitation, the Plan Proponents will, in accordance with the Bankruptcy Code and the Bankruptcy Rules, seek a determination by the Bankruptcy Court that acceptance of the Plan of any holder of Claims pursuant to this solicitation will constitute a consent to the Plan's treatment of such holder regardless of the class as to which such holder is ultimately deemed to be a member. The Plan Proponents believes that under the Bankruptcy Rules the Plan Proponents would be required to resolicit votes for or against the Plan only when a modification adversely affects the treatment of the Claim of any creditor.

The Bankruptcy Code also requires that the Plan provide the same treatment for each Claim of a particular class unless the holder of a particular Claim agrees to a less favorable treatment of its Claim. The Plan Proponents believe that the Plan complies with the requirement of equal treatment. However, to the extent that the Bankruptcy Court finds that the Plan does not satisfy such requirement, the Bankruptcy Court could deny confirmation of the Plan.

Issues or disputes relating to classification and/or treatment could result in a delay in the confirmation and Effective Date of the Plan and could increase the risk that the Plan will not be consummated.

**E.    Claims Estimations**

The Valuation Analysis and the Liquidation Analysis are premised on certain assumptions regarding, among other things, the amounts of certain Senior Indenture Administrative Expense Claims and Indenture Priority Claims that would be Allowed by the Bankruptcy Court. There can be no assurance that the estimated Claim amounts set forth therein are correct. The estimated Claim amounts are subject to certain risks, uncertainties and

NEWYORK 7964400 (2K)

assumptions.  Should one or more of these risks or uncertainties materialize or should underlying assumptions prove incorrect, and should the Plan be consummated, the actual amount of Allowed Claims may significantly vary from those estimated therein and could require payment of such Claims in full, which could negatively impact projected recoveries of Senior Noteholders.

## F.      Limited Liquidity

The Senior Notes Claims that will receive Plan Distributions are highly illiquid.  There is no secondary market for such Senior Notes Claims, and it is unlikely that any such market will develop.  No Person is under any obligation to make a market in such Senior Notes Claims.  In addition, such Senior Notes Claims are subject to certain transfer restrictions set forth herein and in the Indenture.  Before voting in favor of the Plan, Senior Noteholders should be prepared to hold their investment in such Senior Notes Claims until each of the Designated Assets held by NewCo have been liquidated, repaid or otherwise written down to zero.

## G.      Management of NewCo

Certain conflicts of interest may arise from the fact that the Investment Manager, an affiliate of the Plan Proponents, provides investment management services to NewCo.  The liquidation strategies employed by the Investment Manager could conflict with the interests of the Senior Noteholders as a whole.

## H.      Risks Arising from Liquidation Activities

The Valuation Analysis and Liquidation Analysis are premised on certain assumptions regarding NewCo's ability to sell the Assets over certain time periods and at certain prices.  Due to market volatility, the price of the Designated Assets and the timing of any liquidation of such Designated Assets could be affected by factors affecting securities markets generally, such as real or perceived adverse economic conditions, supply and demand for particular instruments, changes in the general outlook for the market or adverse investor sentiment generally.  These events could prevent NewCo from liquidating the Designated Assets and have an adverse effect on its liquidation strategies.

## I.      ERISA Considerations

The Debtor's Assets Could Be Deemed To Be "Plan Assets".  If 25% or more of the Senior Notes (calculated in accordance with ERISA) are owned, directly or indirectly, by pension plans or other benefit plan investors (meaning employee benefit plans subject to ERISA's fiduciary rules, plans subject to Section 4975 of the Internal Revenue Code, and entities whose underlying assets are deemed to include assets of any such plans), the Debtor's assets could be deemed to be "plan assets" subject to the significant constraints of ERISA or Section 4975 of the Internal Revenue Code.  Because investment in and transfer of the Senior Notes has not been and will not be monitored for purposes of this 25% limit, there can be no assurance that 25% or more of the Senior Notes will not be held by benefit plan investors, and, therefore, the Debtor's assets may be deemed to be "plan assets" that are subject to ERISA or Section 4975 of the Internal Revenue Code.  If the assets of the Debtor were deemed to be "plan assets", certain transactions or investments that the Debtor might enter into, or may have entered into, in the

NEWYORK 7964400 (2K)

ordinary course of its business might constitute direct or indirect non-exempt prohibited transactions under ERISA and/or Section 4975 of the Internal Revenue Code, or breached contracts to which the Debtor is a party, and might have to be rescinded. See "Certain ERISA and Other Considerations" for a more detailed discussion of certain ERISA and related considerations with respect to holding the Senior Notes.

## XI.

## CONFIRMATION AND CONSUMMATION PROCEDURES

### A.   Overview

A plan of reorganization may provide anything from a complex restructuring of a debtor's business and its related obligations to a simple liquidation of a debtor's assets. In either event, upon confirmation of a plan, it becomes binding on such debtor and all of its creditors and equity holders and the obligations owed by such debtor to such parties are compromised and exchanged for the obligations specified in such plan.

If all classes of claims and equity interests accept a plan of reorganization, the bankruptcy court may confirm the plan if the bankruptcy court independently determines that the requirements of section 1129(a) of the Bankruptcy Code have been satisfied. Section 1129(a) sets forth the requirements for confirmation of a plan and, among other things, requires that a plan meet the "best interests of creditors" test and be "feasible." The "best interests of creditors" test generally requires that the value of the consideration to be distributed to the holders of claims or equity interests under a plan may not be less than those parties would receive if the debtor were liquidated pursuant to a hypothetical liquidation occurring under Chapter 7 of the Bankruptcy Code. Under the "feasibility" requirement, the bankruptcy court generally must find that there is a reasonable probability that the debtor will be able to meet its obligations under its plan without the need for further financial reorganization. **The Plan Proponents believe that the Plan satisfies all the applicable requirements of section 1129(a) of the Bankruptcy Code (other than section 1129(a)(8)), including, in particular, the best interests of creditors test and the feasibility requirement.**

The Bankruptcy Code does not require that each holder of a claim or interest in a particular class vote in favor of a plan of reorganization for the bankruptcy court to determine that the class has accepted the plan. Rather, a class of creditors will be determined to have accepted the plan if the bankruptcy court determines that the plan has been accepted by a majority in number and two-thirds in amount of those claims actually voting in such class. Similarly, a class of equity security holders will have accepted the plan if the bankruptcy court determines that the plan has been accepted by holders of two-thirds of the number of shares actually voting in such class.

In addition, classes of claims or equity interests that are not "impaired" under a plan of reorganization are conclusively presumed to have accepted the plan and thus are not entitled to vote. Furthermore, classes that are to receive no distribution under the plan are conclusively deemed to have rejected the plan. Accordingly, acceptances of a plan will generally be solicited only from those persons who hold claims or equity interests in an impaired class. A class is

NEWYORK 7964400 (2K)

"impaired" if the legal, equitable or contractual rights associated with the claims or equity interests of that class are modified in any way under the plan. Modification for purposes of determining impairment, however, does not include curing defaults and reinstating maturity on the effective date of the plan. **Class 1 – Senior Indenture Administrative Expense Claims and Class 2 – Indenture Priority Claims are unimpaired and are therefore deemed to have accepted the Plan. Class 4 through Class 11, which include all Junior Note Claims, Subordinated Claims, Income Note Claims, General Unsecured Claims and Old Equity Interests, are not entitled to a distribution under the Plan and are therefore deemed to have rejected the Plan. Accordingly, the Plan Proponents are soliciting acceptances of the Plan from the holders of Class 3 – Senior Note Claims.**

The bankruptcy court also may confirm a plan of reorganization even though fewer than all the classes of impaired claims and equity interests accept such plan. For a plan of reorganization to be confirmed despite its rejection by a class of impaired claims or equity interests, the plan must be accepted by at least one class of impaired claims (determined without counting the vote of insiders) and the proponent of the plan must show, among other things, that the plan does not "discriminate unfairly" and that the plan is "fair and equitable" with respect to each impaired class of claims or equity interests that has not accepted the plan.

Under section 1129(b) of the Bankruptcy Code, a plan is "fair and equitable" as to a rejecting class of claims or equity interests if, among other things, the plan provides: (a) with respect to secured claims, that each such holder will receive or retain on account of its claim property that has a value, as of the effective date of the plan, equal to the allowed amount of such claim; and (b) with respect to unsecured claims and equity interests, that the holder of any claim or equity interest that is junior to the claims or equity interests of such class will not receive or retain on account of such junior claim or equity interest any property from the estate, unless the senior class receives property having a value equal to the full amount of its allowed claim.

A plan does not "discriminate unfairly" against a rejecting class of claims or equity interests if (a) the relative value of the recovery of such class under the plan does not differ materially from that of any class (or classes) of similarly situated claims or equity interests and (b) no senior class of claims or equity interests is to receive more than 100% of the amount of the claims or equity interest in such class.

The Plan has been structured so that it will satisfy the foregoing requirements as to any rejecting class of Claims or Old Equity Interests, and can therefore be confirmed, if necessary, over the objection of any class of Claims or Old Equity Interests provided Class 3 – Senior Note Claims votes to accept the Plan.

## B.    Confirmation of the Plan

1.    *Elements of Section 1129 of the Bankruptcy Code*

At the Confirmation Hearing, the Bankruptcy Court will confirm the Plan only if all of the conditions to confirmation under section 1129 of the Bankruptcy Code are satisfied.

Such conditions include the following:

NEWYORK 7964400 (2K)

(i)        The Plan complies with the applicable provisions of the Bankruptcy Code;

(ii)       The Plan has been proposed in good faith and not by any means proscribed by law;

(iii)      Any payment contemplated under the Plan for services or for costs and expenses in, or in connection with, the Chapter 11 Cases, or in connection with the Plan and incident to the Chapter 11 Cases, has been approved by, or is subject to the approval of, the Bankruptcy Court as reasonable;

(iv)       The Plan Proponents have disclosed the identity and affiliations of any individual proposed to serve, after confirmation of the Plan, as a director of the Debtor or a successor the Debtor under the Plan and the appointment to, or continuance in, such office of such individual is consistent with the interests of creditors and equity holders and with public policy;

(v)        With respect to each impaired class of Claims or Old Equity Interests, each holder of an impaired Claim or impaired Old Equity Interest either has accepted the Plan or will receive or retain under the Plan, on account of the Claims or Old Equity Interests held by such entity, property of a value, as of the Effective Date, that is not less than the amount that such entity would receive or retain if the Debtor was liquidated on such date under Chapter 7 of the Bankruptcy Code;

(vi)       In the event that the Plan Proponents do not move to confirm the Plan nonconsensually, each class of Claims or Old Equity Interests entitled to vote has either accepted the Plan or is not impaired under the Plan;

(vii)      Except to the extent that the holder of a particular Claim has agreed to a different treatment of such Claim, the Plan provides that Administrative Claims and Tax Claims will be paid in full, in Cash, on the Effective Date;

(viii)     At least one impaired class of Claims has accepted the Plan, determined without including any acceptance of the Plan by any insider holding a Claim in such class;

(ix)       Confirmation of the Plan is not likely to be followed by the liquidation or the need for further financial reorganization of the Debtor or any other successor to the Debtor under the Plan, unless such liquidation or reorganization is proposed in the Plan; and

(x)        All fees payable under 28 U.S.C. § 1930, as determined by the Bankruptcy Court at the Confirmation Hearing, have been paid or the Plan provides for the payment of all such fees on the Effective Date of the Plan.

**The Plan Proponents believe that the Plan will satisfy all the statutory provisions of Chapter 11 of the Bankruptcy Code, that they have complied or will have complied with all of the provisions of the Bankruptcy Code and that the Plan is being proposed and submitted to the Bankruptcy Court in good faith.**

2.      *Acceptance*

A class of Claims will have accepted the Plan if the Plan is accepted, with reference to a class of Claims, by at least two-thirds in amount and more than one-half in number of the Allowed Claims of each such class of Claims.

3.      *Best Interests of Creditors Test*

With respect to each impaired class of holders of Claims and Old Equity Interests, confirmation of the Plan requires that each such holder either (a) accept the Plan or (b) receive or retain under the Plan property of a value, as of the applicable consummation date under the Plan, that is not less than the value such holder would receive or retain if the Debtor was liquidated under Chapter 7 of the Bankruptcy Code.

To determine what holders of Claims and Old Equity Interests of each impaired class would receive if the Debtor was liquidated, the Bankruptcy Court must determine the proceeds that would be generated from the liquidation of the properties and interests in property of the Debtor in a Chapter 7 liquidation case.  The proceeds that would be available for satisfaction of unsecured Claims against and Old Equity Interests in the Debtor would consist of the proceeds generated by disposition of the unencumbered equity in the properties and interests in property of the Debtor and the Cash held by the Debtor at the time of the commencement of the liquidation case.  Such proceeds would be reduced by the costs and expenses of the liquidation and by such additional administration and priority claims that may result from the termination of the business of the Debtor and the use of Chapter 7 for the purposes of liquidation.

The costs of liquidation under Chapter 7 of the Bankruptcy Code would include the fees payable to a trustee in bankruptcy, and the fees that would be payable to additional attorneys and other professionals that such a trustee may engage, plus any unpaid expenses incurred by the Debtor during the Chapter 11 Case, such as compensation for attorneys, financial advisors, accountants and costs that are allowed in the Chapter 7 case.  In addition, Claims would arise by reason of the breach or rejection of obligations incurred and executory contracts entered into or assumed by the Debtor during the pendency of the Chapter 11 Case.

The foregoing types of Claims and such other Claims which may arise in the liquidation cases or result from the pending Chapter 11 Case would be paid in full from the liquidation proceeds before the balance of those proceeds would be made available to pay unsecured Claims arising on or before the Petition Date.

To determine if the Plan is in the best interests of each impaired class, the present value of the distributions from the proceeds of the liquidation of the properties and interests in property of the Debtor (net of the amounts attributable to the aforesaid claims) is then compared with the present value offered to such classes of Claims and Old Equity Interests under the Plan.

After consideration of the effects that a Chapter 7 liquidation would have on the ultimate proceeds available for distribution to creditors in the Chapter 11 Case, including: (a) the increased costs and expenses of a liquidation under Chapter 7 arising from fees payable to a trustee in bankruptcy and professional advisors to such trustee and (b) the erosion in value of assets in a Chapter 7 case in the context of the expeditious liquidation required under Chapter 7 and the "forced sale" environment in which such a liquidation would likely occur, the Plan

NEWYORK 7964400 (2K)

Proponents have determined that confirmation of the Plan will provide each holder of a Claim or Equity Interest with a greater or equal recovery than it would receive pursuant to liquidation of the Debtor under Chapter 7 of the Bankruptcy Code.

The Liquidation Analysis is further described in Section V herein.

4.    *Feasibility*

The Bankruptcy Code conditions confirmation of a plan of reorganization on, among other things, a finding that it is not likely to be followed by the liquidation or the need for further financial reorganization of a debtor.  For purposes of determining whether the Plan satisfies this condition, the Plan Proponents have analyzed the capacity of the Debtor to service its obligations under the Plan.  If the Debtor's Cash on the Plan Distribution Date or any Quarterly Plan Distribution Date or Senior Note Plan Distribution Date is not sufficient to pay all unpaid Allowed Administrative Claims, Allowed Tax Claims, Allowed Senior Indenture Administrative Expense Claims and Allowed Indenture Priority Claims, the Debtor will obtain all Cash needed to make such payments from NewCo.  NewCo will obtain such funds by borrowing under the Exit Facility.  Accordingly, the Plan Proponents believe that the Debtor will be able to service its obligation under the Plan and confirmation of the Plan will not likely be followed by the need for further financial reorganization of the Debtor.

**C.    Cramdown**

Because certain classes are deemed to have rejected the Plan, it must be demonstrated to the Bankruptcy Court that the Plan "does not discriminate unfairly" and is "fair and equitable" with respect to such Classes and any other Classes of Claims that vote to reject the Plan.

1.    *No Unfair Discrimination*

A plan of reorganization "does not discriminate unfairly" if (a) the legal rights of a nonaccepting class are treated in a manner that is consistent with the treatment of other classes whose legal rights are similar to those of the nonaccepting class and (b) no class receives payments in excess of that which it is legally entitled to receive for its claims or equity interests. The Plan Proponents believe that under the Plan all impaired classes of Claims and Old Equity Interests are treated in a manner that is consistent with the treatment of other classes of Claims and Old Equity Interests that are similarly situated, if any, and no class of Claims or Old Equity Interests will receive payments or property with an aggregate value greater than the aggregate value of the Allowed Claims and Allowed Old Equity Interests in such class.  Accordingly, the Plan Proponents believe the Plan does not discriminate unfairly as to any impaired class of Claims or Old Equity Interests.

2.    *Fair and Equitable Test*

The Bankruptcy Code establishes different "fair and equitable" tests for classes of secured claims, unsecured claims and equity interests as follows:

a.    <u>*Secured Claims.*</u>  Either (i) each holder of a claim in an impaired class of secured claims retains its liens securing its secured claim and it receives on account of its secured

58

claim deferred cash payments having a present value equal to the amount of its allowed secured claim, (ii) each holder of a claim in an impaired class of secured claims realizes the indubitable equivalent of its allowed secured claim or (iii) the property securing the claim is sold free and clear of liens, with such liens to attach to the proceeds and the treatment of such liens on proceeds as provided in clause (i) or (ii) of this subparagraph.

b.      *Unsecured Claims*.  Either (i) each holder of a claim in an impaired class of unsecured claims receives or retains under the plan property of a value equal to the amount of its allowed claim or (ii) the holders of claims and interests that are junior to the claims of the dissenting class will not receive any property under the plan of reorganization, subject to the applicability of the judicial doctrine of contributing new value.

c.      *Equity Interests*.  Either (i) each holder of an equity interest in an impaired class of interests will receive or retain under the plan of reorganization property of a value equal to the greater of (A) the fixed liquidation preference or redemption price, if any, of such stock or (B) the value of the stock or (ii) the holders of interests that are junior to the stock will not receive any property under the plan of reorganization, subject to the applicability of the judicial doctrine of contributing new value.

THE PLAN MAY BE CONFIRMED IF THE REQUISITE HOLDERS OF CLAIMS IN CLASS 3 – SENIOR NOTE CLAIMS VOTE TO ACCEPT THE PLAN.

**D.      Effect of Confirmation**

Under section 1141 of the Bankruptcy Code, the provisions of a confirmed plan bind the debtor, any entity issuing securities under the plan, any entity acquiring property under the plan and any creditor or equity security holder, whether or not the claim or interest of such creditor or equity security holder is impaired under the plan and whether or not such creditor or equity security holder voted to accept the plan.  Further, after confirmation of a plan, the property dealt with by the plan is free and clear of all claims and interests of creditors and equity security holders, except as otherwise provided in the plan or the confirmation order.

NEWYORK 7964400 (2K)

# XII.

## CONCLUSION

The Plan Proponents believe that the Plan is in the best interest of the holders of Class 3 – Senior Note Claims, and urge all holders of Class 3 – Senior Note Claims to vote to accept the Plan and to evidence such acceptance by returning their Ballots in accordance with the instructions provided on the Ballot and in Section II of this Disclosure Statement.

Dated: March 15, 2011

Respectfully,

ANCHORAGE CAPITAL MASTER
OFFSHORE, LTD.
By:  Anchorage Capital Group, L.L.C.
      its Investment Manager

By: _____
      Name:          KEVIN ULRICH
      Title:          Chief Executive Officer


ANCHORAGE ILLIQUID OPPORTUNITIES
OFFSHORE MASTER, L.P.
By:  Anchorage Capital Group, L.L.C.
      its Investment Manager

By: _____
      Name:          KEVIN ULRICH
      Title:          Chief Executive Officer


GRF MASTER FUND, L.P.
By:  Anchorage Capital Group, L.L.C.
      its Investment Manager

By: _____
      Name:          KEVIN ULRICH
      Title:          Chief Executive Officer


60