**QUINN EMANUEL URQUHART & SULLIVAN, LLP**
Jon Pickhardt (NY Bar No. JP 8590)
Susheel Kirpalani (NY Bar No. SK 8926)
Scott C. Shelley (NJ Bar No. SS-1013)
51 Madison Avenue, 22nd Floor
New York, New York 10010
Telephone:  (212) 849-7000
Telecopier: (212) 849-7100

**QUINN EMANUEL URQUHART & SULLIVAN, LLP**
Eric D. Winston (Cal. No. 202407)
865 S. Figueroa St., 10th Floor
Los Angeles, California 90017
Telephone:  (213) 443-3000
Telecopier: (212) 443-3100

*Counsel for Hildene Capital Management and*
*Hildene Opportunities Master Fund, LTD*

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**

| | | |
|---|---|---|
| ------------------------------------------------------------x | : | |
| In re: | : | |
| | : | **Chapter 11** |
| **ZAIS INVESTMENT GRADE LIMITED VII,** | : | |
| | : | **Case No. 11-20243 (RTL)** |
| | : | |
| **Debtor.** | : | |
| | : | **Hearing Date: June 20, 2011** |
| | : | **Hearing Time: 10:00 a.m.** |
| | : | **Oral Argument Requested** |
| ------------------------------------------------------------x | | |

**MOTION OF HILDENE CAPITAL MANAGEMENT AND HILDENE
OPPORTUNITIES MASTER FUND, LTD TO DISMISS CHAPTER 11 CASE
PURSUANT TO 11 U.S.C. §§ 305 AND 1112 OR, IN THE ALTERNATIVE, ABSTAIN
PURSUANT TO 11 U.S.C. § 305.**

# TABLE OF CONTENTS

**Page**

I.   INTRODUCTION ........................................................................................................1

II.  FACTUAL BACKGROUND .....................................................................................3

    A.   ZIGL's Formation .............................................................................................3

    B.   The Issuance of the Notes, the Indenture and the Relationships Between
        the Noteholders .................................................................................................5

        1.   The Issuance of the Notes and Security for the Notes ..............................5

        2.   The Notes' Priority of Payment Scheme ....................................................7

        3.   The Indenture's Limitations on Noteholder Actions ..................................8

    C.   ZIGL's Default And Note Acceleration .............................................................8

    D.   The Commencement of this Involuntary Case ....................................................9

III. ARGUMENT ............................................................................................................11

    A.   This Case Must Be Dismissed Because ZIGL Is Not An Eligible Debtor
        And Anchorage Was Not A Qualifying Petitioning Creditor. ...........................11

        1.   This Court Should Dismiss ZIGL's Case Because ZIGL Is Not An
            Eligible Debtor Under Bankruptcy Code Section 109 .............................12

            a.   ZIGL's Only Place of Business is in the Cayman Islands.............13

            b.   There Is No Evidence That ZIGL Has Any Assets in the
                United States. .............................................................................14

        2.   This Case Should Be Dismissed Because The Anchorage Entities
            Were Not Qualifying Petitioning Creditors. ............................................15

    B.   This Court Should Dismiss or Abstain Under Bankruptcy Code Section
        305 ..................................................................................................................19

        1.   Factors Courts Consider Under Section 305 ............................................21

        2.   The Section 305 Factors Strongly Favor Dismissal or Abstention. ...........23

    C.   Cause Under Bankruptcy Code Section 1112 Exists to Dismiss This Case. .........29

IV.    REQUEST FOR ORAL ARGUMENT ..............................................................................31

V.    CONCLUSION.................................................................................................................32

## **TABLE OF AUTHORITIES**

**Page(s)**

## **Cases**

*In re 680 Fifth Ave. Assocs.*,
   156 B.R. 726 (Bankr. S.D.N.Y. 1994) .................................................................17

*In re Allen-Main Assocs. Ltd.*,
   223 B.R. 59 (2d Cir. BAP 1998) ...............................................................17, 18

*Argus Group 1700, Inc. v. Steinman*,
   206 B.R. 757 (E.D. Pa. 1997) ...................................................................22

*Baker v. Latham Sparrowbush Assoc. ( In re Cohoes Indus. Terminal, Inc.)*,
   931 F.2d 222 (2d Cir.1991) .......................................................................30

*Basin Electric Power Cooperative v. Midwest Processing Co.*,
   47 B.R. 903 (D.N.D. 1984), *aff'd*, 769 F.2d 483 (8th Cir. 1985) .....................28, 29

*In re Better Care, ltd.*,
   97 B.R. 405 (Bankr. N.D. Ill. 1989) ...........................................................25

*C-TC 9th Ave. P'ship v. Norton Co. (In re C-TC 9th Ave. P'ship)*,
   113 F.3d 1304 (2d Cir. 1997) ....................................................................30

*In re Caucus Distributors, Inc.*,
   106 B.R. 890 (Bankr. E.D. Va. 1989) .........................................................20

*In re Compania de Alimentos Fargo, S.A.*,
   376 B.R. 427 (Bankr. S.D.N.Y. 2007) ........................................................25

*Counties Contracting & Constr. Co. v. Constitution Life Ins. Co.*,
   855 F.2d 1054 (3d Cir. 1988) ....................................................................19

*In re East-West Assocs.*,
   106 B.R. 767 (Bankr. S.D.N.Y. 1989) ....................................................18, 19

*In re Fitzgerald Group*,
   38 B.R. 16 (Bankr. S.D.N.Y. 1983) ...........................................................21

*In re Global Ocean Carriers Ltd.*,
   251 B.R. 31 (Bankr. D. Del. 2000) ....................................................12, 13, 15

*Grogan v. Garner*,
   498 U.S. 279 (1991) .................................................................................23

*In re Head*,
   223 B.R. 648 (Bankr. W.D.N.Y. 1998) .......................................................13

*In re Integrated Telecom Express, Inc.*,
   384 F.3d 108 (3d Cir. 2004) ................................................................31, 32

*In re International Zinc Coatings & Chemical Corp.*,
355 B.R. 76 (Bankr. N.D. Ill. 2006) ...................................................................23

*In re Jr. Food Mart of Ark., Inc.*,
234 B.R. 420 (Bankr. E.D. Ark. 1999) ...............................................................12

*Landon v. Hunt*,
977 F.2d 829 (3d Cir. 1992)................................................................................32

*In re Law Ctr.*,
261 B.R. 607 (Bankr. M.D. Pa. 2001) ................................................................32

*In re Macke Intern. Trade, Inc.*,
370 B.R. 236 (9th Cir. BAP 2007)......................................................................22

*In re Mazzacone*,
200 B.R. 568 (E.D. Pa. 1996) .............................................................................20

*In re Monitor Single Lift I, Ltd.*,
381 B.R. 455 (Bankr. S.D.N.Y. 2008).....................................................20, 21, 22

*In re PPI Enterprises (U.S.), Inc.*,
324 F.3d 197 (3d Cir. 2003)................................................................................30

*Paradise Hotel Corp. v. Bank of Nova Scotia*,
842 F.2d 47 (3d Cir. 1988)..................................................................................16

*In re S. Canaan Cellular Investments, Inc., BNKR. 09-10473*,
2009 WL 2922959 (Bankr. E.D. Pa. May 19, 2009.......................................21, 22

*In re SGL Carbon Corp.*,
200 F.3d 154 (3d Cir. 1999)............................................................................29-32

*In re Silverman*,
230 B.R. 46 (Bankr. D.N.J. 1998) ............................................................. *passim*

*In re Skyworks Ventures, Inc.*,
431 B.R. 573 (Bankr. D.N.J. 2010) ................................................................13, 24

*In re Spade*,
258 B.R. 221 (Bankr. D. Colo. 2001) ...................................................... *passim*

*In re Tichy Elec. Co.*,
332 B.R. 364 (Bankr. N.D. Iowa 2005) ........................................................28, 29

*In re Williamsburg Suites, Ltd.*,
117 B.R. 216 (Bankr. E.D. Va. 1990).................................................................21

## **Statutes**

11 U.S.C. § 101(13) ...............................................................................................16

11 U.S.C. § 101(41) ...............................................................................................16

11 U.S.C. § 102(2) ........................................................................................................17, 18, 19

11 U.S.C. § 109 ...........................................................................................................11, 12, , 13 15

11 U.S.C. § 1111(b) .............................................................................................................18, 19

11 U.S.C. § 1112 .................................................................................................... *passim*

11 U.S.C. § 303 ...................................................................................................... *passim*

11 U.S.C. § 305 ...................................................................................................... *passim*

U.C.C. § 9-307(c)........................................................................................................................6

## Miscellaneous

2 Collier on Bankruptcy ¶ 305.01 (2011) ......................................................................20

H.R. Rep. No. 95-595, 1st Sess. 325 (1977),
    *reprinted in* 1978 U.S.C.C.A.N. 5963, 6281 ..................................................20, 21

H.R. Rep. No. 595, 1st Sess. 406,
    *reprinted in* 1978 U.S.S.C.A.N. 5963, 6362..........................................................30

**TO    THE HONORABLE RAYMOND T. LYONS**
**UNITED STATES BANKRUPTCY JUDGE**

Hildene Capital Management and Hildene Opportunities Master Fund, LTD (collectively,

"Hildene") respectfully submit this Motion pursuant to 11 U.S.C. §§ 305 and 1112 to dismiss, or

in the alternative abstain from, the involuntary chapter 11 case of Zais Investment Grade Limited

VII ("ZIGL").  Hildene is a creditor of ZIGL because it is the holder of $27 million in principal

amount of Class A-2 senior secured notes (the "Class A-2 Notes") issued in 2005 by ZIGL

pursuant to that certain Indenture dated October 19, 2005 (the "Indenture").  This motion is

supported by the "Declaration of Eric D. Winston" (the "Winston Declaration") and the record in

this case.[1]

## I.    INTRODUCTION

This case is the classic example of a creditor using an involuntary bankruptcy case to

improperly obtain a disproportionate advantage against other creditors.  For decades, numerous

courts, including the Third Circuit in several decisions, have dismissed bankruptcy cases –

voluntary and involuntary, solvent debtor or hopelessly insolvent debtor – where the case was

commenced for an improper purpose or for no valid bankruptcy purpose.

This case must be dismissed, pursuant to Bankruptcy Code sections 305 and/or 1112,

because the commencement of it was (and is) an abuse of this Court's jurisdiction.  The entities

that commenced this involuntary chapter 11 case against ZIGL are all funds managed by

Anchorage Capital Group, L.L.C. ("Anchorage").  Anchorage filed this case because it is

---

[1]   This bankruptcy case has resulted in very little disclosure to this Court and to creditors
of ZIGL.  Hildene intends to take discovery of, among others, ZIGL and Anchorage in
connection with the relief sought in this Motion, and reserves the right to supplement this Motion
if information obtained through discovery reveals additional facts supporting dismissal or
abstention.

attempting to obtain a result that it believes it cannot obtain as a matter of contract.  Pursuant to

the unambiguous terms of the Indenture, Anchorage needs the consent of a majority of all

holders of Notes to cause a sale or liquidation of ZIGL's assets.  Anchorage has not obtained that

consent, nor has it even attempted to do so, but instead it trying to force such a sale or liquidation

via an involuntary chapter 11 case that it controls, entirely circumventing the terms of the

Indenture that binds Anchorage.  Such a purpose is a paradigm example of a "bad faith" filing -

improperly using bankruptcy to obtain a litigation or tactical advantage.

      Further, no valid bankruptcy purpose is served by ZIGL being in bankruptcy.  The

chapter 11 case envisioned by Anchorage is intended solely for Class A-1 Noteholder benefit –

no one else.  Further, ZIGL has no business, no employees, and no officers.  It has extremely few

connections with the United States.  ZIGL has no intention of filing a plan or trying to

"reorganize."  ZIGL has been in default for several years, but there has been no rush to the

courthouse to take action, no doubt because ZIGL's only meaningful creditors are the secured

noteholders, and the Indenture places severe restrictions on Noteholders taking individual

actions.

      Independent of the "bad faith" nature of the commencement of this case, this Court

should dismiss this case for two threshold reasons.  First, ZIGL was ineligible to be a debtor

under Bankruptcy Code section 109.  ZIGL is a Cayman Islands company, and thus does not

reside or have a domicile in the United States.  Notwithstanding Anchorage's assertions to the

contrary, ZIGL does not have a "place of business" in the United States and does even have any

property in the United States.  Second, even if ZIGL was eligible to be a debtor, Anchorage was

not eligible to be a petitioning creditor under Bankruptcy Code section 303.  Bankruptcy Code

section 303 requires that, in ZIGL's case, there are at least three petitioning creditors holding

unsecured claims.  But all Noteholders, including Anchorage, hold only non-recourse claims

secured by ZIGL's assets, and do not have any unsecured deficiency claims.

At bottom, Anchorage is attempting something unprecedented and extraordinarily

disruptive – ignoring the terms of an indenture by forcing a Cayman Islands CDO into

bankruptcy the United States when all facts demonstrate Anchorage should not be able to do so.

This Court must dismiss this case.

## II.        FACTUAL BACKGROUND

### A.        ZIGL's Formation

ZIGL was incorporated on June 10, 2005, as an exempted company under the laws of the

Cayman Islands.  Its registered office was the offices of Maples Finance Limited, P.O. Box

1093GT, Queensgate House, South Church Street, George Town, Grand Cayman, Cayman

Islands.  ZIGL is what is commonly referred to as a "CDO Squared" – a corporate vehicle that

holds debts of other collateralized debt obligations ("CDOs"), entities often formed and based in

the Cayman Islands and other foreign jurisdictions.[2]

As confirmed by ZIGL's schedules of assets and liabilities filed with this Court on May

10, 2011 [Dkt. No. 36] (the "Schedules"), ZIGL's **only** assets consist of approximately $500 in

"exempt property under Transaction Documents" and "Debt obligations held by the Indenture

Trustee – Unknown value."  Schedules at 5.  The Schedules do not indicate that ZIGL even has a

bank account in the United States.  There is nothing to indicate that ZIGL has any assets in the

District of New Jersey, much less in the United States.[3]

---

[2]   Hildene is unaware of any case where a creditor successfully placed a CDO into an involuntary bankruptcy in the United States.

[3]   The Involuntary Petition filed on April 1, 2011, states that ZIGL's principal place of business is "2 Bridge Avenue, The Galleria Building Three, Red Bank, New Jersey, 07701" and

ZIGL has never had any employees or officers.[4]  It does not maintain any headquarters or offices from which it conducts any business,[5] because it has never conducted any business other than issuing the Notes.  *See* Offering Circular at 35, 93.[6]  The sole shareholder of ZIGL is Maples Finance Limited, which holds the shares under the terms of a declaration of trust in favor of charitable purposes.  *See id.*  The directors of ZIGL are, on information and belief, officers of Maples Finance Limited.

---

that the location of the principal assets of ZIGL is "New York, New York."  Involuntary Petition at 1 [Dkt. No. 1].  However, the Schedules, signed by a representative of ZIGL under penalty of perjury, do not support this assertion.  Indeed, the New Jersey address listed in the Involuntary Petition is the address of ZAIS Group, LLC (the "Collateral Manager"), not ZIGL.  The Collateral Manager has not filed a notice of appearance in this case and appears to be doing nothing now as ZIGL's collateral manager.

[4]  The Indenture obligates ZIGL not to have any employees other than its directors.  *See* Indenture at § 7.4(b).  The Indenture is an extremely lengthy document, and, solely to ease any administrative burden on this Court and parties in interest reviewing this Motion, copies of excerpts of the Indenture cited in this Motion are attached to the Winston Declaration as Exhibit "A".  Hildene will provide a complete copy of the Indenture to this Court if this Court needs a complete copy, and will provide a complete copy to any party in interest requesting it.

[5]  The Indenture obligates ZIGL from engaging in any business other than issuing the Notes and owning, holding, pledging, and selling Collateral Securities.  *See* Indenture at § 7.12.  ZIGL is further obligated to refrain from engaging in any activity that subjects ZIGL to United States federal or state income tax, *see id.*, and to refrain from owning any asset that would cause ZIGL to engage in a trade or business "within the United States for United States federal income tax purposes."  *Id.* at § 7.17(h).

[6]  Like the Indenture, the Offering Circular is lengthy document, and, solely to ease any administrative burden on this Court and parties in interest reviewing this Motion, copies of excerpts of the Offering Circular cited in this Motion are attached to the Winston Declaration as Exhibit "B".  Hildene will provide a complete copy of the Offering Circular to this Court if this Court needs a complete copy, and will provide a complete copy to any party in interest requesting it.

B.    **The Issuance of the Notes, the Indenture and the Relationships Between the Noteholders**

1.    **The Issuance of the Notes and Security for the Notes**

ZIGL was established "as a special purpose vehicle for the purpose of listing asset backed securities in accordance with the listing of Notes on the Irish Stock Exchange."  Offering Circular at 92.  On or about October 19, 2005, ZIGL issued notes (the "Notes") with a face amount of $365.5 million that have a stated maturity of October 15, 2040.  In addition, ZIGL issued $40,001,000 in so-called "Income Notes".  The Notes were issued pursuant to the Indenture, which is governed by New York law.  The Income Notes were issued pursuant to an Income Note Issuing and Paying Agency Agreement and are governed by Cayman Island law. In connection with the issuance of the Notes, ZIGL prepared an "Offering Circular," dated October 18, 2005.

The Notes were issued in eight tranches, with varying interest rates:

| Note Tranche | Face Amount |
| --- | --- |
| Class A-1A | $215,000,000 |
| Class A-1B | $15,000,000 |
| Class A-2 | $27,000,000 |
| Class A-3 | $72,000,000 |
| Class B-1A | $7,000,000 |
| Class B-1B | $13,000,000 |
| Class B-2A | $4,000,000 |
| Class B-2B | $12,500,000 |

The proceeds of the Notes were to be used to acquire "Collateral Securities," which the Indenture define to mean a "CDO Security, Structured Finance Security, Synthetic Security or

Repackage Security" that satisfied certain conditions.  Indenture at 13.  The conditions include a

fixed amount of principal payable on scheduled payments and are not convertible or

exchangeable into "Equity Securities."

All of the Notes are secured by substantially all of the assets of ZIGL, including the

Collateral Securities and any payments due to ZIGL under the Cashflow Swap, as evidenced by a

lien granted in favor of the Indenture Trustee.  No Noteholder holds a lien on the assets of ZIGL

– only the Indenture Trustees holds a lien.  *See* Indenture at  1.  On or about October 21, 2005,

the Indenture Trustee recorded a UCC-1 financing statement with the District of Columbia

Secretary of State's office.  *See* Winston Declaration at Ex. "C".  Presumably this filing was

made in the District of Columbia (as opposed to New York or New Jersey) because ZIGL is a

foreign corporate entity that has no principal place of business in the United States.  *See* U.C.C. §

9-307(c) (foreign debtor is deemed located in the District of Columbia).  Hildene is unaware of

other any UCC-1 filings in New York or New Jersey.

Pursuant to the Indenture, all of the accounts into which proceeds of Collateral Securities

were deposited were accounts in the name of the Indenture Trustee.  *See* Indenture at §§ 10.2-

10.3.  Hildene is not aware of any bank accounts in the United States in the name of ZIGL.

The Notes are **non-recourse** obligations of the Issuer.  *See* Indenture at § 2.8(j).[7]  The

Offering Circular expressly stated that a risk factor associated with the Notes was that "holders

---

[7]  Section 2.8(j) of the Indenture provides:

> (j) The obligations of the Issuer under the Senior Notes, the
> Composite Obligations and this Indenture are limited recourse
> obligations of the Issuer payable solely from the Assets and
> following realization of the Assets, and application of the proceeds
> thereof in accordance with this Indenture, all obligations of the
> Issuer and any claims against the Issuer under the Senior Notes, the

of the Notes must rely solely on distributions on the Collateral Securities and other assets pledged to secure the Senior Notes for payment on the Notes.  If distributions on such Collateral Securities and assets are insufficient to make payment on the Notes, no other assets will be available for payment of the deficiency and all claims in respect of the Notes will be extinguished and shall not thereafter revive."  Offering Circular at 24.

### 2.   The Notes' Priority of Payment Scheme

The Indenture provides for a detailed "waterfall" or "Priority of Payment" scheme with respect to payments to Noteholders.  *See* Indenture at § 11.1.  There are 22 levels in the Priority of Payment scheme, and the scheme generally divides payments between interest payments and principal payments.[8]  In the case of the Class A-1, Class A-2, and Class A-3 Notes, Class A-1 Notes have priority over Classes A-2 and A-3; however, accrued and unpaid interest due on the Class A-2 Notes and Class A-3 Notes takes priority over principal due on any Notes.  *See* Indenture at §§ 11.1(a)(E)-(G), (I).

The Priority of Payment is subject to section 13.1, which contains subordination provisions.  Section 13.1(a) provides that if an event of default has occurred and the Notes have accelerated, "each Priority Class shall be paid in full in Cash, or, to the extent that a Majority of such Class consents, other than in Cash, before any further payment or distribution is made on account of any Junior Class with respect thereto."  Indenture at § 13.1(a).[9]  The Indenture does

---

Composite Obligations or this Indenture or arising in connection therewith shall be extinguished and shall not thereafter revive.

[8]   Certain obligations have priority over interest and principal due on the Notes.

[9]   The Indenture defines "Priority Class" as "[w]ith respect to any specified Class of Notes, each Class of Notes that ranks senior to such Class, as indicated in Section 2.3." Section 2.3 of the Indenture provides that the priority of the Classes of Notes is as follows: Class A-1, Class A-2, Class A-3, Class B-1, and Class B-2.

not contain any language explicitly subordinating payment on account of Notes to postpetition interest that accrues on any Notes held by a Priority Class.

**3.       The Indenture's Limitations on Noteholder Actions**

The Indenture places significant restrictions on individual Noteholders from taking action against ZIGL or the collateral securing the Notes, including restrictions on exercising remedies in the event of a default.  The architecture of the Indenture, commonly used in CDO indentures, is designed to prevent rogue lenders such as Anchorage from taking unilateral action for such lenders' sole benefit.  Two provisions require special attention:

First, section 5.5 restricts the Indenture Trustee from disposing of any "Assets" unless one of two conditions have been satisfied: (1) the Indenture Trustee has determined, and a majority of the Controlling Class agrees, that the anticipated proceeds from a disposition of the Assets is sufficient to pay in full the Senior Notes (i.e., all Notes other than the Income Notes); or (2) at least 66.66% of all Noteholders (excluding the Income Noteholders) direct the sale and liquidation of the Assets.  *See* Indenture at § 5.5(a).  This second condition will play a prominent role here because it is clause (ii) that is driving Anchorage to make an end-run around the Indenture to compel liquidation of ZIGL's assets via this involuntary case.

Second, section 5.13 of the Indenture provides that a majority of the Controlling Class can cause "the institution of and direct the time, method and place of any Proceeding for any remedy available to the Trustee," but those rights cannot conflict with any express provision of the Indenture and cannot require the sale of Assets not in accordance with section 5.5(a) of the Indenture.

**C.       ZIGL's Default And Note Acceleration**

On March 11, 2009, the Indenture Trustee served a notice of default on ZIGL.  The event of default was not a default in the payment of principal or interest.  Rather, it was a violation of

section 5.1(g) of the Indenture, which provides for an event of default due to the failure to maintain the "Class A-1/ClassA-2 Par Value Ration at 100% or higher on a recent Measurement Date." In its notice of default, the Indenture Trustee expressly stated that it would maintain the Assets intact in accordance with section 5.5(a) of the Indenture unless and until the conditions precedent to the sale or liquidation of the Assets have been satisfied. The notice made express reference to the 66.66% Noteholder consent requirement to dispose of the Assets.

On May 13, 2009, the Indenture Trustee requested direction from a majority of the Class A-1 Noteholders whether to accelerate the Senior Notes. On June 3, 2009, the Indenture Trustee delivered a notice to ZIGL that, pursuant to a direction of a majority of the Class A-1 Noteholders, all of the Senior Notes had accelerated due to the default under section 5.1(g) of the Indenture. The notice of acceleration was to ZIGL's address in the Cayman Islands. Copies of the notices are attached to the Winston Declaration as Exhibits "D"-"F".

### D. The Commencement of this Involuntary Case

On April 1, 2011 (the "Petition Date"), the three Anchorage entities filed an involuntary petition against ZIGL. Anchorage purports to hold approximately $133.3 million of Notes issued by ZIGL pursuant to the Indenture, consisting of Class A-1A Notes, Class A-3 Notes, and Class B-2A Notes. *See* "Involuntary Petition" at 3 [Dkt. No. 1].[10] No other creditors, including

---

[10] According to the Bankruptcy Rule 1003 statements accompanying the Involuntary Petition, all three Anchorage entities acquired Class A-1 Notes and composite obligations consisting of Class A-3 Notes and Class B-3A Notes between October 28, 2009 and March 18, 2011. *See* Involuntary Petition at 5-7. However, the Involuntary Petition does not disclose when each entity acquired the Class A-1 Notes because the documents indicating acquisition of Class A-1 Notes do not reflect the name of the individual Anchorage entity acquiring such notes. Moreover, it appears that, notwithstanding the assertions that the Class A-1 Notes were not acquired for the purpose of commencing an involuntary case against ZIGL, two sets of Class A-1 Notes were acquired in 2011 (one set on or about January 19, 2011, *see* Involuntary Petition at 12, and the other set on or about March 18, 2011, *see id.* at 14).

any Class A-1 Noteholders unaffiliated with Anchorage, joined the Involuntary Petition. The

Indenture Trustee, which holds any security interests securing the Notes, did not join the

Involuntary Petition.

Prior to the Petition Date, Anchorage apparently had been soliciting holders of Class A-

1A Notes and Class A-1B Notes with respect to a plan of reorganization for ZIGL that would

transfer all of the value of ZIGL solely for the benefit of Class A-1A Notes and Class A-1B

Notes, leaving nothing for the benefit of ZIGL's other noteholders (the "Anchorage Plan"). *See*

Exclusivity Termination Application at ¶ 7. Apparently because Anchorage believes that only it

and other Class A-1 Noteholders are entitled to any recovery, Anchorage solicited only Class A-

1 Noteholders for the Anchorage Plan.

In its "Disclosure Statement and Solicitation of Acceptances of a Prepackaged Chapter 11

Plan of Reorganization" (the "Anchorage Disclosure Statement"), Anchorage admitted why it

filed in the Involuntary Petition: "Notwithstanding the default, the Indenture does not permit for

the liquidation of the Debtor's Assets to satisfy the Debtor's obligations, including the Senior

Notes,[11] absent consent of the Junior Notes, which consent the Plan Proponents [Anchorage] is

not obtainable under the current circumstances." Anchorage Disclosure Statement at 15.[12]

Even though ZIGL is in default, the Collateral Securities continue to generate substantial

cash flow. For example, between April 9, 2011 and May 5, 2011, the Collateral Securities

generated in excess of $2.3 million in cash.

---

[11]    Even though the Indenture defines "Senior Notes" to mean all of the Notes, the
Anchorage Disclosure Statement defines "Senior Notes" to mean only the Class A-1 Notes.

[12]    On May 18, 2011, Anchorage filed with this Court the Anchorage Plan [Dkt. No. 38]
and the Anchorage Disclosure Statement [Dkt No. 39]. On May 19, 2011, Anchorage filed an
application to establish a schedule for approval of its Anchorage Plan and Anchorage Disclosure
Statement.

No motion for use of cash collateral has been filed.  Even though all cash proceeds of

Collateral Securities secure all of the Notes, on or about April 15, 2011 (i.e., after the Petition

Date), nearly $7 million apparently was paid to Class A-1 Notes in unscheduled principal

reduction payments.  Class A-1 Notes also received nearly $7.7 million in cash payments in

January 2011.  *See* "Statement of Financial Affairs," Dkt. No. 36 at 31.

## III.   ARGUMENT

The facts of this case demonstrate that the best interests of creditors and ZING are served

by this Court dismissing, or abstaining from exercising jurisdiction over, this case.  The only

entity that benefits from this case being in chapter 11 is Anchorage, which filed the Involuntary

Petition in contravention of the provisions of the Indenture, in order to gain an inappropriate

advantage not available to Anchorage by the terms of the Indenture under which its debt was

issued, and with no intention of seeing ZIGL reorganize.  Dismissal or abstention is warranted

because:

- ZIGL is not an eligible debtor under Bankruptcy Code section 109;

- The Anchorage entities that filed the Involuntary Petition were not qualified to

  commence an involuntary case under Bankruptcy Code section 303;

- Virtually every relevant Bankruptcy Code section 305 factor considered by courts

  favors dismissal or abstention; and

- Cause exists under Bankruptcy Code section 1112(b) to dismiss this case.

### A.   This Case Must Be Dismissed Because ZIGL Is Not An Eligible Debtor And Anchorage Was Not A Qualifying Petitioning Creditor.

Before this Court need consider whether this case should be dismissed under Bankruptcy

Code sections 305 or 1112, it should enter an order dismissing this case because two threshold

requirements to commence this involuntary case were not met.  First, ZIGL was not eligible to be

a debtor under Bankruptcy Code section 109.  Second, the Anchorage entities that filed the

Involuntary Petition were not qualifying petitioning creditors to commence an involuntary case

under Bankruptcy Code section 303.

**1.     This Court Should Dismiss ZIGL's Case Because ZIGL Is Not An Eligible Debtor Under Bankruptcy Code Section 109.**

The Anchorage entities commenced this case by filing an Involuntary Petition.  As the

entities commencing this case, they bear the burden of proving that ZIGL is eligible to be a

debtor under Bankruptcy Code section 109.  *See In re Global Ocean Carriers Ltd.*, 251 B.R. 31,

37 (Bankr. D. Del. 2000).[13]  Bankruptcy Code section 109(a) defines who may be a debtor,

providing that "[n]otwithstanding any other provision of this section, only a person that resides

or has a domicile, a place of business, or property in the United States, or a municipality, may be

a debtor under this title."  11 U.S.C. § 109(a).  The test for eligibility is measured as of the

petition date.  *See Global Ocean*, 251 B.R. at 37.

It is undisputed that ZIGL, as a Cayman Islands company, does not reside or have a

domicile in the United States.  As demonstrated below, ZIGL also has no "place of business" in

the United States and has no "property in the United States."  ZIGL therefore was never an

eligible debtor, and this case should be dismissed.[14]

---

[13]   ZIGL was the only entity that could contest the Involuntary Petition.  *See* 11 U.S.C. § 303(d); *see also In re Jr. Food Mart of Ark., Inc.*, 234 B.R. 420 (Bankr. E.D. Ark. 1999). ZIGL's apparent choice not to contest the Involuntary Petition does not bind other parties to contest ZIGL's eligibility to be a debtor.

[14]   Normally a debtor will challenge an involuntary petition and seek damages to the extent that the petitioning creditor fails to conduct sufficient diligence to establish that Bankruptcy Code sections 109 and 303 are satisfied.  *See In re Skyworks Ventures, Inc.*, 431 B.R. 573, 5778 (Bankr. D.N.J. 2010); *In re Silverman*, 230 B.R. 46, 53-54 (Bankr. D.N.J. 1998). Here, ZIGL failed to respond to the Involuntary Petition, which means there has been no inquiry into whether Anchorage conducted such diligence.

### a.    ZIGL's Only Place of Business is in the Cayman Islands

A person is eligible to be a debtor if it has a place of business in the United States.  *See* 11 U.S.C. § 109(a).  A "place of business" requires more than merely conducting business in the United States, or owing debts to persons located in the United States.  *See In re Head*, 223 B.R. 648, 651-52 (Bankr. W.D.N.Y. 1998).  Indeed, conducting significant amount of business in the United States, including being physically present for significant portions of a year, does not translate into a person having a place of business in the United States.  *See Global Ocean*, 251 B.R. at 37.

The Involuntary Petition asserts that ZIGL's "place of business" is at an address in Red Bank, New Jersey.  But that is wrong.  The Red Bank, New Jersey, address is the address of the Collateral Manager, not ZIGL itself.  ZIGL is a separate legal entity, as confirmed by ZIGL's proposed bankruptcy counsel.  *See* Dkt. No. 26 at ¶ 11(a).  ZIGL has no place of business in the United States.  Indeed, it does not operate a business at all and it has no employees or officers.  Its "place of business" is an address in the Cayman Islands, which is where its directors, shareholder, and administrator are all located.

The Indenture further confirms that ZIGL has no place of business in the United States.  For purposes of delivery of notice, ZIGL's address is "c/o Maples Finance Limited, P.O. Box 1093 G.T., Queensgate House, South Church Street, George Town, Grand Cayman, Cayman Islands."  Indenture at § 14.3(a)(ii).

Other documents further demonstrate that ZIGL has no place of business in the United States.  According to the Schedules, ZIGL neither owns nor leases any real property in the United States.  The recently filed application to employ Jones Day includes an engagement letter with ZIGL, listing only ZIGL's Cayman Island address.  *See* Dkt. No. 29-3 at 2.

Finally, no UCC-1 financing statement, which perfects the Indenture Trustee's lien on

ZIGL's assets, was filed by the Indenture Trustee either in New Jersey (which is the forum

Anchorage contends is ZIGL's place of business) or New York (which is the forum that

Anchorage contends is where ZIGL's assets are located).  Instead, the Indenture Trustee filed a

UCC-1 financing statement on October 21, 2005 in the District of Columbia Secretary of State's

office, and a continuation statement was filed on June 8, 2010, each listing only ZIGL's Cayman

Island location.

> **b.**     ***There Is No Evidence That ZIGL Has Any Assets in the United States.***

A person who owns property in the United States is eligible to be a debtor, and even

funds in a bank account located in the United States can satisfy Bankruptcy Code section 109.

*See Global Ocean*, 251 B.R. at 38-39.  However, the purported debtor must still own "property"

in the United States.  The mere fact that copies of a debtor's books and records are in the hands

of entities located in the United States or that the debtor held a claim against property located in

the United States is <u>not</u> sufficient to satisfy Bankruptcy Code section 109.  *See id.*

The Involuntary Petition asserts that ZIGL has assets located in New York, New York,

but does not identify what those assets are.  *See* Dkt. No. 1.  Anchorage's assertion in the

Involuntary Petition is not supported by the Schedules.  According to the Schedules, ZIGL's **<u>only</u>**

assets consist of approximately $500 in "exempt property under Transaction Documents" and

"Debt obligations held by the Indenture Trustee – Unknown value."  Schedules at 5.  The

Schedules' statements, made by ZIGL under penalty of perjury, rebut Anchorage's assertion that ZIGL has property located in New York.[15]

Indeed, the typical route foreign debtors often use to access United States bankruptcy courts – the creation and maintenance of accounts – is not present here.  All of ZIGL's "accounts" under the Indenture are actually bank accounts or investment accounts in the name of the Indenture Trustee, not ZIGL.  There simply is **no** evidence of any assets owned by ZIGL located in the United States.

### 2.        This Case Should Be Dismissed Because The Anchorage Entities Were Not Qualifying Petitioning Creditors.

In addition to the fact that ZIGL is not an eligible debtor, this case must be dismissed because the Anchorage Entities were not qualifying petitioning creditors under Bankruptcy Code section 303.  Because the Notes were non-recourse obligations of ZIGL, no Noteholder can be an unsecured creditor of ZIGL.  An involuntary petition filed only by Noteholders (and not joined by any qualifying unsecured creditor) is invalid.

This case was commenced as an involuntary case under Bankruptcy Code section 303. The three Anchorage funds were the petitioning creditors.  No other creditor joined the Involuntary Petition and the case was not converted to a voluntary chapter 11 case.

Bankruptcy Code section 303(b) provides in relevant part that an involuntary case "against a person is commenced by the filing with the bankruptcy court of a petition under chapter 7 or 11 . . . by three or more entities, each of which is either a holder of a claim against such person that is not contingent as to liability or the subject of a bona fide dispute as to liability

---

[15]   If ZIGL's property were located in New York, presumably the Indenture Trustee would have recorded a UCC-1 financing statement in that jurisdiction, as opposed to the protective filing in Washington, D.C.

or amount, or an indenture trustee representing such a holder, if such noncontingent, undisputed claims aggregate at least $13,475 more than the value of any lien on property of the debtor securing such claims held by the holders of such claims".  11 U.S.C. § 303(b).

By its plain language, section 303(b) provides that only creditors holding unsecured claims may be qualifying petitioning creditors.  *See* 11 U.S.C. § 303(b).[16]  This requirement is buttressed by section 303(b)'s use of the phrase "claim against such person."  An involuntary case is commenced against a "person" by creditors holding claims against that "person."  An involuntary case is <u>not</u> commenced against a debtor.[17]  The Bankruptcy Code separately defines "person" and "debtor."  *See* 11 U.S.C. §§ 101(13) and 101(41).  Importantly, while the phrase "claim against the debtor" includes claims against the debtor and claims against property of a debtor, *see* 11 U.S.C. § 102(2), Bankruptcy Code section 303 does <u>not</u> use the phrase "claim against the debtor" but instead uses the phrase "claim against such person."

The natural consequence of only unsecured creditors being qualifying petitioning creditors is that creditors who hold only <u>non-recourse</u> claims cannot be qualifying petitioning creditors.  That is because, as a matter of applicable non-bankruptcy law (here, New York), non-recourse creditors hold no rights against a person, but only rights against the property securing the obligations owed to the creditor.  *See In re 680 Fifth Ave. Assocs.*, 156 B.R. 726, 732 n.8 (Bankr. S.D.N.Y. 1994).

---

[16]  Fully secured creditors can file an involuntary petition, but there still be must qualifying petitioning creditors.  *See Paradise Hotel Corp. v. Bank of Nova Scotia*, 842 F.2d 47, 49-50 (3d Cir. 1988).

[17]  Indeed, during the period between the filing of an involuntary petition and the resolution of whether to grant an order for the relief, the person against whom an involuntary case is filed is commonly referred to as the "alleged debtor."  *See, e.g., In re Silverman*, 230 B.R. 46, 48 (Bankr. D.N.J. 1998) (referring to "alleged debtor").

In *In re Allen-Main Assocs. Ltd.*, 223 B.R. 59 (2d Cir. BAP 1998), an undersecured nonrecourse creditor filed an involuntary chapter 7 petition. At the time of the filing, the property securing the creditor's claim was less than the amount of the claim, and the deficiency exceeded the statutory minimum set forth in Bankruptcy Code section 303(b). The chapter 7 debtor answered the involuntary, claiming that the creditor was not an eligible petitioning creditor. The bankruptcy court dismissed the case, and the Second Circuit Bankruptcy Appellate Panel affirmed. The court held that in "a chapter 7 case a nonrecourse creditor has no claim or right to payment of any deficiency from either the debtor or the property of the debtor. Code § 303 clearly requires that a sole petitioning creditor establish a right to payment of at least $10,000 above the value of its lien in order to be eligible to file an involuntary chapter 7 petition. [The petitioning creditor] has established no right to payment. This is true even if, as [the petitioning creditor] has suggested, it were to waive a portion of its secured claim." *Id.* at 63.

Anchorage did not, of course, filed a chapter 7 involuntary petition, but instead selected chapter 11.[18]  *Allen-Main* noted that in a prior decision of the United States District Court for the Southern District of New York, *In re East-West Assocs.*, 106 B.R. 767 (Bankr. S.D.N.Y. 1989), the court held that a nonrecourse creditor can be an eligible petitioning creditor with respect to an involuntary chapter 11 case. The *East-West* court stated that the "Bankruptcy Code makes no distinction between recourse and non-recourse claims; in fact . . . a claim 'against the debtor' under the Bankruptcy Code, 11 U.S.C. § 102(2), includes both claims against the debtor and claims against the property." *Id.* at 771.

---

[18]   No doubt Anchorage has no desire to have a trustee appointed, which would have been automatic following entry of the order for relief in a chapter 7 case, since Anchorage has not sought the appointment of a chapter 11 trustee in this case notwithstanding the fact that from day one ZIGL has no intention of filing a plan of reorganization.

With due respect to the *East-West* court, it incorrectly concluded that the Bankruptcy Code makes no distinction between recourse and non-recourse claims. Indeed, as confirmed by *Allen-Main*, the Bankruptcy Code does in fact distinguish between recourse and non-recourse claims, and in the chapter 11 context a secured creditor has the right to elect to have a non-recourse claim be treated as a recourse claims. *See Allen-Main*, 223 B.R. at 63; *see also* 11 U.S.C. § 1111(b). But a section 1111(b) election applies only <u>after</u> a case has been commenced against a debtor; <u>i.e.</u>, the order for relief has been entered and a bankruptcy estate exists. It cannot be that a right that exists only in a chapter 11 bankruptcy case – a section 1111(b) election – should be the basis upon which a non-recourse creditor can qualify as a petitioning creditor to attempt to force a person into bankruptcy. That would be a classic case of "putting the cart before the horse." Section 1111(b) should be available only after a "person" has become a "debtor."[19]

Further, the *East-West* court, by focusing solely on Bankruptcy Code section 102(2), did not address the use of the phrase "against a person" that is used in Bankruptcy Code section 303. Thus, *East-West* incorrectly treats a claim "against the debtor" (which does include nonrecourse claims) as the same thing as a claim "against a person," which necessarily refers only to recourse claims.

Finally, if *East-West* is correct, it raises two troubling policy concerns. One, it would give non-recourse creditors rights that they would not have outside of bankruptcy. Bankruptcy

---

[19]    Treating section 1111(b) as applying only after the order for relief is entered is consistent with the claim allowance process. Section 1111(b) is triggered by the claim allowance process under Bankruptcy Code section 502. *See* 11 U.S.C. § 1111(b)(1)(A). Section 502(a) provides that a claim, proof of which is filed in accordance with section 501, is allowed unless a party in interest objects. Claims are not filed in a bankruptcy case, and are not allowed or disallowed, until after an order for relief is entered.

generally does not enlarge the prepetition rights of debtors or creditors unless the Bankruptcy

Code expressly provides.  *See Counties Contracting & Constr. Co. v. Constitution Life Ins. Co.*,

855 F.2d 1054, 1059 (3d Cir. 1988).

Second, it creates an incentive for savvy non-recourse creditors to file involuntary

chapter 11 cases instead of chapter 7 cases even though there is no hope for a debtor to attempt

to reorganize.  Indeed, that is what is happening here.  ZIGL defaulted two years ago, and is

barred from acquiring any new Collateral Securities.  ZIGL made no attempt to oppose the

Involuntary Petition.  As soon as the Order for Relief was entered, Anchorage filed an

application to terminate exclusivity, representing to this Court that ZIGL had no intention of

filing a plan of reorganization.  To the extent that ZIGL ever should have been forced into

bankruptcy, the facts obviously call for a chapter 7 case.  But because it is a nonrecourse

creditor, Anchorage could not be a qualifying petitioning creditor in a chapter 7 case, and instead

has selected chapter 11 for in order to attempt to satisfy the eligibility requirements.

**B.      This Court Should Dismiss or Abstain Under Bankruptcy Code Section 305.**

Bankruptcy Code section 305(a)(1) provides, in pertinent part, that: "The court, after

notice and a hearing, may dismiss a case under this title, or may suspend all proceedings in a

case under this title, at any time if . . . the interests of creditors and the debtor would be better

served by such dismissal or suspension."  11 U.S.C.A. § 305(a)(1).  Section 305 "grants

significant discretion to the bankruptcy courts to decline, in certain circumstances, to exercise

jurisdiction over a case filed under title 11."  2 <u>Collier on Bankruptcy</u> ¶ 305.01 (2011).[20]

---

[20]   If this Court is not inclined to dismiss ZIGL's case outright, Hildene requests that this
Court abstain from exercising jurisdiction.  While Bankruptcy Code section 305 does not refer to
abstention in its substantive text (other than the title), the legislative history indicates that section
305 permits a court to "decline jurisdiction" by means of abstention.  *See* 2 Collier on
Bankruptcy ¶ 305.01 (2011); H.R. REP. No. 95-595, 95th Cong., 1st Sess. 325 (1977) ("This

At its core, dismissal or abstention under section 305 is proper where it would better serve the interests of creditors and the debtor. *See e.g.*, *In re Mazzacone*, 200 B.R. 568, 575 (E.D. Pa. 1996). Section 305 is often applicable in the involuntary petition context,[21] given that involuntary petitioners may fail to contemplate whether the filing of the petition serves the best interests of creditors other than themselves. *See In re Caucus Distributors, Inc.*, 106 B.R. 890, 929-30 (Bankr. E.D. Va. 1989) ("[O]ne of the factors a court must consider when presiding over a contested involuntary petition is whether the administration of an estate in bankruptcy would be beneficial to creditors other than the petitioners. A petitioner would do well to consider this question *prior* to the filing of an involuntary petition to avoid dismissal under Section 305 of the Code, which enables a court to suspend or dismiss a petition in bankruptcy if the interests of creditors and the debtor would be better served.") (emphasis in original).[22] It also follows that dismissal or abstention pursuant to section 305 may be granted even where a basis for an involuntary case has been established. *In re Williamsburg Suites, Ltd.*, 117 B.R. 216, 218 (Bankr. E.D. Va. 1990) ("Dismissal pursuant to § 305 is appropriate even where petitioning creditors have established a case for an involuntary bankruptcy.").

---

section recognizes that there are cases in which it would be appropriate for the court to decline jurisdiction . . . . Thus, the court is permitted, if the interests of creditors and the debtor would be better served by dismissal of the case or suspension of all proceedings in the case to so order.").

[21]    *See In re Monitor Single Lift I, Ltd.*, 381 B.R. 455, 464 (Bankr. S.D.N.Y. 2008) (recognizing that the landscape of section 305 cases is "dominated by cases concerning involuntary petitions filed by creditors," though noting that section 305 is not limited to such a situation).

[22]    The legislative history of section 305 offers, as an example of an appropriate case for abstention under that section, a situation where an involuntary bankruptcy is filed by certain creditors to exercise leverage in an out-of-court workout. *See* H.R. Rep. No. 95-595 at 325 (1977), *reprinted in* 1978 U.S.C.C.A.N. 5963, 6281.

1.    <u>**Factors Courts Consider Under Section 305.**</u>

Courts have most recently rejected any past strict interpretation of the application of section 305, noting instead that relief under section 305 (whether dismissal or abstention) must be determined on each case's particular facts.  *See e.g.*, *In re S. Canaan Cellular Investments, Inc.*, BNKR. 09-10473, 2009 WL 2922959, at \*8 (Bankr. E.D. Pa. May 19, 2009) *aff'd sub nom. In re S. Canaan Cellular Investments, LLC*, 420 B.R. 625 (E.D. Pa. 2009) ("Whether to dismiss a case or abstain pursuant to section 305 is committed to the discretion of the bankruptcy court, and is also determined based upon the totality of the circumstances."); *In re Monitor Single Lift I, Ltd.*, 381 B.R. 455, 464 (Bankr. S.D.N.Y. 2008) ("The decision to abstain under § 305(a)(1) should be made on a case-by-case basis."); *In re Fitzgerald Group*, 38 B.R. 16, 17 (Bankr. S.D.N.Y. 1983) (same); *In re Spade*, 258 B.R. 221, 231 (Bankr. D. Colo. 2001) *aff'd*, 269 B.R. 225 (D. Colo. 2001) (citing cases and noting that "[c]learly, the historical and contemporary trend in § 305 case law permits courts to consider a wide variety of factors relevant to the facts of the particular case in determining whether to abstain under § 305.").

Courts routinely apply a seven-factor test to determine whether dismissal or abstention under section 305 is proper:

> (1) the economy and efficiency of administration;
>
> (2) whether another forum is available to protect the interests of both parties or there is already a pending proceeding in state court;
>
> (3) whether federal proceedings are necessary to reach a just and equitable solution;
>
> (4) whether there is an alternative means of achieving an equitable distribution of assets;
>
> (5) whether the debtor and the creditors are able to work out a less expensive out-of-court arrangement which better serves all interests in the case;

(6) whether a non-federal insolvency has proceeded so far in those proceedings that it would be costly and time consuming to start afresh with the federal bankruptcy process; and

(7) the purpose for which bankruptcy jurisdiction has been sought.

*Monitor Single*, 381 B.R. at 464-65; *Canaan*, 2009 WL 2922959, at *8-9. No factor is any more controlling or persuasive than any other. *Monitor Single*, 381 B.R. at 465.

In addition to the seven factors commonly examined by courts, section 305 has been found to be applicable to certain common fact patterns. For example, as noted above (and as illustrated in the legislative history), the filing of an involuntary petition by a recalcitrant creditor to gain a tactical advantage is one such situation. Another common situation where courts have found relief under section 305 warranted is an absence of a true bankruptcy purpose.[23] As the Supreme Court has noted, the central purpose of the Bankruptcy Code "to provide a procedure by which certain insolvent debtors can reorder their affairs, make peace with their creditors, and enjoy a new opportunity in life with a clear field for future effort, unhampered by the pressure and discouragement of preexisting debt." *Grogan v. Garner*, 498 U.S. 279, 286 (1991) (internal quotations omitted). Where those purposes will not be served, courts dismiss cases pursuant to section 305. *See In re International Zinc Coatings & Chem. Corp.*, 355 B.R. 76, 87 (Bankr. N.D. Ill. 2006) ("The case must have its own justification for being, one related to some legitimate bankruptcy policy or purpose. A bankruptcy case filed or maintained purely for some

---

[23]    *See e.g., Argus Group 1700, Inc. v. Steinman*, 206 B.R. 757, 761 (E.D. Pa. 1997) (upholding Bankruptcy Court's *sua sponte* dismissal of chapter 11 case under section 305(a) and section 1112(b) on the grounds that "debtor's bankruptcy cases lack[ed] any legitimate bankruptcy purpose."); *In re Macke Intern. Trade, Inc.*, 370 B.R. 236, 247 (9th Cir. BAP 2007) (upholding the Bankruptcy Court's decision to dismiss an involuntary case pursuant to section 305 where, among other things, the filing lacked any bankruptcy purpose because, as the Bankruptcy Court held, the debtor "was not in need of debt adjustment, does not need a breathing spell from creditors, and does not need a discharge and a fresh start – there appears to be nothing to reorganize or even liquidate").

party's procedural ends, one having no purpose cognizable under the bankruptcy laws, should be dismissed under section 305(a)(1).").

Along the same lines, courts have recognized that abstention or dismissal under section 305 of the Bankruptcy Code is warranted where an involuntary petition is filed to obtain a disproportionate advantage for petitioning creditor's position. *See e.g.*, *Spade*, 258 B.R. at 231-2 (holding that petitioning creditors did not "file the petition in order to commence an orderly and fair distribution of [the Debtor's] assets to all of [the Debtor's] creditors" and that the motivation was entirely the petitioning creditors' desire to gain an advantage over other parties).

> **2.    The Section 305 Factors Strongly Favor Dismissal or Abstention.**

Virtually every factor courts have examined under Bankruptcy Code section 305 that is relevant to ZIGL and this case favors dismissal or abstention. Anchorage's true reason for commencing this case is that it cannot force liquidation of the Collateral (for its own benefit and to the exclusion of all other creditors) absent a majority of <u>all</u> Noteholders, but that is by design – it is a bargained for protection that junior creditors negotiated and contracted for according to the unambiguous terms of the Indenture. The Class A-1 Noteholders could have bargained to eliminate this right, but they did not. Now Anchorage is hoping that this Court will serve as the vehicle to obtain a result that Class A-1 Noteholders did not bargain for.

*First*, it cannot be disputed that Anchorage's purpose in commencing this case was to circumvent the Indenture's restriction on the Indenture Trustee disposing of ZIGL's assets absent requisite consent of all Noteholders. *See* Indenture at § 5.5. Anchorage admitted as much in the Anchorage Disclosure Statement:

> Notwithstanding the default, *the Indenture does not permit for the liquidation of the Debtor's Assets to satisfy the Debtor's obligations, including the Senior Notes, absent consent of the Junior Notes*, which consent the Plan Proponents [Anchorage] is not obtainable under the current circumstances.

Anchorage Disclosure Statement at 15 (emphasis added).

While the Indenture permits a majority of Class A-1 Noteholders to take various actions, the one thing Class A-1 Noteholders absolutely cannot do is direct the Indenture Trustee to sell ZIGL's assets absent requisite consent of Noteholders.  *See* Indenture at § 5.13(d).  Now, Anchorage is hoping to use the power of the Bankruptcy Code and this Court to confirm a plan that transfers all of ZIGL's assets to Anchorage's affiliate.  In other words, Anchorage is trying to use the Bankruptcy Code to <u>expand</u> its non-bankruptcy rights so that it can cause a sale of ZIGL's assets (to itself and other Class A-1 Noteholders).  This is a paradigm example of an improper purpose in commencing an involuntary case.  *See In re Skyworks Ventures, Inc.*, 431 B.R. 573, 579 (Bankr. D.N.J. 2010) (awarding punitive damages against petitioning creditor for filing "involuntary petition without support from other creditors solely to foster their own interests" and concluding that "filing the petition was a tactical maneuver to avoid prosecuting" a nonbankruptcy action).  *In re Better Care, ltd.*, 97 B.R. 405, 411 (Bankr. N.D. Ill. 1989) ("An improper use of the Bankruptcy Code justifying a finding of bad faith will then exist any time a creditor uses an involuntary bankruptcy to gain a disproportionate advantage to that particular creditor's position, rather than to protect against other creditors obtaining a disproportionate advantage.").

***Second***, federal court jurisdiction is in no way required or is necessary, as there are other forums available to protect the interests of Noteholders, as mandated by the Indenture.  Indeed, there was a panoply of non-bankruptcy rights and remedies that could have been pursued.  If there has been a payment default, the Indenture Trustee can commence an action against ZIGL to enforce the terms of the Indenture.  If ZIGL must be placed into an insolvency proceeding, the Caymans Islands' insolvency law is well suited to address all of the issues that could be

addressed in this Court.  ZIGL has virtually no connections to the United States – ZIGL has no

officers or employees and maintains no office in the United States; and its assets, if located in the

United States (which they are not), consist of debt obligations against third parties that virtually

all incorporated in jurisdictions outside of the United States.  The Notes were listed on the Irish

Stock Exchange.  These facts favor dismissal or abstention.  *See e.g.*, *In re Compania de*

*Alimentos Fargo, S.A.*, 376 B.R. 427, 439 (Bankr. S.D.N.Y. 2007) (dismissing involuntary

petition against foreign company under section 305(a)(1) whose only United States assets are

were one trademark and three trademark applications).

> *Third*, there is an alternative means of achieving an equitable distribution of assets – the

unambiguous terms of the Indenture.  Anchorage simply wants to bypass those provisions to

effectuate an inequitable distribution of assets.  Notably, neither the Indenture Trustee nor any

other Class A-1 Noteholder has joined the Involuntary Petition.

> *Fourth***,** the debtor and the creditors, if given the chance, should be able to work out a

less expensive out-of-court arrangement which better serves all interests in the case.  Anchorage

admitted that it was possible to negotiate with other Noteholders, it just was unlikely (to achieve

the results Anchorage desired) in the "current circumstances."

> *Fifth*, the purpose for which bankruptcy jurisdiction has been sought has <u>nothing</u> to do

with bankruptcy principles.  ZIGL will not be reorganized.  It has no intention of filing a plan of

reorganization.  According to the Schedules, there are only nine unsecured creditors, which

consist of three entities owed less than $270,000 in liquidated amounts (two of which are law

firms seeking to be employed in this case), institutions such as Moody's, Standard's & Poor's, and

the Irish Stock Exchange (each holding claims in unknown amounts), a swap counterparty owed

an unknown amount, and two insiders.  These claimants will receive nothing on account of their

unsecured claims.  All Noteholders other than Anchorage are, according to Anchorage, entitled to no votes on the Anchorage Plan.

Courts considering analogous circumstances have had little trouble dismissing (voluntary and involuntary) bankruptcy cases commenced for improper purposes.

In *Silverman*, Judge Stripp of this Court granted an alleged debtor's motion for punitive damages against a petitioning creditor following dismissal of the involuntary petition.  The court had found that the petitioning creditor had been advised that he would gain a strategic advantage by filing an involuntary petition.  This constituted an improper purpose.  Judge Stripp stated: "Section 303 of the Code authorizes a creditor to file an involuntary petition to protect *its claim against collection efforts by other creditors*.  Filing an involuntary petition with the intent to gain a strategic advantage, rather than to protect one's interest relative to other creditors or to prevent dissipation of assets, constitutes an improper purpose."  *Silverman*, 230 B.R. at 53 (emphasis added).  Here, there is no evidence that Anchorage needed to protect its interest from the collection efforts of other creditors because there are no collection efforts pending,[24] and there is no evidence that ZIGL is dissipating assets.  There, as was in the case of *Silverman*, evidence that Anchorage commenced this case to obtain a tactical advantage.

In *Spade*, a creditor sued the debtor in state court to collect on a 1997 promissory note, but the state court litigation did not proceed as the creditor desired.  The creditor, joined by two other holders of 1997 notes, filed an involuntary petition.  The creditor's representative testified that the primary purpose of the bankruptcy filing "was to gain the assistance of a trustee who, using the special tools given to trustees by the Bankruptcy Code, could conduct discovery into

---

[24]    *See* Anchorage Disclosure Statement at 13 (Section IV.F).

Spade's affairs far more effectively and quickly that [the creditor] could in its state court action."

*Spade*, 258 B.R. at 232.

The *Spade* court did not "buy" the creditor's story. "If a fair recovery for all creditors was [the creditor's] primary objective, it most certainly could have filed the involuntary petition to begin with rather than its exclusive state court action." Id. at 232-33. "[T]he Court finds that the filing of this petition to be a litigation tactic by [the creditor] . . . . The Petitioning Creditors did not file the petition in order to commence an orderly and fair distribution of Spade's assets to all of Spade's creditors. In view of the apparent self interest of [the creditor] in filing this petition, the Court must seriously consider whether the creditors as a whole will be better served by the exercising jurisdiction over this case or by dismissal in favor of allowing the state court to continue with the cases pending before it." Id. at 233.

Here, nothing in the record shows that Anchorage filed this case for the purpose of benefitting ZIGL's creditor body as a whole. Rather, Anchorage filed the Involuntary Petition because it wants to force the liquidation of ZIGL's assets for its own benefit, but it has not obtained the consent of the requisite number of Noteholders, and thus is barred by the express terms of the Indenture from doing so. As was the case in *Spade*, Anchorage's self-serving interests are not designed to benefit ZIGL's creditors as a whole, but to give Anchorage a litigation advantage it is not entitled to have outside of bankruptcy. If Anchorage actually wanted bankruptcy for legitimate purposes, it would have filed the case as a chapter 7 and permit a chapter 7 trustee to dispose of ZIGL's assets for the benefit of all creditors.

A different form of "bad faith" occurred in *In re Tichy Elec. Co.*, 332 B.R. 364 (Bankr. N.D. Iowa 2005). In *Tichy*, three creditors filed an involuntary petition. One month later, they filed a motion to dismiss, representing that each had been paid in full by the debtor. The

bankruptcy court dismissed the case, but found the petitioning creditors had acted in bad faith in filing the involuntary petition, noting that the "filing of an involuntary petition for a non-bankruptcy purpose is evidence of bad faith." *Id.* at 373.  The court stated: "[t]he evidence reveals that the normal reasons for filing a bankruptcy petition were absent in this case" and that the petitioning creditor's counsel had believed nonbankruptcy options were "slow and the results have been unsatisfactory." *Id.* at 376.  Such actions were not in good faith.  "The power of an involuntary petition *must be exercised* for the good of the entire creditor body and for legitimate bankruptcy purposes." *Id.* (emphasis added).

In *Basin Electric Power Cooperative v. Midwest Processing Co.*, 47 B.R. 903 (D.N.D. 1984), *aff'd*, 769 F.2d 483 (8th Cir. 1985), Basin Electric Power Cooperative ("Basin") was the beneficiary of a $5 million letter of credit issued for the account of Midwest Processing Company ("Midwest").  "One of the conditions under which Basin could draw on the letter of credit was if a petition in bankruptcy was filed against Midwest and if that petition was not dismissed for a period of sixty days." 47 B.R. at 905.  Soon before the letter of credit was to expire, Basin filed an involuntary petition against Midwest.  Midwest argued that the filing was in bad faith since Basin's purpose was to create the circumstances permitting a draw on the letter of credit.  The bankruptcy court did not dismiss the involuntary on these grounds, but the district court reversed, explaining that "Basin filed the involuntary petition to put itself in a more advantageous position with respect to the . . . letter of credit.  In so doing, Basin attempted to invoke the jurisdiction of the Bankruptcy Court to affect a contract dispute." *Id.* at 909.  Basin's attempt constituted bad faith because "[i]t has long been recognized that using the bankruptcy process to promote individual interests in a manner not consistent with the legislative purposes of the Bankruptcy Code is an abuse of the jurisdiction of the bankruptcy courts." *Id.*  On a further

appeal, the Eighth Circuit affirmed the district court, reiterating that "Basin Electric was

motivated by the desire to attain an advantageous position with regard to the letter of credit.  The

use of the petition by Basin Electric to affect a non-bankruptcy purpose is further evidence of

bad faith."  769 F.2d at 487.

This Court should following the holdings of *Silverman*, *Spade*, *Tichy*, and *Basin Elec.*

and not permit Anchorage to achieve its self-serving goals.

### C.    Cause Under Bankruptcy Code Section 1112 Exists to Dismiss This Case.

In addition to grounds for dismissal or abstention under Bankruptcy Code section 305,

good cause exists to dismiss this case under Bankruptcy Code section 1112.  Section 1112(b)

provides, in pertinent part:  [T]he court may convert a case under [Chapter 11] to a case under

Chapter 7 . . . or may dismiss a case under this chapter, whichever is in the best interest of

creditors and the estate, for cause….  11 U.S.C. § 1112(b).  In other words, the statute provides

for dismissal for cause, even if the case is not in the best interest of the creditors and the estate.

*In re SGL Carbon Corp.*, 200 F.3d 154, 159-60 (3d Cir. 1999).

Bankruptcy Code section 1112(b)(4) lists 16 specific examples of "cause," but the list is

non-exclusive; they are only illustrative examples.[25]  For example, it is well settled that a chapter

11 case may be dismissed for "cause" if it was not commenced in good faith.  Lack of good faith

is evidenced "if it is clear that on the filing date there was no reasonable likelihood that the

debtor intended to reorganize and no reasonable probability that it would eventually emerge from

bankruptcy proceedings."  *C-TC 9th Ave. P'ship v. Norton Co. (In re C-TC 9th Ave. P'ship)*, 113

---

[25]    *See e.g.*, H.R. Rep. No. 595, at 406, *reprinted in* 1978 U.S.S.C.A.N. 5963, 6362
("[The] list [contained in § 1112(b)] is not exhaustive.  The court will be able to consider other
factors as they arise, and to use it equitable powers to reach an appropriate results in individual
cases.").

F.3d 1304, 1309-10 (2d Cir. 1997) (quoting *Baker v. Latham Sparrowbush Assoc. ( In re Cohoes Indus. Terminal, Inc.)*, 931 F.2d 222, 227 (2d Cir.1991)).

The Third Circuit has held that "bankruptcy petitions are subject to dismissal unless filed in good faith." *SGL Carbon Corp.*, 200 F.3d at 160.  The good faith standard "protects the jurisdictional integrity of the bankruptcy courts by rendering their equitable weapons . . . available only to those debtors and creditors with clean hands." *Id*. at 161.  The debtor bears the burden of proving good faith.  *See In re PPI Enter. (U.S.), Inc.*, 324 F.3d 197, 211 (3d Cir. 2003).  The Third Circuit has recognized that "no list is exhaustive of all the factors which could be relevant when analyzing a particular debtor's good faith." *Id.*

In *SGL Carbon*, the Third Circuit confronted whether a debtor's voluntary chapter 11 petition should be dismissed where the case had been filed to frustrate the prosecution of civil antitrust claims against the debtor, which was financially sound on the petition date.  The Third Circuit reversed the district court's denial of a motion to dismiss under section 1112(b).  The court held that a "Chapter 11 petition is not filed in good faith unless it serves a valid reorganizational purpose." *SGL Carbon*, 200 F.3d at 165.  Because the debtors' officers admitted that the petition was "filed solely to gain tactical litigation advantages," *id.* at 167, the Third Circuit determined that the case had to be dismissed.

Following *SGL Carbon*, in *In re Integrated Telecom Express, Inc.*, 384 F.3d 108 (3d Cir. 2004), the Third Circuit again reversed an order denying dismissal under section 1112.  Unlike the debtor in *SGL Carbon*, the *Integrated Telecom* debtor was out of business as of the petition date.  The record demonstrated that the case was filed to take advantage of Bankruptcy Code section 502(b)(6)'s cap on lease rejection claims.  While filing a bankruptcy case in order to take advantage of a provision of the Bankruptcy Code does not itself establish bad faith, the

*Integrated Telecom* court held it also does not conclusively establish good faith. *Id.* at 128.

Rather, the relevant inquiry is "(1) whether the petition serves a valid bankruptcy purposes, *e.g.*,

by preserving a going concern or maximizing the value of the debtor's estate, and (2) whether the

petition is filed merely to obtain a tactical litigation advantage." *Id.* at 119-20. The Third Circuit

rejected the argument that the filing was in good faith because chapter 11 permitted an efficient

distribution of value under the auspices of the Bankruptcy Code, holding that distribution alone

is not a valid bankruptcy purpose. *Id.* at 127. Nothing in the record demonstrated that the value

would increase if the case remained in bankruptcy, or that the results could not be obtained under

applicable nonbankruptcy law. *Id.*

Applying *SGL Carbon* and *Integrated Telecom* to the facts here,[26] "cause" clearly exists

under Bankruptcy Code section 1112. Anchorage filed the Involuntary Petition so avoid the

Indenture's restrictions on the Indenture Trustee's ability to sell assets of ZIGL absent consent of

all noteholders – a clear tactical advantage. There is no valid reorganization purpose, since

ZIGL is not reorganizing but per the terms of the Anchorage Plan instead will be dissolved, and

its assets (both prepetition assets and estate causes of action) are to be immediately transferred

(without any auction process) to Anchorage's affiliate for the benefit of only Class A-1

Noteholders.

## IV.    **REQUEST FOR ORAL ARGUMENT**

Hildene respectfully requests oral argument in respect of the Motion.

---

[26]    While both decisions concerned financially healthy debtors, the Third Circuit was
clear that its rationale for imposing a good faith requirement on any chapter 11 petition was not
limited to cases involving solvent debtors. *See Integrated Telecom*, 384 F.3d at 120 n.4; *see also
In re Law Ctr.*, 261 B.R. 607, 612-13 (Bankr. M.D. Pa. 2001) (citing *SGL Carbon* and holding
that "the Circuit has indicated that an involuntary bankruptcy petition lacking the statutory
requirements will support a dismissal, a finding of bad faith, and appropriate sanctions upon the
entity filing the petition. *Landon v. Hunt*, 977 F.2d 829, 833 (3d Cir. 1992).").

## V.    <u>CONCLUSION</u>

This case never should have been commenced.  ZIGL does not have any assets or place of business in the United States, and is not a corporation formed under any state's law.  No bankruptcy policy is served with ZIGL being subject to this Court's jurisdiction under chapter 11. Anchorage commenced this case to circumvent the Indenture, a clear effort to obtain a tactical advantage that constitutes an improper purpose.  This Court should grant this Motion and dismiss or abstain from this case.

Dated: May 23, 2011
       New York, New York

**QUINN EMANUEL URQUHART & SULLIVAN LLP**

*Counsel for Hildene Capital Management and
Hildene Opportunities Master Fund, LTD*

    /s/  Scott C. Shelley          _
        Scott C. Shelley