**FOR PUBLICATION**

UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY

- - - - - - - - - - - - - - - - - - - - - - - - - - -X

In re:  ZAIS INVESTMENT GRADE
       LIMITED VII,                        Chapter 11
                                                     Case No. 11-20243 (RTL)

         Debtor.
- - - - - - - - - - - - - - - - - - - - - - - - - - -X

## OPINION

**APPEARANCES:**

**WHITE & CASE**
Dwight A. Healy, Esq., Gerald H. Uzzi, Esq., Thomas MacWright, Esq.

And

**FOX ROTHSCHILD LLP**
Richard M. Meth, Esq., Martha B. Chovanes, Esq.
Attorneys for Anchorage Capital Master Offshore, Ltd., GRF Master Fund, L.P., Anchorage Illiquid Opportunities Master Offshore, L.P., and Anchorage Capital Group, L.L.C.

**QUINN EMANUEL URQUHART & SULLIVAN, LLP**
Scott C. Shelley, Esq., Eric D. Winston, Esq., Jonathan Pickhardt, Esq., Curran Walker, Esq.
Attorneys for Hildene Capital Management, Hildene Opportunities Master Fund, LTD and Babson Capital Management LLC

**HERRICK, FEINSTEIN LLP**
Stephen B. Selbst, Esq., John August, Esq.
Attorneys for ZAIS Group, LLC

**UNITED STATES DEPARTMENT OF JUSTICE**
Mitchell B. Hausman, Esq.
Attorney for Roberta A. DeAngelis, United States Trustee

**WOOLMUTH, MAHER & DEUTSCH LLP**
James N. Lawlor, Esq.
Attorneys for Debtor

**JONES DAY**
Heather Lennox, Esq.
Special Counsel for Debtor

**EMMET, MARVIN & MARTIN, LLP**
Tyler J. Kandel, Esq.
Edward P. Zujkowski, Esq.
Attorneys for The Bank of New York Mellon Trust Company, N.A.

**RAYMOND T. LYONS, U.S.B.J.**

## INTRODUCTION

Hildene Capital Management and Hildene Opportunities Master Fund, LTD (collectively "Hildene" or "Movants"), noteholders in a junior tranche, move to dismiss this involuntary chapter 11 case filed by senior noteholders.[1] Zais Group, LLC (the "Collateral Manager") and Babson Capital Management, a senior noteholder, join in the motion. Because the Debtor failed to contest the involuntary petition and the order for relief has been entered, Hildene may not challenge the involuntary petition. The Debtor has property in the United States and a place of business in the United States through a trustee and the Collateral Manager; therefore, it is eligible to be a debtor under title 11, United States Code. The petitioning creditors have established a good faith basis for filing this involuntary petition in that they seek to maximize the value of the Debtor's assets by actively managing them freed of the strictures of the trust indenture. Motion denied.

## JURISDICTION

---

[1] Tranche warfare. Reminds one of the line by Maj. T.J. "King" Kong (played by Slim Pickens) in Dr. Strangelove, "Well, boys, I reckon this is it – nuclear combat toe to toe with the Rooskies."

2

This court has jurisdiction of this proceeding under 28 U.S.C. § 1334(a) and (b), 28 U.S.C. § 157(a) and the Standing Order of Reference by the United States District Court for the District of New Jersey dated July 23, 1984, referring all cases and proceedings arising under Title 11 of the United States Code to the bankruptcy court.   This is a core proceeding within the meaning of 28 U.S.C. §157(b)(2)(A) concerning the administration of this case.

## FINDINGS OF FACT[2]  AND PROCEDURAL HISTORY

Zais Investment Grade Limited VII ("ZING VII" or the "Debtor") is a Cayman Islands corporation formed in 2005. Zais Group, LLC worked with an affiliate of Citigroup, Inc. to create this special purpose vehicle.   It issued notes in the face amount of $365.5 million on the Irish Stock Exchange and used the proceeds to acquire securities.   ZING VII then pledged those securities (Collateral Securities) as collateral for its obligations to the noteholders.   The Bank of New York Mellon Trust Company, N.A. is Trustee under a trust indenture for the benefit of the noteholders.   It holds ZING VII's assets in trust here in the United States.   ZING VII also issued $40 million of so-called Income Notes that are not secured and are junior to all the secured notes. Under the indenture the Income Notes are treated as equity.

In Wall Street jargon ZING VII is a CDO Squared.   "CDO" stands for collateralized debt obligation; i.e., ZING VII issued notes and pledged the securities as collateral.   In addition, the Collateral Securities are made up primarily of CDO's issued by other entities – hence, CDO Squared. At the bottom of this pyramid of debt are, primarily, residential mortgages, but also commercial mortgages, corporate loans, auto loans, credit cards, student loans and others.

The noteholders are separated into classes (tranches) and are entitled to distributions from

---

[2] This is a simplified version of a very complex transaction, but the essential elements are set out for the purpose of the issues raised in this motion.

3

the trust in descending order of priority. The petitioning creditors hold Class A-1 notes, the first priority. Hildene holds Class A-2 notes – second in line. ZAIS Group, LLC is the Collateral Manager for ZING VII's securities. It was permitted to sell securities and replace those with other eligible securities. If all noteholders were satisfied in full, the Collateral Manager stood to share any excess proceeds with the Income Noteholders. There is a nominal shareholder of ZING VII but it has no right to any residual value realized through ZING VII's business. ZING VII has contracted away any right to benefit from its assets. Two individuals in the Cayman Islands serve as directors and maintain the corporate existence. ZING VII has no employees or officers and takes no role in the management of its assets. It merely exists.

An event of default under the indenture occurred on March 11, 2009. It was not a payment default but a covenant default. That triggered a provision in the indenture requiring the Trustee to hold the Collateral Securities intact. Therefore, the Trustee has merely been collecting payments under the securities it holds as collateral and distributing the money it collects. The Collateral Manager has not been managing the Collateral Securities but continues to monitor the assets. The senior noteholders accelerated their notes effective June 3, 2009. Following acceleration, all collections must be distributed to the Class A-1 noteholders until they are satisfied in full. Since default and acceleration the Trustee has collected and distributed significant amounts and reduced the principal balance on the Class A-1 notes.

The petitioning creditors, GRF Master Fund, L.P., Anchorage Illiquid Opportunities Master Offshore, L.P., Anchorage Capital Master Offshore, Ltd., and Anchorage Capital Group, L.L.C., are all funds managed by Anchorage Capital Group, L.L.C. ("Anchorage"). None of them was an original investor in ZING VII. They all acquired their notes after default, beginning

in October 2009. Anchorage asserts that the collateral could yield a better return if it were managed, or liquidated in an orderly fashion, not just left to runoff by collection of the debt securities held in trust now. Anchorage attempted, without success, to convince ZING VII to rectify the passive holding of its assets. Under the trust indenture, the only way to achieve an orderly liquidation of the assets is to obtain the consent of 66.67% of all noteholders, which Anchorage deems highly unlikely, if not impossible. Secondly, Anchorage asserts that, even if managed well, the securities will never yield enough to satisfy the Class A-1 noteholders, so all other noteholders are out of the money.

An involuntary petition under chapter 11 of the Bankruptcy Code was filed on April 1, 2011by the Anchorage entities; no other creditors joined the petition under section 303(c). No answer was filed, therefore, the court entered an order for relief by default on April 26, 2011. *See* 11 U.S.C. §303(h). The Debtor filed schedules listing one small bank account with $500.00 in a Cayman Islands bank. The other assets are described as "Debt obligations held by the Indenture Trustee." The Trustee has submitted a declaration of an officer detailing the Collateral Securities it holds. Certificated securities are held in a vault in New York City. Un-certificated securities are registered with Depository Trust Company in New York City and Euroclear in Brussels. The Trustee also holds millions of dollars in cash in a bank account in the United States.

The petitioning creditors filed a plan of reorganization and disclosure statement. The plan was prepared prepetition and, according to Anchorage, garnered approval by 95% in amount of the Class A-1 noteholders before the case was filed. Hildene challenges the voting tabulation. The plan calls for all of the Collateral Securities to be transferred to Anchorage for management and orderly liquidation with the proceeds distributed to the Class A-1 noteholders.

5

Hildene, likewise, was not an original investor. It purchased junior notes after the involuntary petition was filed and on the eve of entry of the order for relief. Hildene's principal submitted a declaration that Hildene expects to realize a profit on its investment because it estimates the collections of the Collateral Securities will be more than the amount needed to satisfy the Class A-1 notes. In addition, Hildene holds junior positions in other CDO's, believes that CDO's should not be in bankruptcy, and that allowing ZING VII to be placed in involuntary bankruptcy sets a bad precedent for the CDO market. Hildene filed a motion to dismiss or abstain under sections 305 and 1112 of the Bankruptcy Code.

## DISCUSSION

Movants argue that there are two threshold issues that warrant dismissal of this case: (1) ZING VII is not eligible to be a debtor under Section 109 of the Bankruptcy Code; or (2) the Anchorage entities are not qualified to be petitioning creditors.

### *ZING VII's Eligibility To Be A Debtor*

Section 109(a) limits who may be a debtor under title 11 of the U.S. Code:

> [O]nly a person that resides or has a domicile, a place of business, or property in the United States . . . may be a debtor under this title.

The burden of establishing eligibility is on the petitioners. *In re Global Ocean Carriers Limited*, 251 B.R. 31, 37 (Bankr. D. Del. 2000). It is uncontroverted that ZING VII, a Cayman Islands corporation, does not reside in or have a domicile in the United States. The petition listed ZING VII's place of business in Red Bank, New Jersey, but that is the office of ZAIS Group, LLC, the Collateral Manager, a separate entity from ZING VII. Movants also contend that since ZING VII does not engage in business, it has no place of business. The business activities of collecting

money from the Collateral Securities and distributing money to the noteholders are done by the Trustee, pursuant to a contract with ZING VII. To the extent the Collateral Securities were managed or are being managed, that is by the Collateral Manager, ZAIS Group LLP, under contract with ZING VII.

*Place of Business*

A *principal* place of business is not required to satisfy Section 109(a)'s requirement, rather it is merely "*a*" place of business (emphasis added). *In re Paper I Partners, L.P.*, 283 B.R. 661, 672 (Bankr. S.D.N.Y. 2002). Further, "[a] person has a place of business in the United States if such person conducts business in the United States or business is conducted in the United States on the person's behalf." *Id.* The court in *In re Petition of Brierley* found that the England-based debtor's employment of an accountant in New York who maintained books and records regarding the debtor in her office was sufficient to render the United States "a place of business" under section 109(a) although the accountant was an independent contractor, worked for Arthur Anderson, reported to a partner at Arthur Anderson, and the accountant's telephone was not listed in the debtor's name. 145 B.R. 151, 161-62 (Bankr. S.D.N.Y. 1992). In *In re Paper I Partners*, the court found that having a general partner in the United States who conducted administrative and substantive business on behalf of the general partnership was sufficient to find that the United States was "a place of business." 283 B.R. at 670-71. Here, the Collateral Manager, Collateral Administrator, and Trustee services, the major portion of the Debtor's operations, are all performed in the United States. This is sufficient to meet the requirement of "a place of business" under section 109(a) as, without these functions, the Debtor would not be able to operate.

The Collateral Manager, in support of the motion to dismiss, cites *In re Global Ocean*

*Carriers, Ltd.* for the proposition that the petitioner must demonstrate that the debtor has a "significant physical and operational" presence in the United States. 251 B.R. 31. Such a reading carries that portion of the *Global Ocean* opinion too far. Global Ocean Carriers, the debtors in that case, had an initial public offering of stock in the United States, used American attorneys and investment bankers to issue notes, and renegotiated the terms of the notes in the United States. *Id.* at 37-38. Further, some of the debtor's vessels visited ports in the United States on a frequent basis. *Id.* The court there found that these activities were insufficient to establish that the United States was "a place of business." *Id.* Despite the amount of business being done in the United States in *Global Ocean* and that court's eventual finding, this case is distinguishable on several important points. First, the debtor in *Global Ocean* had its books and records located and maintained in Athens, Greece (*Id.* at 34-35) quite unlike this case where the books are maintained here. Second, the shipping vessels in *Global Ocean* were maintained and chartered by Tsakos Shipping and Trading, S.A., which is also headquartered in Greece. *Id.* The analogous property here, the Collateral Securities, is maintained in the United States. These demonstrate the difference between "doing business" and having "a place of business" in the United States.

    *In re Bear Sterns High-Grade Structured Credit Strategies Master Fund, Ltd.*, 374 B.R. 122 (Bankr. S.D.N.Y. 2007), a*ff'd* 389 B.R. 325 (S.D.N.Y. 2008), while not directly on point, is instructive in determining where a company does business. In that case, the court was asked to recognize insolvency proceedings in the Cayman Islands as either a foreign main proceeding or a foreign non-main proceeding under 11 U.S.C. § 1502(4) or (5) and § 1517(b). To do so the court had to find either that the Cayman Islands funds had their center of main interest ("COMI") or an

8

establishment in the Cayman Islands. *Id.* Although the Bankruptcy Code presumes that the registered office of a company is its COMI, that presumption may be overcome by evidence to the contrary. 11 U.S.C. § 1516(c). In *Bear Sterns,* the court found that the COMI was not the Cayman Islands but the U.S. because the administrator of the funds who performed all back office functions and the investment manager that handled the securities owned by the funds were both located in the United States. Further, the court found that the funds did not even have an establishment in the Cayman Islands because the only activity there was maintaining their registration as corporations, what the court referred to as "letterbox companies." The court refused to recognize the Cayman Islands insolvency proceedings as either a foreign main proceeding or a foreign non-main proceeding. *Bear Sterns,* 374 B.R. at 132. Nevertheless, the court suggested that an involuntary petition might be filed for the funds. *Id.* at 132 – 33.

The facts in this case are analogous. ZING VII can be characterized as a letterbox company. All that happens in the Cayman Islands are the necessities for maintaining registration. The important functions of investing, collecting, disbursing, recordkeeping and communicating with noteholders is primarily done in the U.S. As the court in *Bear Sterns* pointed out, COMI "equates with the concept of a 'principal place of business' in United States law." 374 B.R. at 129. The court finds that ZING VII does have a place of business in the United States for the purpose of section 109 through the Trustee and Collateral Manager.

*Property*

Movants argues that ZING VII has no property in the United States. The schedules list one small bank account with $500.00 in a Cayman Islands bank. The other assets are described as "Debt obligations held by the Indenture Trustee." These securities are held in a vault in New

9

York City or are registered in New York City and in Brussels.  Millions of dollars in cash are in a bank account in the United States.  These securities and cash, although pledged as collateral and held by the Trustee, are nominally the property of the Debtor and are located in the United States.  In response to the motion to dismiss or abstain the Debtor has clarified its position that the assets held by the Trustee as collateral belong to the Debtor and are located in the United States.  The Trustee, likewise, has filed a supplemental declaration disclaiming any beneficial interest in the cash or Collateral Securities.

In *Bear Sterns*, one factor relied on in determining that the Cayman Islands was not the COMI was that most assets of the funds were in the hands of the investment manager located in the United States.  The flip side of that case is presented here.  ZING VII's Collateral Securities and cash are held or registered in the U.S.  It is eligible to be a debtor under Section 109.

*Qualification of Petitioning Creditors*

Movants contend that the Anchorage Entities were not qualified to be petitioning creditors because their notes are non-recourse, they cannot be unsecured creditors.  Section 303(b)(1) permits three or more entities holding claims aggregating at least $14,425 more than the value of any collateral securing such claims to file an involuntary petition.  According to Movants, since the notes are non-recourse, the claims can never be more than the value of the collateral, i.e., the petitioning creditors are secured, but not unsecured creditors.

Only the alleged debtor may contest an involuntary petition, including challenging the qualifications of the petitioning creditors.  11 U.S.C.§ 303(d); *In re QDN, LLC*, 363 F. App'x. 873, 875-6 (3d Cir. 2010).  Here, ZING VII failed to contest the petition and the order for relief was entered by default.  Movants may not question the petitioning creditors' qualifications.

*Abstention*

Movants urge the court to abstain and dismiss this case under Section 305(a)(1) of the Bankruptcy Code because the interests of creditors and the Debtor would be better served. They concede that they have the burden of proof under section 305. Citing *In re Monitor Single Lift I, Ltd.,* 381 B.R. 455 (Bankr. S.D.N.Y. 2008), Movants list seven factors the court should consider in determining whether to abstain:

1. the economy and efficiency of administration.
2. whether another forum is available.
3. whether federal proceedings are necessary.
4. whether there is an alternate means of achieving an equitable distribution of assets.
5. whether the debtor and creditors can do an out-of-court work out.
6. whether a non-federal insolvency proceeding is far advanced.
7. the purpose for which bankruptcy jurisdiction has been sought.

*Monitor Single Lift*, 381 B.R. at 464-65.

The suggestion that there is another forum to grant relief is not realistic. A Cayman Islands proceeding would suffer the same infirmities as those in *Bear Sterns*. There are no other proceedings presently pending and there is no prospect for an out-of-court work out or a settlement among noteholders that could overcome the super majority voting requirement of the indenture.

Movants' essential contention is that the petitioning creditors are trying to use the Bankruptcy Code to avoid the limitations of the indenture, and that is an improper purpose for

seeking bankruptcy jurisdiction. To their knowledge no other CDO has been in bankruptcy because CDO's are designed to avoid bankruptcy. They assert that allowing the Collateral Securities to runoff is an alternate means of equitably distributing the assets of the Debtor. While not deciding if the plan is confirmable, the court sees no reason why the case should be dismissed before confirmation has been heard. Bankruptcy is historically a creditors' remedy allowing for the orderly liquidation of assets for the collective benefit of all creditors. THOMAS H. JACKSON, THE LOGIC AND LIMITS OF BANKRUPTCY LAW 3-4 (Beard Books 1986). That is the avowed purpose of this case even though the petitioning creditors posit that there is no value in the Collateral Securities beyond what is due to the Class A-1 Noteholders.

Movants also contend that the Plan will not reorganize ZING VII but merely transfer the Collateral Securities to Anchorage without benefitting other creditors. Again, Hildene may object to confirmation but that does not mean dismissal is appropriate. Liquidation is an appropriate purpose of a chapter 11 case. 11 U.S.C. § 1123(b)(4). *Solow v. PPI Enterprises (U.S.), Inc. (In re PPI Enterprises (U.S.), Inc.)*, 324 F.3d 197, 211 (3d Cir. 2003). The Code specifically contemplates the transfer of property of the estate to another entity. 11 U.S.C. § 1123(a)(5)(B). Also, classes of unsecured creditors and equity interests may be wiped out in a confirmed plan so long as it is fair and equitable; i.e. no junior claim or interest receives anything. 11 U.S.C. § 1129(b)(2)(B) and (C).

To abstain or dismiss under section 305 the court must find that it is in the best interest of the creditors and the debtor. Here the Debtor has no stake and takes no position on the motion. It views this matter as an inter-creditor dispute to be resolved in an appropriate forum. Movants have failed to prove that it is in the best interests of creditors to abstain. The assets of the Debtor

are not being managed. The court will determine at confirmation whether the plan treats creditors fairly and equitably without discrimination.

*Dismissal*

The court may dismiss a case for cause under Section 1112. Although not mentioned as one of the list of specific causes for dismissal, lack of good faith is recognized as grounds for dismissal. *In re SGL Carbon Corp.,* 200 F.3d 154, 159-63 (3d Cir.1999). When a party files a motion to dismiss and places good faith "at issue" by presenting a *prima facie* case of bad faith in the filing, the non-moving party bears the burden of demonstrating good faith. *Id.* at 162 n. 10. ("Once at issue, the burden falls upon the bankruptcy petitioner to establish that the petition has been filed in 'good faith.'"); *see also NMSBPCSLDHB, L.P. v. Integrated Telecom Express, Inc. (In re Integrated Telecom Express, Inc.)*, 384 F.3d 108, 118 (3d Cir. 2004). Further, dismissal is appropriate when the petition lacks a "valid reorganizational purpose." *In re SGL Carbon Corp.,* 200 F.3d at 169 (holding that the filing of a chapter 11 merely to avoid the consequences of antitrust litigation while the company was otherwise financially stable did not meet the requirement of a "valid reorganizational purpose" and consequently the petition was not filed in good faith). The court must consider the totality of the circumstances. *SGL Carbon*, 200 F.3d at 165.

Initially, Movants invite the court to consider the eligibility of the debtor under section 109 and the qualification of the petitioners as indicia of bad faith. The court declines that invitation. As determined above, the debtor is eligible and the Movants may not challenge the qualifications of the petitioners. There is no reason to consider these factors as cause for dismissal.

Movants disparage the motives of the petitioning creditors alleging an attempt to gain an

unfair advantage at the expense of other noteholders. However, if Anchorage is correct that under the best of circumstances no creditors beyond Class A-1 will ever receive a payment, no other noteholders are disadvantaged. Receiving zero under the plan is no worse than getting nothing from a runoff collection of the Collateral Securities. If the court were to find Anchorage's valuations incorrect, and that some other tranches are in the money, then Anchorage's plan cannot be confirmed. 11 U.S.C. § 1129(a)(7) and (b). Furthermore, Anchorage's plan benefits all Class A-1 Noteholders, not just Anchorage. This case is distinguishable from *SGL Carbon* because the Debtor is in financial distress. An event of default under the indenture has occurred and is expected to persist. The Class A-1 notes have been accelerated and no junior classes will receive a distribution until the A-1's have been paid. It is also distinguishable from *Integrated Telecom* where the debtor's assets were sufficient to pay all creditors in full whether or not the landlord's claim was limited under section 502(b)(6). Even Hildene would concede that some noteholders have no prospect of payment in this case.

Movants also contend that it is not a valid bankruptcy purpose to avoid the limitations on management of the Collateral Securities under the indenture. They point out that the petitioning creditors acquired their notes after default and acceleration when the requirement of the indenture that the Trustee hold the Collateral Securities intact had already become effective. Movants suggest that the sanctity of the contract should be upheld. However, sections 365(a) and 1123(b)(2) of the Bankruptcy Code specifically permit the rejection of an executory contract indicating that there are circumstances justifying overriding a burdensome contract. In addition, section 1123(b)(1) specifically provides that a plan may impair secured or unsecured claims or interests. Any knowledgeable attorney opining on the enforceability of a contract will disclaim

the effects of bankruptcy law.

Lastly, Movants contend that the indenture is a subordination agreement that must be enforced under section 510(a) of the Bankruptcy Code. Although the indenture subordinates all tranches to the Class A-1 Notes, the Movants argue that the requirement to hold the Collateral Securities intact following default absent the consent of a supermajority of all noteholders is for their benefit and cannot be disregarded. One need only note that section 1129(b)(1) permits confirmation of a plan "notwithstanding section 510(a)." *In re TCI 2 Holdings, LLC*, 428 B.R. 117, 139 – 41 (Bankr. D.N.J. 2010). Movants cite *Ion Media Networks, Inc. v. Cyrus Select Opportunities Master Fund, LTD. (In re Ion Media Networks, Inc.)*, 419 B.R.585 (Bankr. S.D.N.Y 2009) for the proposition that inter-creditor agreements barring certain bankruptcy actions will be enforced. Here, while the indenture prohibits the Trustee and junior noteholders from filing an involuntary petition against the debtor, Class A-1noteholders are not mentioned in those provisions. To the contrary, the limitations expire one year and a day after senior noteholders have been paid in full, indicating that the non-petition clauses are for the benefit of senior noteholders, not a limitation on their rights to file a petition.

The arguments by the Movants do not constitute a *prima facie* case of bad faith, but even if they did, the court finds that the petitioning creditors have shown good faith in their desire to realize the greatest present value of the Collateral Securities for the benefit of the Class A-1 creditors without negatively impacting junior creditors who have no prospect of recovery under the status quo. It remains to be seen if the plan proponents can carry their burden of proof at confirmation.

## CONCLUSION

The debtor is eligible to be in bankruptcy in the United States because it has a place of business and property here. The Movants may not challenge the involuntary petition and have not shown that it is the best interests of creditors and the debtor to abstain or dismiss the petition under section 305 of the Bankruptcy Code. The petitioning creditors have demonstrated a good faith basis for filing bankruptcy to maximize the value of the debtor's assets by actively managing them. While the court makes no finding regarding confirmation of the plan proposed by the petitioning creditors, the motion to dismiss or abstain is denied.


Dated: August 26, 2011                    **/S/Raymond T. Lyons**
                                          United States Bankruptcy Judge